# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA
### West Palm Beach Division

CASE NO.  01 08708 CIV HURLEY/Magistrate Lynch

MERRILL LYNCH, PIERCE, FENNER
& SMITH, INC.,

                Plaintiff,

        v.

STEPHEN A. COHEN,

                Defendant.

_____

## APPENDIX TO DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND OTHER INJUNCTIVE RELIEF

Glenn D. Kelley, Esq.
KELLEY & WARREN, P.A.
1555 Palm Beach Lakes Boulevard, #1006
West Palm Beach, Florida  33401
(561) 681-9494  Telephone
(561) 681-9436  Facsimile

Attorneys for Defendant



# TABLE OF CONTENTS

**TAB NO.**

1    Merrill Lynch v. Hafner, No. 01 C 427, slip op. (N.D. Ill. Jan. 24, 2001)
     (Order)

2    Merrill Lynch v. Novak, No. 01 CV 207, slip op. (Wis. Cir. Ct. Jan. 9, 2001)
     (Order)

3    H&R Block Financial Advisors, Inc. v. Carmack, NASD No. 00-05576
     (Order Dec. 22, 2000)

4    Merrill Lynch v. Gurtin, No. 99 C 406, slip op. (N.D. Ill. Jan. 27, 1999)
     (Transcript of Proceedings for TRO Motion)

5    Merrill Lynch v. Gurtin, No. 99 C 406, slip op. (N.D. Ill. Jan. 29, 1999)
     (Transcript of Proceedings for TRO Motion)

6    Merrill Lynch v. Vanderwoude, No. 1-96-CV-48, slip op. (W.D. Mich. Jan.
     25, 1996) (Order)

7    Merrill Lynch v. Paine Webber and VanderWoude, NASD No. 96-00332
     (NASD Interim Order)

8    First of Michigan v. J.J.B. Hilliard, W.L. Lyons, Inc., No. 1:97-CV-947, slip
     op. (W.D. Mich. Nov. 13, 1997) (Order)

9    Merrill Lynch v. Stockum, No. 3:96-CV-0059-D, slip op. (N.D. Tex. Jan. 11,
     1996) (Order)

10   Merrill Lynch v. Oblon, No. 99 C 5968, slip op. (N.D. Ill. Sept. 10, 1999)
     (Order)

11   Merrill Lynch v. O'Connor, No. 00 C 2065, slip op. (N.D. Ill. April 12, 2000)
     (Order)

12   Merrill Lynch v. O'Connor, No. 00 C 2065, slip op. (N.D. Ill. May 19, 2000)
     (Order of Magistrate)

13   Merrill Lynch v. O'Connor, No. 00 C 2065, slip op. (N.D. Ill. June 29, 2000)
     (Minute Order)

14   Merrill Lynch v. Pinzker, No. 98 C 7979, slip op. (N.D. Ill. Dec. 11, 1998)
     (Transcript of Proceedings for TRO Motion)

15   <u>Merrill Lynch v. Pinzker</u>, No. 98 C 7979, slip op. (N.D. Ill. Dec. 15, 1998) (Transcript of Proceedings for TRO Motion)

16   Pinzker Announcement card

17   <u>Merrill Lynch v. Bobrowicz</u>, No. 00 CH 0510, slip op. (Ill. Cir. Ct. Oct. 3, 2000) (Order); <u>Bobrowicz and Boe v. Merrill Lynch</u>, NASD No. 00-04349 (Award Oct. 4, 2000)

18   <u>Choksi v. Merrill Lynch</u>, NASD No. 97-05701 (Order Dec. 10, 1997)

19   <u>Nolen v. Merrill Lynch</u>, NASD No. 98-01012 (Order March 23, 1998)

20   <u>Martin v. Merrill Lynch</u>, NASD No. 98-02225 and <u>Merrill Lynch v. Martin</u>, NASD No. 98-02209 (Order June 24, 1999 and June 30, 1999)

21   <u>Merrill Lynch v. McDowell</u>, No. 00 CV 1483 (Wis. Cir. Ct. June 2, 2000) (Order)

22   <u>McDowell v. Merrill Lynch</u>, NASD No. 00-2300, and <u>Merrill Lynch v. McDowell</u>, NASD No. 00-2239 (June 7, 2000) (Order)

23   <u>Merrill Lynch v. Schlender</u>, No. 98-32079 (Mich. Cir. Ct. Oct. 16, 1998) (Transcript of Hearing on Motion for TRO)

24   <u>Merrill Lynch v. Zalokar</u>, No. 00-00533-CK (Mich. Cir. Ct. Jan. 28, 2000) (Order)

25   <u>Merrill Lynch v. Fowler, et al.</u>, No. CA 99-3000 JR (D. D.C. Nov. 15, 1999) (Transcript of Proceedings for TRO Motion)

26   <u>Manaia v. Merrill Lynch</u>, No. 93-CV-74226-DT (E. D. Mich. Oct. 18, 1993) (Transcript of Proceedings on TRO Motion)

27   <u>US Bankcorp Piper Jaffray Inc. v. Thomas</u>, No. 00 C 287, slip op. (D. Kan. March 22, 2000) (Memorandum Decision and Order)

28   <u>Merrill Lynch v. Twombly</u>, No. 97 C 7738, slip op. (N.D. Ill. Nov. 10, 1997) (Transcript of Proceedings on TRO Motion)

29   <u>Nigris v. Prudential Securities, Inc.</u>, NASD No. 00-00162 (Order Jan. 27, 2000)

30   NASD Manual, Code of Arbitration Procedure, Rule 10100

31   NASD Manual, Code of Arbitration Procedure, Rule 10335

32  <u>Merrill Lynch v. Baxter</u>, No. 00 C 7774 (N.D. Ill. Dec. 14, 2000) (Transcript of TRO Proceedings)

33  <u>Merrill Lynch v. Hageman</u>, No. 1:01cv0082 (N.D. Ohio Jan. 11, 2001) (Order)

34  <u>H&R Block Financial Advisors, Inc. v. Moore</u>, NASD No. 01-01893 (Order Apr. 20, 2001)

35  <u>Merrill Lynch v. Dickerson</u>, No. 6:01-CV-75 (E.D. Tex. Feb. 22, 2001) (Order)

NGEDOCS:7239N.0805:628179.1





RECYCLED PAPER

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MERRILL LYNCH, PIERCE, et al.,      ) DOCKET NO. 01 C 427
                                    )
                         Plaintiff, )
                                    )
        vs.                         )
                                    )
ETHAN D. HAFNER,                    ) Chicago, Illinois
                                    ) January 24, 2001
                         Defendant.) 9:30 o'clock a.m.


TRANSCRIPT OF PROCEEDINGS BEFORE THE HONORABLE
MILTON I. SHADUR, Judge

APPEARANCES:

For the Plaintiff:
                    MR. PETER G. HALLAM and
                    MR, DAN O'MEARA


For the Defendant:
                    MR. JERRY M. SANTANGELO



JESSE ANDREWS
Official Court Reporter - U.S. District Court
219 S. Dearborn Street
Chicago, Illinois  60604
(312) 435-6899

        *     *     *     *     *     *

2

1          THE CLERK:  01 C 427, Merrill Lynch vs. Ethan Hafner.

2          MR. HALLAM:  Good morning, your Honor.  Peter Hallam,

3  H-a-l-l-a-m, for the plaintiff.

4          MR. SANTANGELO:  Good morning, your Honor.  Jerry.

5  Santangelo on behalf of Mr. Hafner.

6          MR. HALLAM:  I have with me, Judge, Dan O'Meara, who

7  is the counsel from out of town.  We have worked together, but

8  Mr. O'Meara would be prepared to argue this.  And we would be

9  filing an appropriate motion, if that would be acceptable to

10  the Court, for him to argue this morning.

11          THE COURT:  Well, there is no problem with that.

12          Although I have, I don't know whether you have had a

13  chance to read over the extended response that came in late

14  yesterday on behalf of Mr. Hafner, including a Memorandum of

15  Law and the bulky set of exhibits that were included as an

16  appendix.  Have you had a chance to look at that.

17          MR. O'MEARA:  We have had a chance to look at this

18  brief, Judge.  We are ready to proceed.

19          THE COURT:  Yes.  I was frankly kind of astonished by

20  that until I saw that Mr. Santangelo has been around this block

21  more than once before.  And I gather that you are --

22          MR. HALLAM:  We have been.

23          THE COURT:  -- adversaries that have been accustomed

24  to coping with each other.

25          MR. HALLAM:  We have been around the same block.

1          THE COURT: Yes.

2          Let me just ask you:  Is it accurate that Merrill

3    Lynch had adopted this policy that is referred to at the

4    beginning of the Memorandum filed on behalf of Mr. Hafner, the

5    one about the difference in treatment of what might be

6    characterized as smaller clients?  Is that an accurate

7    characterization?

8          MR. O'MEARA:  Well, the small chunk that's referred

9    to is partially accurate.  There have been some changes within

10   Merrill Lynch's policies recently.  I believe the case isn't

11   that these clients are automatically being shipped off to a

12   Servicing Center as has been stated.  The brokers aren't paid

13   commissions on certain clients -- the smaller clients.

14   However, their commissions on other clients have been greatly

15   enhanced.  This is the back-up changes that Merrill Lynch has

16   suggested to the brokers for many years.

17         THE COURT:  What about a broker whose clients' mix

18   tends to be toward the lower end of the scale?

19         MR. O'MEARA:  Well, I think still that broker would

20   make out on the whole.

21         THE COURT:  Really?  Maybe, maybe not.  But I guess

22   that's something that a person is entitled to decide for

23   himself or herself as a matter of economics, right?

24         MR. HALLAM:  I very much agree.  And Mr. Hafner has

25   been richly rewarded with an up-front check from Smith Barney.

4

1  *But in point of fact, the agreement at issue which we are*
2  *seeking to enforce is a mere nonsolicitation agreement, which*
3  *is Exhibit 1 to the Complaint.  The Financial Consultant*
4  *Employment Agreement is a very narrow agreement, and*
5  *Mr. Hafner --*
6  *        THE COURT:  Well, like beauty being in the eyes of*
7  *the beholder, your characterization of that as "narrow" is, I*
8  *will tell you, something that does not commend itself to me.  I*
9  *view it as one that has substantial breadth, and under many*
10 *circumstances overbreadth, particularly when it comes to what I*
11 *gather is your notion of what constitutes "solicitation."  You*
12 *know I read these responses very carefully.  I have read what a*
13 *lot of my colleagues have done -- and I will tell you my sense*
14 *of the situation is much the same.*
15 *        When we come to the standards for preliminary*
16 *injunctive relief, especially the kind of threshold relief that*
17 *essentially accomplishes a major impact in terms of how*
18 *somebody is in a position to conduct himself or herself or not*
19 *conduct himself or herself in terms of livelihood, one of the*
20 *most critical components of the formulation is in terms of the*
21 *public interest.  Until then Judge, later Chief Judge Posner*
22 *wrote his opinion in the case that I think really became sort*
23 *of the hallmark of how to treat with preliminary injunctive*
24 *relief, Roland Machinery against Dresser Industries, I think*
25 *everybody had pretty much thought of the notion that a*

5

1 preliminary injunction or TRO should not "disserve the public
2 interest," as kind of a caboose on the train, you know, that
3 dealt with the other issues.   But the Posner opinion very
4 properly identified "public interest" as the interests of those
5 who are not before the Court, persons who are not themselves
6 directly involved in the litigation.

7          And that's particularly critical, it seems to me, in
8 the situation of the  investor who deals with a broker, maybe
9 deals with a brokerage firm.  And I think that part of your own
10 presentation, as I read it, acknowledging that you had a
11 responsibility to let people know about the fact that someone
12 who had been handling their account at your firm had changed
13 places, recognizes that the investor's interest is what
14 paramount.  People tend to have relationships.  Some people
15 have relationships with firms.  Most have relationships with
16 people.  And it's really their call as to where they want to go
17 and where they want to stay in terms of their investment
18 matters.

19          Now what that means as I see it is, and this just
20 echoes what a lot of judges have done here and elsewhere, what
21 that means is that an informational communication about where
22 the person who has been handling the account has gone or now
23 is, is something that's separate from solicitation.  Indeed, to
24 define "solicitation" broadly in a way that would not give the
25 freedom of contract as it should be given to the person who is

1  the investor would I think strongly disserve the public

2  interest, which is paramount in all of this stuff.

3          So the idea of essentially putting Mr. Hafner at

4  peril of the notion that he may end up with contempt of court,

5  or chilling the opportunity simply to inform people, which is

6  what he says is what he has been doing and what Smith Barney

7  has been doing, is something that doesn't commend itself.

8          And that by the way is over and above the idea, you

9  know the most ancient of all equitable principles: "He who

10  seeks equity must do equity." If you have a situation in which

11  there has been a meaningful change in the dynamics, in the

12  economics of the presentation of the brokerage business in a

13  way that may impact adversely in the perception of an

14  individual broker, then it seems to me that in a way the rules

15  of the game have changed. And something that might be a

16  perfectly appropriate constraint if what somebody was dealing

17  with were clients that had come to that person through the firm

18  primarily, and he was therefore going to be poauching on the

19  firm's preserves, I think you have a very different situation

20  where, as is represented here, the bulk -- virtually all -- of

21  the people that Mr. Hafner deals with I think he uses the term

22  90 percent, but in any event the bulk of them) are people that

23  basically, although I hesitate to use the term "proprietary"

24  you know on either side of this, they are basically his

25  customers, his clients. And so the idea of imposing the kind

1 *of the constraint that's referred to here is one that, I like a*

2 *lot of my colleagues, find troublesome.*

3 *I am also bothered frankly by the fact that the*

4 *proposed form of injunction that you tendered goes beyond the*

5 *form of the promises that were contained in the contract.   I*

6 *mean you know there is no warrant at all for that.  You know*

7 *the most that you would be entitled to under any circumstances,*

8 *as I see it, would be something that tracked the constraints in*

9 *the contract.  And I sat down and I looked at the two things*

10 *together.  And frankly there is just no justification for it.*

11 *I am not surprised that a couple of my colleagues had*

12 *been even tougher on Merrill Lynch than I have suggested in my*

13 *remarks up to this point this morning.  It frankly sounds to me*

14 *as though there has been -- there is a good basis for saying*

15 *that there is -- an unfortunate overreaching here.*

16 *But I don't have to deal with that in order to*

17 *address -- ultimately in order to address -- the question*

18 *whether a TRO ought to be granted, when the parties are going*

19 *to have their responsibility to go to arbitration.  Counsel has*

20 *pointed out on Mr. Hafner's behalf that this is not a*

21 *situation -- in an important way, it may not even be a*

22 *situation of inadequacy of remedy at law because one thing we*

23 *know about the brokerage situation is that the money aspect of*

24 *it is defined.  It's on a per-customer basis.  The numbers of*

25 *dollars involved re ascertainable.  If Hafner breaches his*

8

1  obligations and has been found to breach his obligations, the

2  harm to Merrill Lynch is really measurable in terms of the lost

3  commissions from those same customers.  And if they are then

4  entitled at the end of the road to permanent injunctive relief

5  in any respect, that's one of the things that I suppose the

6  arbitrators are going to address.

7         So the idea of enlisting the Court's aid in this

8  situation in which the parties -- both sides -- have committed

9  themselves to arbitration -- you have got to do that anyway.

10 And essentially what you are asking is what you would

11 characterize as a maintenance of the status quo while the

12 arbitration is going on, when in fact it sounds to me as though

13 it really alters the status quo materially.

14         Now I have given you plenty of opportunity to argue,

15 right?  No, seriously.  I wanted you to understand the

16 perspective that seems to me to jump out of what are very

17 thoughtful submissions on both sides.  And I just do not find

18 persuasive the notion that you are entitled to the kind of

19 relief that you are seeking in preliminary terms.

20         So now you tell me why that's wrong.

21         MR. O'MEARA:  Thank you for the opportunity for

22 speaking.  I would like to address a number of the issues that

23 you have raised.  First, that the proposed order goes beyond

24 the terms of the Financial Consultant Employment Agreement is

25 news to me.  And I will take full accountability for the order.

9

1    It tracks the remedies precisely.  And I would be glad to --

2            THE COURT:  It may track the nature of the remedies

3    precisely, but if you look at the particulars -- and of course

4    the devil is in the details -- if you look at the particulars

5    you will find that it does depart in what I think is a

6    meaningful way from the language.  But that's a matter of

7    vocabulary.

8            MR. O'MEARA:  And I know better than to disagree with

9    a federal judge, but I would stake my case on paragraph 4

10   (a)(b) and (c), which is the consent to the preliminary

11   injunction that we track.  But I will move on from there:

12           As to as the issue of he's "merely announcing," I

13   gave Mr. -- it is true that Merrill Lynch has announced to any

14   clients who inquire as to where he is and how he can be

15   reached.  I am sorry I didn't know this would be an issue.

16   There is an internal memorandum which was referenced in

17   affidavit where Merrill Lynch's director of the office states

18   in no uncertain terms, if asked where he is, "He's at Smith

19   Barney."  If they ask for his phone number, give him the phone

20   number, in essence we are announcing.

21           But I also want to point out that Mr. Santangelo

22   neglects to state in his papers that what Mr. Hafner and Smith

23   Barney are doing, they initially sent out a mass announcement

24   to the clients --

25           THE COURT:  That's the Smith Barney thing that he

10

1 attached as an exhibit of his own?

2         MR. HALLAM:  I didn't have a chance to review it.
3 But it is a tombstone announcement or --

4         THE COURT:  Well, it's actually very -- take a look
5 at I think it's maybe the last page of the Memorandum of, Law
6 of Exhibit A.

7         MR. SANTANGELO:  Exhibit A.

8         MR. O'MEARA:  Okay.  It's known as a "tombstone
9 announcement."  He is then notwithstanding -- and by the way,
10 the memorandum I handed you is a standard Merrill Lynch affair.
11 He received it as an employee when other financial consultants
12 left.  So he knows the standard is that clients will be told
13 where he is.

14         He then sends out this tombstone announcement.  He
15 then follows up to the clients with "announcement calls", in
16 which according to his counsel he says "I am with Smith Barney,
17 bye," hangs up.  That's the case he relies on.  I respectfully
18 submit that the realities are a little different from this.
19 When he has already announced in writing, and there is no
20 question about the ability of the clients to read and
21 understand this announcement, any follow-up phone call acts as
22 a solicitation.  And don't take my word for it.  Take the word
23 of the Illinois courts in defining the term "solicitation."

24         Now subsequent to receiving the papers, we prepared a
25 supplemental memorandum on the issue of announcements verus

1    solicitation.

2            THE COURT:  Do you want to hand that up?

3            MR. O'MEARA:  We have a number of cases, but the

4    prominent one is Tomei vs. Tomei.

5            THE COURT:  Yes, I know Tomei.

6            MR. O'MEARA:  In which the Illinois Appellate Court

7    says, and frankly there misappropriation of trade secrets

8    wasn't an issue because the defendant had bought a list

9    legitimately from a third party.  It just so happens that among

10   the people on that list to whom he sent the communication were

11   some individuals he was prohibited from soliciting.  What the

12   Illinois court said was you look to three things to determine

13   whether solicitation has occurred:  The method employed; the

14   intent of the solicitor; and whether the solicitation was

15   targeted to a specific client in need of his services.  That's

16   at 26 Illinois Appellate, which I have given you at --

17           THE COURT:  I will tell, you I think if it's read

18   that way that's an overbroad constraint here.  It really goes

19   beyond what is reasonably necessary for Merrill Lynch in the

20   climate in which we deal.  In this industry the whole notion

21   that is involved here ought to be freedom of choice on the part

22   of the customers, on the part of the clients.  And informing

23   them -- if there is someone with whom the broker has a

24   relationship, and if hearing the broker's voice is somehow an

25   inducement to the client to stay with the broker, something

1  that the client would have done in any event upon being given

2  the choice, that I must tell you to characterize that as malum

3  in se or malum prohibitum as something that constitutes an

4  invalid solicitation, is something that given the balance that

5  is required here, the balancing of harms, I would not be

6  persuaded by in those terms.

7        I recognize that it is possible to define

8  "solicitation" -- one of the problems of course with

9  contractual matters of this nature is imprecision, you know,

10  ambiguity.  If there is an ambiguity about what "solicitation"

11  is, guess what?  Contra proferentem.  Who drafted that one?

12  Okay.  And so it seems to me that what we are talking about

13  here is essentially overkill.

14        But again the harm, if there is harm from a violation

15  is something that is going to measurable.  It's going to be

16  readily recoverable by Merrill Lynch.  This is not the kind of

17  situation that I talked about years ago in Instrumentalist

18  against the Marine Corps League, that our Court of Appeals

19  picked up in that Hyatt Hotels against Hyatt, that talked about

20  the idea that you don't know who would have come knocking on

21  the door had it not been for the infringement.  You know that's

22  anot involved here.

23        Here is a situation in which the people that we are

24  talking about are a defined universe.  To the extent that he

25  has been guilty of violations, Merrill Lynch is going to have

13

1   an available remedy to it.  And the arbitrators that the

2   parties have agreed are the ones to decide the ultimate dispute

3   between the parties are in a classic position:  They know a lot

4   more about the industry than the Court (as omniscient of as all

5   of us are, of course).  But it is really true they know the

6   industry.  They know the practicalities of it.  They can

7   resolve the issue.  And what you are really asking for is

8   something up front that can readily be dealt in that fashion.

9   And again the call on where to go, as far as I am concerned, is

10  really for the clients to make.

11          And I know I m repeating a lot of stuff that is

12  reflected in the rulings of a number of my colleagues.  And I

13  recognize there is room for some difference of view on this.  I

14  happen to find what Judge Gettleman had done, Judge Holderman,

15  Judge Bucklo, very convincing as I have read through all of the

16  stuff.  And I made it my business when I got the thing this

17  morning -- that is, the response -- and I read through the bulk

18  of what was presented here.  I just don't find your position

19  persuasive.

20          MR. O'MEARA:  Okay.  And I understand that.  If I can

21  just clear the air on one issue.  The defendant has said that

22  he cares about the customers, and Merrill Lynch obviously is

23  indifferent.  The fact of the matter is --

24          THE COURT:  No, no.  Everybody cares about

25  customers.  That's what makes for a free market, right?

14

1          MR. O'MEARA:  Okay.  But at the very least I want to
2  point out that the defendant left last Friday without a notice,
3  threw the letter of resignation on the desk and walked out.  If
4  that happened in the law firm context and a defendant lawyer
5  came in the next week saying, "Sure, I called the customers all
6  weekend to announce where I was, but I am really just concerned
7  with the customers," I don't know about any laws, but I know in
8  law firms we treat ourselves as professionals, we expect to be
9  treated as professionals, and we give notice.  I have changed
10 jobs.  I always gave notice.  It would have been better for me
11 to leave without notice.  I might have done better with
12 clients, but I didn't because I cared about the clients.  And I
13 am taken aback by the indication reflected in the papers with
14 the defendant being concerned with the clients after he gives
15 notice.
16         THE COURT:  Well, you know usually the
17 employment-at-will shoe is on the other foot, you know.  I
18 think it was maybe 1954 that somebody who ultimately became one
19 of my best clients came to me in a situation in which he was
20 with an advertising agency and had a set of constraints
21 comparable to this, but compounded by the fact that the
22 contract distinguished between firm clients and the individual
23 clients.  And it had a hooker in which the employer was able to
24 reclassify the customers and the employee had to give a 30 day
25 notice in order to leave.

15

1          MR. O'MEARA:  I hope you won't hold that client

2  against Merrill Lynch.

3          THE COURT:  No I won't.  It led to some creative

4  lawyering, but that's another issue.  Anyway, look.  I have

5  looked at this stuff very carefully really.  I will tell you

6  very frankly, when I read your submission before I had gotten

7  theirs I found some aspects of it to be convincing, while I

8  found some other aspects troublesome just on their own.

9          But it seems to me in light of what I have seen by

10  way of response, you just don't qualify for the high standard

11  that has to be met in order to grant the extraordinary remedy

12  of preliminary injunctive relief, most particularly in a

13  situation in which something that is just is unusual in

14  litigation.  And that is, usually the preliminary injunctive

15  relief is sought in order to keep things in a the posture so

16  that the court could then deal with the substantive aspects.

17  Here, because of the nature of the industry, you have got an

18  established arbitration procedure -- and the contract says quit

19  properly, you know, that preliminary injunctive relief you are

20  entitled to come into court essentially in aid of the

21  arbitration.  That's what it amounts to:  to hold things in

22  place while the arbitration goes on.  It seems to me, given all

23  of the circumstances that are set out here, that no real

24  necessity for that is shown, and that the balance goes on the

25  other side of the scales here.

16

1        MR. O'MEARA:  Well, your Honor, I will waive my

2 discussion of the irreparable harm.  Obviously you know how I

3 fell and how the Seventh Circuit felt in Salvone, which is an

4 identical case.  But I guess the key issue --

5        THE COURT:  Well, no.  I read that.  And in way there

6 are some material aspects of that really cut against you.

7 Although I know the relief that was involved, but notice that

8 they basically disapproved of the scope of relief that had been

9 granted at the District Court level.

10        No, I read that case.  You know that's obviously the

11 first one that I went to.  When I get word that there are a lot

12 of District Judges scurrying around dealing with this thing and

13 our Court of Appeals has had occasion to speak to the issue,

14 guess where I go?  Okay.  Because the Court of Appeals

15 regularly teaches us we don't make precedents.  And I read that

16 case, and it does not seem to me that it supports your ultimate

17 position.

18        MR. O'MEARA:  Well, I will drop those comments.

19 Again I disagree, but I guess the question before us is whether

20 we schedule expedited discovery and preliminary injunction

21 proceedings, or as I believe Mr. Santangelo has requested,

22 refer the case over immediately over to the NASD for handling

23 by --

24        THE COURT:  Has either side launched NASD

25 proceedings?

1      MR. O'MEARA:  Yes.  We filed our so-called statement
2  of claim, I believe it was yesterday, with the NASD.  And the
3  cases like this can be given expedited handling.  If the Court
4  would prefer we can refer the matter over to the NASD
5  immediately with all rights of parties to make motions there
6  for preliminary injunctive relief or otherwise.

7      THE COURT:  Wait.  I don't have to refer it.  You
8  have launched an independent proceeding, which you are entitled
9  to pursue.  Actually it was sort of the other way around:  You
10 asked for the relief here in aid of that.  And indeed one of
11 the things that I frankly got a little concerned about in that
12 regard was not just the injunctive count, but the other counts
13 of the Complaint.  Because it seems to me that if you people
14 have opted as you have to for the arbitration remedy, that the
15 other counts -- you know, seeking other relief -- really belong
16 in the first instance before the arbitrators, right?

17     MR. SANTANGELO:  Yes.

18     MR. O'MEARA:  Well, exactly.  We are not seeking
19 damages in the Court, if that is an answer to the question.  I
20 just want to clarify that your Honor's ruling today is without
21 prejudice to the right of Merrill Lynch to move at the NASD for
22 interim injunctive relief, et cetera.

23     MR. SANTANGELO:  Your Honor, what he's asking for,
24 without being direct about it, is he wants to get a second bite
25 for a TRO in arbitration.  He wants to say that the Court's

18

1  *ruling isn't a ruling addressing the merits of the claim for*
2  *the TRO, but rather because of the arbitration, and that's not*
3  *what I have heard from the Court.*
4          *THE COURT:  That is not correct.  And both sides are*
5  *free to draw on Jesse's resources to make plain to the NASD the*
6  *basis for my ruling, which is that I find that you have failed*
7  *to satisfy the requirements for preliminary injunctive*
8  *relief -- either a TRO or preliminary injunction -- and that*
9  *you have failed in that respect on several components of the*
10 *five that are pointed out by Roland Machinery against Dresser*
11 *Industries as the preconditions for preliminary injunctive*
12 *relief.*
13          *That is, I find you have failed to demonstrate the*
14 *inadequacy of a remedy at law.  I find that you have failed to*
15 *demonstrate the irreparability of harm under the circumstances.*
16 *When it comes to the balancing of harms, the so-called sliding*
17 *scale, I find that tilts heavily in favor of the defendant.  It*
18 *is true that you would satisfy the standard of likelihood of*
19 *success on the merits, but only because Roland Machinery has*
20 *said that only need be "more than negligible" or some such*
21 *term, which is a very low threshold, which by definition gets*
22 *tempered by the need for balancing.  And as you know, the lower*
23 *the plaintiff is on that scale the more the plaintiff has to*
24 *show that the balance of harms favors it.  And in this case you*
25 *are very low indeed on that scale, and the balancing of harms*

1  goes heavily in the other direction.  And then finally I have

2  already told you why my view is that the public interest calls

3  for the denial of the injunction relief.  So if you look at the

4  standards -- the substantive standards -- that apply for

5  preliminary injunctive relief, even failure on one precludes a

6  plaintiff from being successful.  And you are on the wrong side

7  of the hill, think, on all butone.  And that one is simply

8  because of the modest requirement that's defined by the case

9  law.

10            MR. SANTANGELO:  Thank you, your Honor.

11            THE COURT:  Thank you.

12            MR. O'MEARA:  Thank you

13        (WHICH WERE ALL OF THE PROCEEDINGS HAD AT THE HEARING OF
          THE ABOVE-ENTITLED CAUSE ON THE DAY AND DATE AFORESAID.)

14                          C E R T I F I C A T E

15  I HEREBY CERTIFY that the foregoing is a true and correct

16  transcript from the report of proceedings in the above-entitled
    cause.

17  _____

18  JESSE ANDREWS, CSR
    OFFICIAL COURT REPORTER

19  UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF ILLINOIS

20  EASTERN DIVISION
    DATED: January 24, 2000

21

22

23

24

25



RECYCLED PAPER



1   STATE OF WISCONSIN  :  CIRCUIT COURT :  MILWAUKEE COUNTY
                            BRANCH 25
2   ───────────────────────────────────────────────────

3   MERRILL LYNCH, PIERCE, FENNER,
    & SMITH, INC.,
4
                    Plaintiff,
5
        -VS-                      Case No. 01-CV-207
6
    JEFFREY A. NOVAK, et al.,
7
                    Defendants.
8   ───────────────────────────────────────────────────

9   Proceedings were held on January 9, 2001

10
                    **TRO HEARING**
11              **(EXCERPT) - COURT'S RULING**

12  JUDGE:  JOHN FRANKE
    CIRCUIT COURT JUDGE
13

14                     **APPEARANCES**

15          **DAVID MCCOMB**, Attorney-at-Law, appeared on

16  behalf of the Plaintiff.

17          **MATT MCLEAN**, Attorney-at-Law, appeared on

18  behalf of the Plaintiff.

19          **JERRY SANTANGELO**, Attorney-at-Law, appeared on

20  behalf of the Defendants.

21          **MICHAEL ASH**, Attorney-at-Law, appeared on

22  behalf of the Defendants.

23

24                  **STEPHANIE L. JACKSON**

25                  **OFFICIAL COURT REPORTER**

1                     P R O C E E D I N G S

2                     (Whereupon, the following

3         proceedings began at 3:50 o'clock in the

4         afternoon.)

5                     (Whereupon, the following excerpt

6         was requested by Attorney Jerry Santangelo.)

7                     THE COURT:  In my tenure in the

8         civil division, I have found the decision about

9         whether to enforce a restrictive covenant in an

10        the employment contract to rank way up there

11        with the most difficult decisions.  It is not

12        that they're terribly difficult from a legal

13        standpoint or terribly difficult from a factual

14        standpoint.  I suppose it is just that they're

15        difficult from a public policy perspective.  On

16        the one hand, failure to enforce the agreement

17        means that people are allowed to ignore or even

18        encouraged to ignore contracts that they have

19        freely arrived at, apparently something

20        reasonable consenting adults have arrived at.

21        On the other hand, the strict enforcement of

22        these provisions raise several problems that

23        suggest to us that the strict enforcement of

24        such covenants is not wise public policy.  The

25        courts are left with a very difficult balancing

2

1    test, and as a general rule, the law, at least

2    in Wisconsin, appears to strongly encourage us

3    to lean against rather than in favor of

4    enforcement of these provisions.

5                    Now, these very general issues

6    are before me have today only in a very narrow

7    context, and that is the context of a request

8    for a temporary restraining order, the most

9    temporary type of injunctive relief.  And not

10   only does the law encourage me to lean against

11   the enforcement of these provision and to be

12   suspicious about such restrictive covenants,

13   the law also encourages me not to enter

14   injunctive relief of any sort lightly.

15                   As is often the case with a

16   temporary restraining order other than my

17   common knowledge I have very little

18   information, almost no information, beyond that

19   about the nature of the industry at issue,

20   which is something that is important in

21   deciding what's reasonable in terms of

22   restrictive covenants.  I certainly have very

23   little in terms of the particulars of this

24   case.  What is the real nature of these clients

25   who are at issue?  What is the nature of the

3

1   documents that were allegedly taken, and, at

2   least as I is sit here today, I have no doubt

3   were taken.  But what were they?  What do they

4   look like?  What information do they contain?

5   Without objection, both sides

6   have made factual representations to the Court

7   that go well beyond any formal record that I

8   have.  On the record that I do have, I am going

9   to deny any temporary restraining order request

10  at this point for two reasons.  While the two

11  reasons are basically the same, I'm going to

12  distinguish my decision on what I would call

13  the "solicitation aspects" of the requested

14  restraining order and the "trade secret and

15  document aspects" of the request.  But the two

16  reasons I'm denying this apply to both.  First,

17  I'm finding plaintiff has failed to demonstrate

18  irreparable harm, and failure -- there has been

19  a failure to demonstrate a fair likelihood of

20  success on the merits.

21  As to the solicitation aspects

22  of the requested restraining order, I want to

23  emphasize that I am only dealing with the

24  irreparable -- the alleged harm that will occur

25  over a very short time frame, that is either

4

1    between now and the time that there can be a

2    full hearing on temporary injunctive relief or

3    perhaps in this case more correctly the time

4    between now and when the arbitration that

5    appears to be contractually, if not legally

6    required, will kick in.  And from what I've

7    heard today seems clearly the place where the

8    most orderly forum can be provided to determine

9    what, if any, parts of the agreement are likely

10    to be enforceable and what, if any, injunctive

11    relief ought to govern during the time period

12    when the enforceability of the contract is

13    fully and formally resolved.

14            I recognize the difficulties

15    that the plaintiff must face at this point in

16    terms of establishing just what has happened,

17    just how many people have been solicited, and

18    what kinds of clients they might be, as well as

19    difficulty in establishing what was taken in

20    terms of any documentation or information in

21    written form from Merrill Lynch.  And I've

22    considered that difficulty carefully in trying

23    to decide what is appropriate here, but

24    ultimately have decided that there has not been

25    a showing at this point of irreparable harm.

1    For the most part, any losses that are

2    ultimately established in terms of lost

3    commissions or lost businesses can be easily

4    quantified, at least in the short run.  To the

5    extent that there are arguable losses here

6    beyond commissions or other things which can be

7    easily  quantifiable, it is not clear that

8    those things really exist at this point.  It is

9    not clear if they're going to exist over the

10   next several months; whether they will exist in

11   the short run, and it is not clear that those

12   kinds of damages are going to present any

13   issues of valuation that are beyond the kind of

14   things that we do have to struggle with from

15   time to time in civil proceedings.

16            Secondly, I'm finding that

17   there has been a failurehood -- a failure to

18   establish a likelihood of success on the

19   merits.  My first reaction when I discovered a

20   couple of years ago that there was this thing

21   called the "restrictive covenant" and that the

22   law didn't particularly like it, was to be

23   somewhat surprised to know that people could

24   have a contract and we'd tear it up and say

25   "tough."  As I've had to deal with this over

6

1     and over again, I haven't lost that

2     frustration, but I have come to recognize the

3     extent to which there are valid public policies

4     that do often weigh against enforcement.

5                 At least as I sit here now, I

6     continue to have the view that was intimated in

7     questions I asked of Mr. Santangelo, and that

8     is that in Wisconsin, I'm not aware of any

9     authority on which to ignore this contract

10    other than Section 103.465. But the authority

11    that comes from that statute appears to be

12    quite broad. I can't recall if either side

13    cited it, but the two cases that seemed to come

14    up most often are relatively old, and one is

15    the Chuck Wagon Catering case that I've had to

16    look at, not recently, but certainly many

17    times. It is 88 Wis. 2d 740, and I believe it

18    simply recites the five requirements that were

19    set forth back in 1959, Lakeside Oil Company

20    vs. Slutsky. This is on page 751 of the Chuck

21    Wagon case indicating the five basic

22    requirements necessary to enforcement of a

23    restrictive covenant, also relying on a

24    Marquette Review Article. But the Court says

25    they are: "(1) The agreement must be necessary

1          for the protection of the employer or
2          principal; (2) it must provide a reasonable
3          time period; (3) it must cover a reasonable
4          territory; (4) it must not be unreasonable as
5          to the employee; and (5) it must not be
6          unreasonable as to the general public."
7                    If we could take the entire
8          set of customers which these two defendants are
9          actually going to solicit or end up getting
10         business from in some way or another in
11         violation of the plain language of the
12         contract, we would probably find some clients
13         that might arguably be mostly Merrill Lynch
14         clients.  Obviously to one extent or another or
15         all of this is on Merrill Lynch's time, and it
16         is their paper clips and phone and paper that
17         get used to service these people.  But in the
18         sense of the reasonableness of the restriction
19         here, we might as well find that there is a
20         group that could reasonably be called "Merrill
21         Lynch clients" and some groups that might
22         reasonably be the personal acquisitions and
23         interests of the particular brokers, and then
24         there may well be a group that have significant
25         elements of both.  If in fact that's the way

1    this case ultimately goes, it may turn out that

2    the brokers don't solicit and don't end up

3    servicing anyone who falls in that Merrill

4    Lynch category.

5              To the extent that there is

6    some group of clients which is clearly loyal to

7    their broker and connected to their broker, not

8    the Merrill Lynch name, not its good will, not

9    its office or fax machines, but the brokers

10   themselves, then I think it is likely that this

11   restrictive covenant will not survive on the

12   fifth element because it would not be

13   reasonable to the public, for reasons that

14   Mr. Santangelo has referenced on a number of

15   occasions.

16             The third requirement has to

17   do with a reasonable territory.  And if my

18   recollection is correct, the courts have

19   subsequently interpreted that requirement to

20   apply to the breadth of the agreement.  The

21   territory comes from the old sales route issues

22   that used to arise and maybe still do arise,

23   but it is now looked at in terms of the

24   breadth.  For the same reasons at least on

25   this record, there is a good chance that it is

9

1   going to invade the area of clients who are in

2   fact recruited by, developed by, serviced by,

3   and loyal to the brokers directly.  It is

4   unnecessarily broad and goes beyond the

5   legitimate interests that the employer has in

6   protecting itself.

7                    To address briefly the

8   separate issue of the request for an injunction

9   restricting the use of requiring a return of

10  the records that may have been taken, I looked

11  at this separately because it was clearly my

12  inclination to treat them differently and my

13  inclination to find some way to try to find

14  some relief for the plaintiff to the extent

15  that material was taken by any reasonable

16  measure that should not have been taken.  That

17  was based in part on my view that to these

18  extents the contract was not covered by Section

19  103.465 and that there may be no basis not to

20  enforce it.  It really wasn't clear to me why

21  we should look at this differently than we

22  would look at the theft of pencils and paper

23  and furniture, things -- when somebody leaves

24  an office.  I thought you weren't supposed to

25  take.

1           I read during the recess a
2    case cited in the defense brief that appeared
3    to reference this issue of an overlap between
4    documents and these restrictive covenants.  It
5    is <u>Gary Van Zeeland Talent, Inc. vs. Sandas</u>.
6    That's 84 Wis. 2d 202, and by golly, it is not
7    like taking pencils, paper and furniture.  It
8    is all about unfair restraint of trade.  And at
9    least from what I can glean from that case, the
10   statute does apply, apparently in some
11   backhanded way.  That case is all about the
12   taking of a customer list  There was a
13   provision about it in the contract which the
14   Court found to be an unreasonable restraint of
15   trade.
16           I still would have liked to
17   have carved out some relief here that addresses
18   whatever might have been taken that should not
19   have been taken, but I have to pause in that
20   regard because of what is written on page 218
21   of that decision, "The unreasonable strictures
22   upon the right of disclosure vitiate the entire
23   agreement in accordance with the legislative
24   policy of Section 103.465, Stats. which
25   provides in part," and that's the end of the

11

1    quote.  The language cited is slightly

2    different than the last sentence of 103.465 and

3    I certainly haven't researched the history of

4    this statute, but it appears it was in quite a

5    similar form in 1977.

6          At this stage I have very

7    little to go on in terms of entering any order

8    that would identify with any reasonable

9    clarity, what might go beyond a simple list of

10   names and addresses, and I'm not going to

11   attempt to fashion such relief.  At least that

12   language from Sandas raises a question as to

13   the likelihood of success on the merits, if in-

14   fact any part of the agreement goes beyond

15   what's necessarily the entire agreement.

16          I also find that, for the same

17   reasons that I attempted to state with respect

18   to the solicitation issues, there is not a

19   basis on which to find irreparable harm at this

20   point.  To the extent that the real harm is the

21   loss of customers, the issues are the same as I

22   addressed on solicitation.  I think they can be

23   quantified and dealt with.  To the extent that

24   the issues deal with use of these documents, I

25   think the later injunctive relief can repair

1    that harm.  In any event, there's an

2    insufficient record on which to identify what

3    it is that must not be used or must be

4    returned.

5             For those reasons, the motion

6    for a temporary restraining order is denied.  I

7    don't know if you wish to have a date set for

8    an injunctive hearing at this point or first

9    evaluate where the arbitration process is

10   going.  Apparently something is happening

11   Thursday that may or may not affect how both

12   sides perceive this, but it may be days or

13   weeks before you get to that point.

14            The case is assigned to Judge

15   Flanagan.  I've heard this case for her, and

16   she has instructed me to attempt to give you a

17   date for a hearing.  Do you want to set one now

18   or -- we can discuss this off the record unless

19   there's some reason to do it on the record.

20   Anything else that needs to be put on the

21   record?

22            (Whereupon, the requested excerpt

23   ended.)

24

25

<u>**REPORTER'S CERTIFICATE**</u>

STATE OF WISCONSIN)

)SS

MILWAUKEE COUNTY  )

I, STEPHANIE L. JACKSON, Official Court Reporter, do
hereby certify that as a Certified Professional Reporter
for Milwaukee County, I took in Stenograph the
proceedings had before the Court in the aforementioned
matter on January 9, 2000, and that the attached
transcript is a true and correct copy of said shorthand
notes.

Dated this 10th day of January, 2001, at
Milwaukee, Wisconsin.

Stephanie L. Jackson, CPR

14



RECYCLED PAPER

NASD REGULATION, INC

H&R BLOCK FINANCIAL ADVISORS, INC

    Claimant                               NASD Case No. 00-05576

PETER R. CARMACK and
SOLOMAN SMITH BARNEY INC

    Respondents

## ORDER

On December 21, 2000, pursuant to Rule 10335(d)(1) of the NASAD Code of Arbitration

Procedure, a telephonic hearing was conducted in this case by Hon. Donald B. Clark for the

purpose of ruling on the application of H&R Block Financial Advisors for immediate injunctive

order. On said date, the arbitrator heard and considered the arguments of counsel for claimant and

respondents and has thereafter reviewed and considered the factual presentations and the

memoranda of points and authorities submitted by the parties and, being fully advised, finds as

follows:

## FINDINGS OF FACT

(1) Respondent Carmack entered into the employment of claimant June 14, 1993 and on or about

said date signed a "Stockbroker Trainee Agreement" containing, among other provisions,

covenants relating to the confidentiality of claimant's business/customer records and imposing

restrictions on Carmack's entitlement to engage in business activities in competition with

claimant

(2) On December 8, 2000, respondent Carmack terminated his employment with claimant and

then, or soon thereafter, entered upon employment with respondent Smith Barney as a stock

broker

(3) After respondent Carmack entered the employment of respondent Smith Barney, he or both respondents conjunctively provided notice by mail and/or by telephone to individual investors whose accounts had been serviced by respondent Carmack during his employment by claimant advising such persons of Carmack's affiliation with Smith Barney and informing them of his address and telephone number  No credible evidence has been presented by claimant showing that either respondent made any solicitation to induce such persons to transfer their accounts from claimant to Smith Barney, the only communications having been limited to the announcement of the location of Carmack's change in office location.

(4) Subsequent to December 8, 2000, various investors previously served by Carmack have transferred their accounts from claimant to respondent Smith Barney.

(5) Claimant has presented no evidence of any customer account records or other tangible materials or documents removed by respondent Carmack from the offices of claimant at the time respondent Carmack terminated his employment with claimant. Respondent Carmack does have possession of certain of claimant's records, not a subject of dispute in this proceeding, which were given to him for storage by claimant's office manager at an earlier date.

(6) Respondent Carmack is a resident of Missouri. The office of claimant where Carmack worked while employed by claimant is in Kansas. Claimant is a Michigan corporation and maintains its principal office in that state. No evidence was offered indicating where the agreement concerning Carmack's employment was concluded and the agreement itself is silent as to any understanding

as to what state law is to govern interpretation of the contract

## CONCLUSIONS OF LAW

(A) To prevail on its application for an immediate injunction, claimant must make a clear and convincing showing that, upon a full hearing, it is more likely than not to succeed on the merits of its claim, that it will suffer irreparable injury unless the injunction be granted and that the balance of equities lies in its favor  These conditions are in the conjunctive and unless claimant carries its burden on all three points, relief must be denied.

(B) In the majority of jurisdictions, the rule concerning restrictive employment agreements holds that a departing employee does not violate that agreement or breach any fiduciary duty by sending an informational announcement to customers advising of a change in employment and a notice of where he may be reached. Absent more, such an announcement is not a solicitation within the proscription of the employment agreement. In this case, it is assumed, lacking other evidence to the contrary, that the law of Kansas where respondent Carmack worked, governs the rights of claimant to enforcement of Carmack's contract. Kansas law on the subject of informational notice to customers of change in employment location is in accord with the majority view stated above.

(C) Claimant's request for injunctive relief regarding solicitation of brokerage business from respondent Carmack's customers must be denied because there has been no showing that respondents have breached those terms of the employment agreement. Despite language in the agreement to the contrary, the informational notices respondents did issue are permitted by law in the public interest.

(D) The failure by claimant to demonstrate that account transfers by customers from claimant to respondents were the product of solicitations by respondent Carmack in violation of his employment contract and beyond the informational notices permitted precludes the issuance of an injunctive order with respect to Carmack's acceptance of brokerage business from former clients of claimant  The contract for Carmack's employment does not bind public customers as to their choice of broker-dealers or account representatives.  That claim for injunctive relief must also be denied.

(E) Finally, claimant has conceded that injunctive relief is not sought as to those customers, some twelve or more in number, whose accounts have already been transferred to Smith Barney nor does it claim any recovery as to accounts of respondent Carmack's family members which, based on dollar value, constituted a significant portion of Carmack's customer base..  Whether additional accounts will be moved is a matter of speculation but the result will soon be apparent  The standard of irreparable injury as a precondition to the issuance of an injunctive order requires that the party demonstrate that it can not be made whole by an award of damages.  It is apparent here that claimant will, of necessity, have recourse to a claim in damages for a significant portion of its recovery against respondents should claimant prevail in a hearing on the merits.  Under these circumstances, it is appropriate to conclude that claimant has made no sufficient showing of irreparable injury essential to issuance of injunctive relief.

IT IS THEREFORE ORDERED, for the reasons stated that claimant's Application For Immediate Injunctive Order be and the same is hereby denied.

**IT IS FURTHER ORDERED** that this matter shall proceed to an expedited hearing before a full arbitration panel

*Donald B. Clark*

Donald B Clark, Arbitrator

Dated December 22, 2000



RECYCLED PAPER



```
 1                   IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3   MERRILL LYNCH, PIERCE, FENNER &     )
     SMITH, INC.,                        )
 4                    Plaintiff,         )
                                         )   No. 99 C 406
 5             v.                        )   Chicago, Illinois
                                         )   January 27, 1999
 6   WILLIAM R. GURTIN, STEVEN J.        )   2:30 p.m.
     HEFTER, and BENJAMIN M. LESHEM,     )
 7                                       )
                      Defendants.        )
 8
                     TRANSCRIPT OF PROCEEDINGS - MOTION
 9
                 BEFORE THE HONORABLE ROBERT W. GETTLEMAN
10
     APPEARANCES:
11
     For the Plaintiff:           RUBIN & ASSOCIATES, P.C.
12                                10 South Leopard Road
                                  Paoli, Pennsylvania 19301
13                                BY:  MR. MICHAEL J. FORTUNATO

14                                      AND

15                                LORD, BISSELL & BROOK
                                  115 South LaSalle Street
16                                Chicago, Illinois 60603
                                  BY:  MR. TERRENCE P. CANADE
17                                     MR. JOSEPH M. TALARICO

18
     For the Defendants:          NEAL, GERBER & EISENBERG
19                                Two North LaSalle Street
                                  Suite 2300
20                                Chicago, Illinois 60602
                                  BY:  MR. N. NICHOLAS BERBERIAN
21                                     MR. ROBERT J. MANDEL

22

23
     Official Court Reporter:     JENNIFER S. COSTALES, CSR, RMR
24                                219 South Dearborn Street
                                  Room 1744-A
25                                Chicago, Illinois 60604
                                  (312) 427-5351
```

42

1          MR. BERBERIAN:  We decided to be more cautious and

2    wait to ask to send out the written announcement, which is part

3    of our written leave for tomorrow morning.  We tried to do

4    everything we could to avoid just this.

5          THE COURT:  Okay, all right.  I think I've heard

6    enough.  Thank you.

7          MR. BERBERIAN:  Thank you, Your Honor.

8          THE COURT:  I'm prepared to rule on the motion now.

9          As I said, I think it's the Court's obligation to

10   address the merits of the motion, arbitration or no

11   arbitration.  There are disputed facts, it seems to me,

12   regarding the nature of the communication between the

13   defendants and their customers, former customers or current

14   customers.  I'll call them customers.

15          The affidavit that the plaintiffs submitted with its

16   motion was based in large part on hearsay.  And even though

17   there wasn't any specific objection or motion to strike that

18   affidavit, I will give it very little weight because of that.

19   We're here on an emergency TRO motion, and I have to draw some

20   inferences.  But it's hard for me to draw any conclusions about

21   the exact nature of the solicitations.

22          I do not believe, I guess I agree with Judge

23   Holderman, I do not believe that the fact that the

24   solicitations are oral, one on one, whether in person or by

25   telephone, somehow taints them immeasurably as far as

1 characterizing them as solicitations as opposed to some neutral

2 announcement.

3       I think it's more problematic, because there is a lot

4 of wiggle room that way that there isn't in an announcement.

5 In a written announcement, you know exactly what was said.  In

6 a telephone call, of course, we don't know what was said at

7 each of those telephone calls.  So I certainly don't know as we

8 sit here.

9       But the plaintiff has the burden of proof.  And I

10 can't really assume on this record that the telephone calls

11 were improper solicitations.  Should that fact come out at a

12 later date, then I think I might have to reconsider that

13 portion of my declining to reach that conclusion at this point.

14 And this really goes to likelihood of success on the merits.  I

15 just don't know what these communications are at this point.

16       With respect to irreparable harm, I think I agree

17 with Judge Bucklo's observation that if you have no other

18 avenue to help yourself, you have irreparable harm.

19       I am not in any way minimizing the irreparable harm

20 that would be done to the customer relations here if something

21 wrong is going on, if some improper type of solicitation is

22 going on.  That would certainly be irreparable.

23       Even though you could account for the funds, you

24 know, you could trace the funds to the Dean Witter accounts and

25 perhaps fashion some sort of monetary damages based on that, I

42

1   think the plaintiff is correct in saying that, well, that's

2   maybe part of it, but it certainly doesn't go to the long-term

3   relationships that are irrevocably interfered with at that

4   point.

5           But at this point, once again, that depends on

6   whether or not there were improper solicitations.  So I don't

7   see how I can find irreparable harm given the immediate

8   availability of the NASD arbitration as an avenue just as any

9   other type of avenue of relief would have to be considered in

10  determining whether there would be irreparable harm.

11          When I balance the hardship and equities, it's closer

12  I think than the defendants would have me find, but it still

13  leans in their direction.  Certainly we favor competition, but

14  we favor fair competition.  These people signed an agreement in

15  which they said they would not solicit and accept certain types

16  of benefits after they left the employment.  I'm sure they were

17  handsomely paid while they were there, and there is ample

18  consideration for that.

19          But even if it were an even balance as Judge Marovich

20  said and I think Judge Holderman as well in the cases cited,

21  and it's just good common sense, you have to consider the

22  public interest in competition and in relationships that are, I

23  think, fairly uniquely personal in the brokerage business.

24          I think that if any of us here were to call our

25  broker and find that he had disappeared, we'd be pretty upset,

43

1  even though the company may be as reputable and fine a company

2  as Merrill Lynch.  Our relationships with those companies is

3  generally very personal through the broker.  And those people

4  -- and I realize the plaintiff is saying we have no reason to

5  interfere with that relationship, we are giving out the

6  information.  But even that's contested, at least between you

7  guys.  I don't know who is telling the truth here.  And maybe

8  you don't even know.  What your client tells you about

9  something like that can be very ephemeral, I guess.

10          You don't know who is saying what on the phone.

11  Obviously if what you say is true and these people left in the

12  middle of the night, that's not very nice.

13          And you're shaking your head like that's not the way

14  it happened.

15          I've been around.  I've handled a lot of these cases

16  as a lawyer, and I know that happens just that way sometimes.

17  And sometimes it's planned out with advice of counsel and all

18  the rest of it, and it's kosher, but at other times, it really

19  isn't.  But you can certainly see where the emotions may be

20  running fairly high at Merrill Lynch's Northbrook branch right

21  now, and they may be doing things that even their management

22  wouldn't be approving of.  So I don't really know at that

23  point, I'm speculating as much as anything else by telling you.

24          But I can't speculate and find that the conditions

25  exist to exercise the extraordinary jurisdiction that I would

44

1   have to to issue a temporary restraining order at this point.

2   But I am going to keep an open mind about this.  I certainly

3   would like to know what happens tomorrow, because somebody, and

4   as one of the judges said and was quoted in one of these

5   briefs, the NASD and the people involved, the arbitrators, have

6   a particular expertise in this industry and might apply wisdom

7   that I don't have when I make these decisions based on the

8   papers that I read as hastily as I had to this afternoon.

9           So I'm denying the TRO, that's the long and the short

10  of it, for all those reasons.  And I would like you to report

11  back to me sometime tomorrow.

12          Do you think you'll actually have a result tomorrow

13  or you'll at least know where you are going with that

14  arbitration?

15          MR. FORTUNATO:  24 -- excuse me, Your Honor.  The

16  arbitrator has 24 hours to rule.  So I imagine by near the

17  close of business Friday we'll know something.

18          THE COURT:  Well, 24 -- tomorrow is Thursday, is it

19  not?  You're right.  I'm rushing the clock.

20          MR. FORTUNATO:  Your Honor, will we be given the

21  opportunity to take depositions to find out what it is these

22  guys are saying in this action?

23          THE COURT:  I think I would be very remiss to tell

24  you you couldn't.  There is no lack of jurisdiction here.  The

25  defendants have appeared, correct?

45

1        MR. FORTUNATO:  We would ask then, Your Honor, to set

2   a preliminary injunction hearing for sometime next week and let

3   me sit these guys down to take their depositions and find out

4   what they did.

5        MR. BERBERIAN:  Your Honor, this always comes up, and

6   the merits again, I don't think there is any dispute the merits

7   get decided in arbitration.  The discovery rules are pursuant

8   to the arbitrators and pursuant to their supervision in terms

9   of that proceeding.  There is no dispute that the merits, and

10  those depositions go to the merits, get decided in arbitration.

11       THE COURT:  I would like to know what the arbitrators

12  are deciding to do before I start that competition between the

13  Court and the arbitration.

14       MR. BERBERIAN:  Thank you, Your Honor.

15       MR. FORTUNATO:  We'll report then, Your Honor.

16       THE COURT:  Yes.  I would like you to report on

17  Friday.

18       Who is the magistrate judge?

19       MR. FORTUNATO:  Judge Denlow.

20       THE COURT:  Judge Denlow, he's terrific.

21       I am tied up on trials for the next month beginning

22  on Monday and will have very little time to entertain any type

23  of evidentiary hearing.  So if for some reason we do get tied

24  up in that, I may send it to Judge Denlow.

25       But why don't we wait until Friday.  Do you think by

46

1   the close of business Friday, is that what you said?

2          MR. FORTUNATO:  The NASD rules, they will only say

3   that the single arbitrator will endeavor to rule within one

4   business day.  That's the most commitment we can get out of

5   them.

6          MR. BERBERIAN:  A little slippage between him ruling

7   and the parties getting the results, so it's quite possible we

8   would know by the end of Friday, but not guaranteed.

9          THE COURT:  Well, if you want to come in at 2:00

10  o'clock on Friday, let me know what you know, I mean, I don't

11  need the whole cast of characters.  But if we don't know then,

12  I could probably see you early Monday morning --

13         MR. FORTUNATO:  That would be fine, Your Honor.

14         THE COURT:  -- before we start this trial call.  But

15  we're going to be pretty busy beginning Monday with this trial

16  call.  But let's be optimistic.  Why don't you come on in at

17  2:00 o'clock on Friday.

18         MR. BERBERIAN:  Thank you, Your Honor.

19         THE COURT:  Just for a short report as to what is

20  going on.

21         MR. FORTUNATO:  Thank you, Your Honor.

22         THE COURT:  All right.  Thank you very much.

23         MR. FORTUNATO:  I'm sorry, Your Honor, my admission

24  was moved pro hac vice.  So I apologize and thank you for the

25  privilege of arguing, advocating in front of you.

1            THE COURT:  Well, no, it was very nice.  You did a

2    very nice job.  You guys must have written this stuff before

3    you filed it, that's all I can guess.  You knew what was

4    coming.

5            MR. BERBERIAN:  Thank you, Your Honor.

6            THE COURT:  Did we grant your -- just on your

7    housekeeping, I'm granting you leave to file your brief in

8    excess of 15 pages.

9            Was there a pro hac vice motion?

10            MR. FORTUNATO:  There was.  I apologize.  I thought I

11    was handed a paper saying it was granted.

12            THE COURT:  Well, I've got so many papers right here.

13    I'll grant that too.  Okay.

14            MR. BERBERIAN:  Your Honor, may we have leave?  Our

15    brief, I believe, is also in excess of 15 pages, if we may have

16    leave?

17            THE COURT:  Not as much in excess as theirs.

18            MR. BERBERIAN:  That's true.

19            THE COURT:  But you both have leave.  Okay.

20            MR. BERBERIAN:  Thank you very much.

21            THE COURT:  See you Friday.

22            MR. BERBERIAN:  Thank you.

23        (Proceedings concluded.)

24

25



RECYCLED PAPER

```
 1                    IN THE UNITED STATES DISTRICT COURT
                          NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3   MERRILL LYNCH, PIERCE, FENNER &      )
     SMITH, INC.,                         )
 4                    Plaintiff,          )
                                          )      No. 99 C 406
 5             v.                         )      Chicago, Illinois
                                          )      January 29, 1999
 6   WILLIAM R. GURTIN, STEVEN J.         )      2:30 p.m.
     HEFTER, and BENJAMIN M. LESHEM,      )
 7                                        )
                      Defendants.         )
 8
                     TRANSCRIPT OF PROCEEDINGS - MOTION
 9
                  BEFORE THE HONORABLE ROBERT W. GETTLEMAN
10
     APPEARANCES:
11
     For the Plaintiff:            RUBIN & ASSOCIATES, P.C.
12                                 10 South Leopard Road
                                   Paoli, Pennsylvania 19301
13                                 BY:  MR. MICHAEL J. FORTUNATO

14                                         AND

15                                 LORD, BISSELL & BROOK
                                   115 South LaSalle Street
16                                 Chicago, Illinois 60603
                                   BY:  MR. JOSEPH M. TALARICO
17                                      MR. KEVIN P. McJESSY

18   For the Defendants:           NEAL, GERBER & EISENBERG
                                   Two North LaSalle Street
19                                 Suite 2300
                                   Chicago, Illinois 60602
20                                 BY:  MR. H. NICHOLAS BERBERIAN
                                        MR. ROBERT J. MANDEL
21

22

23   Official Court Reporter:      JENNIFER S. COSTALES, CSR, RMR
                                   219 South Dearborn Street
24                                 Room 1744-A
                                   Chicago, Illinois 60604
25                                 (312) 427-5351
```

1          We at least want that right to defend ourselves, Your

2     Honor.

3          THE COURT:  Well, I noted that that was a disputed

4     fact that I couldn't base an opinion on at that point or a

5     ruling on at that point.

6          I also noticed or I noted that there was not

7     irreparable harm as Judge Bucklo noted in the case that was

8     cited to me, because there was another avenue of redress, and

9     that is the arbitration.

10         Now that this arbitration has taken another step

11    forward, it would seem to me that that would be my ruling no

12    matter what, because there is another avenue.  You know, the

13    balance of hardships remains as well.  That's something that

14    obviously could be developed if there was a little discovery.

15         But I cannot see and I do not believe that this

16    system that governs these types of disputes, and there

17    certainly have been many of them, contemplates parallel

18    litigation, and whoever gets there first is the one that gets

19    to say what happens.  You know, not only does the judiciary

20    generally favor arbitration, but these rules seem to compel it

21    in these types of situations.  And they got to the arbitrator

22    before you got to me.

23         So it seems to me that this ought to be stayed.

24         MR. FORTUNATO:  Your Honor --

25         MR. BERBERIAN:  Thank you, Your Honor.

 1            MR. FORTUNATO:  If I may, Your Honor, just in one

 2    instance.  What's in our motion or the brief that we filed the

 3    other day is that Rule 10335(g) provides that if we go and seek

 4    injunctive relief in court, the only aspect of our claim that's

 5    going to be heard in arbitration, and it won't be for another

 6    two or three weeks at a minimum, is the request for permanent

 7    injunctive relief.

 8            So between -- if you foreclose the possibility that

 9    we can marshal evidence towards a preliminary injunction now,

10    between now and three weeks from now, we can suffer irreparable

11    harm.  You have been misled into believing that simply because

12    there is a D arbitrator available, a single arbitrator

13    available to hear claims, that our harm is no longer

14    irreparable.

15            THE COURT:  You realize that a district judge or a

16    magistrate judge on a referral can collapse both a preliminary

17    and permanent injunction into one proceeding anyway.

18            MR. FORTUNATO:  Sure.  But we're not asking for

19    permanent injunctive relief from the Court.  We have to get

20    that from the arbitrators.

21            But the arbitration panel could decide, Your Honor:

22    Fortunato, we're not going to hear, we're not going to hear the

23    merits of this case for another 60 days.

24            Between now and then, I don't have any procedural

25    mechanism available to me under this code to seek injunctive

19

1  relief because we've initiated this proceeding in court.  And

2  we were here before they got their hearing, Your Honor.

3          THE COURT:  Before they got their hearing, but not

4  before they filed.

5          MR. FORTUNATO:  Well, of course.  But the NASD and

6  many courts have discounted that, Your Honor, because we never

7  know -- they know when they are going to quit before we do.

8  They filed this, they had the lawyers lined up and filed this

9  the minute they worked out the door.  It's time-stamped January

10  22nd, the same day that they resigned.

11          THE COURT:  I'm going to stay this.  But if for some

12  reason the arbitration gets bogged down, then it's without

13  prejudice to your coming back and asking me to lift that stay.

14          MR. BERBERIAN:  That's fair enough, Your Honor.

15          THE COURT:  So that means what I'm expecting very

16  frankly since you're the one who is pushing this arbitration, I

17  expect the defendants in my case and the claimants in the other

18  case to push for a resolution of the arbitration as quickly as

19  I expect the other side to do it.

20          MR. BERBERIAN:  We will do that, Your Honor.

21          THE COURT:  And if I were to hear evidence of foot

22  dragging, I might change my mind here.

23          MR. BERBERIAN:  That is very fair, Your Honor.

24          MR. FORTUNATO:  What if we have affidavits, Your

25  Honor, in the interim that shows that these telephone

22

1    conversations are actually solicitations?  Can we at least come

2    back and renew our motion if there is not a full panel?

3              THE COURT:  I don't think that that's going to do.  I

4    don't think that that's going to do it.  I think it is the

5    timing of this -- that train is out of the station.  My train

6    was -- you wanted it to start pulling out of the station, but

7    it didn't quite get there.  And I think that you've got to be

8    on that first train right now.

9              But if that first train gets bogged down, to keep the

10   metaphor up, then I think that maybe you could jump back on

11   this one.  So everybody has got to be playing by the same rules

12   here.

13             You can't ask to defer the arbitration and then not

14   do everything you can to get that to a quick -- because time is

15   important here, there is no question about it.  I just don't

16   think that the timing of that is going to be very much

17   different from the timing of this.  I think you have to go that

18   route.

19             MR. BERBERIAN:  Thank you.

20             MR. FORTUNATO:  With one --

21             THE COURT:  With all due respect, I'll grant the

22   motion, which you have taken away from me.

23             MR. BERBERIAN:  I'm sorry, Your Honor.

24             THE COURT:  Make sure it is filed.

25             MR. BERBERIAN:  Thank you, Your Honor.

```
1          THE COURT:  All right.

2          MR. FORTUNATO:  Can we file a reconsideration on that

3   particular aspect?

4          THE COURT:  You may.  You can always file.

5          You're such a good lawyer, I feel bad going against

6   you as I have been, but I have to make these decisions.

7          MR. FORTUNATO:  My concern is that between, you know,

8   the arbitration will be a hollow formality if between now and

9   then they do something, they send out the mailing, they do

10  something, they use their information and we have no recourse.

11         THE COURT:  I hear you.

12         MR. BERBERIAN:  Thank you, Your Honor.

13         THE COURT:  What I'm going to do, I think I'm going

14  to set this actually while you're all here, set this for a

15  report on status in a couple of weeks, because I think that I

16  would expect you all to be done with this by then.  Why don't

17  we say the 16th.

18         MR. BERBERIAN:  That would be fine, Your Honor.  What

19  time?

20         THE COURT:  9:00 o'clock.  Just come on in on the

21  9:00 o'clock call.

22         MR. BERBERIAN:  Thank you very much, Your Honor.

23         THE COURT:  All right.

24         MR. BERBERIAN:  Good luck with your other matter.

25      (Proceedings concluded.)
```

```
                                                        22
```

```
1                    C E R T I F I C A T E

2        I, Jennifer S. Costales, do hereby certify that the

3   foregoing is a complete, true, and accurate transcript of the

4   proceedings had in the above-entitled case before the Honorable

5   ROBERT W. GETTLEMAN, one of the judges of said Court, at

6   Chicago, Illinois, on January 29, 1999.

7

8

9                              Official Court Reporter

10                             United States District Court

11                             Northern District of Illinois

12                             Eastern Division

13

14

15

16

17

18

19

20

21

22

23

24

25
```





RECYCLED PAPER

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MERRILL LYNCH, PIERCE,
FENNER & SMITH INC.,

    Plaintiff,

v.

MARCIA L. VANDERWOUDE,

    Defendant.

File No.  1:96-CV-48

HON. ROBERT HOLMES BELL

## O R D E R

    This matter comes before the Court on Plaintiff Merrill
Lynch, Pierce, Fenner & Smith Inc.'s emergency motion for a
temporary restraining order and preliminary injunction.
Plaintiff seeks an order restraining its former employee,
Defendant Marcia L. VanderWoude, from soliciting any business
from any clients of Merrill Lynch and from using any information
contained in the client records of Merrill Lynch.

    It is evident upon review of Plaintiff's verified complaint,
emergency motion and accompanying brief that Plaintiff has
simultaneously filed an arbitration action with the National
Association of Securities Dealers ("NASD") according to the
requirements of § 47 of the NASD Code of Arbitration Procedure.
The newly enacted rules of the NASD provide for a prompt hearing
on applications for injunctions.  Once the arbitration begins, it
is for the arbitrators to decide how to maintain the status quo
during the pendency of the arbitration process.  Performance
Unlimited v. Questar Publishers, Inc., 52 F.3d 1373, 1386 (6th
Cir. 1995).

Because the NASD specializes in securities matter and because it appears that the NASD will be able to give this matter its prompt attention, it does not appear to this Court that immediate and irreparable injury, loss, or damage will result to the Plaintiff before Defendant can be heard in opposition, and the Court declines to grant Plaintiff the extraordinary remedy of a temporary restraining order.

Accordingly, IT IS HEREBY ORDERED that Plaintiff's motion for temporary restraining order (Docket # 4) is DENIED.

IT IS FURTHER ORDERED that a HEARING on Plaintiff's motion for preliminary injunction shall be held on Friday, February 2, 1996, at 9:00 a.m., Courtroom 401, Ford Federal Building, 110 Michigan Ave. N.W., Grand Rapids, MI 49503.

Date: _January 25, 1996_

_____
ROBERT HOLMES BELL
UNITED STATES DISTRICT JUDGE

2



RECYCLED PAPER



N.A.S.D. INTERIM ORDER

## NATIONAL ASSOCIATION OF SECURITIES DEALERS

In the Matter of the Arbitration Between

Name of Claimant

Merrill Lynch, Pierce Fenner & Smith Inc

96-00332

Names of Respondents

PaineWebber, Inc. and
Marcia L. VanderWoude

THIS CAUSE coming on for Hearing in a telephonic conference on January 26, 1995, upon Marcia L. VanderWoude's ("VanderWoude") Statement of Claim filed with the National Association of Securities Dealers, Inc. ("NASD") pursuant to Section 47(d) of the NASD Code of Arbitration Procedure and Merrill Lynch, Pierce, Fenner & Smith, Inc.'s ("Merrill Lynch") Statement of Claim filed with the NASD pursuant to Section 47(g) of the NASD Code of Arbitration Procedure, after due notice to the parties, the parties being each represented by their attorneys; the NASD having duly designated the undersigned Interim Arbitrator, the Arbitrator having read and considered the pleadings of the parties and heard the arguments and evidence presented by the parties:

IT IS HEREBY ORDERED:

1 a.   Merrill Lynch, if requested, shall inform VanderWoude's clients concerning her whereabouts and current affiliation;

b.   Merrill Lynch shall refrain from discussing with VanderWoude's clients the circumstances of, and reasons for, her change of employment;

c.   Merrill Lynch shall refrain from discussing with VanderWoude's clients her ability to continue to serve as their financial advisor or their right to have their account transferred to PaineWebber;

d.   Merrill Lynch shall refrain from filing a form U-5 indicating that VanderWoude has engaged in wrongdoing in connection with her change of employment, including, but not limited to VanderWoude's retention of information concerning her clients;

N.A.S.D. ARBITRATION NO. 96-00322
INTERIM ORDER  PAGE 2 OF 2


e.   Merrill Lynch shall pay VanderWoude all earned and unpaid compensation and o·
     benefits;

f.   Merrill Lynch shall comply with NASD Uniform Practice code Section 65 and NY SE
     Rule 412 Process Account Transfer forms so as to effect transfer of VanderWoud·':
     client accounts within three business days;

g.   Merrill Lynch shall not interfere with the rights of the clients of VanderWoude to recei vi
     advice and service from her or her employer;

h.   This Order shall remain in effect until the Industry Panel hears and rules on the mat it
     pursuant to NASD Section 47(d)(2); and,

2.   No ruling is made in this Interim Order with respect to Merrill Lynch's claim fil x
     pursuant to NASD Section 47(g) dated January 22, 1996.




Arbitrator's Signature



_____
Robert J. Downing, Esq.
Presiding Interim Arbitrator


Dated:_____

N.A.S.D. ARBITRATION NO. 96-00322
INTERIM ORDER   PAGE 2 OF 3

a.   Merrill Lynch shall pay VanderWoude all earned and unpaid compensation and/or bonuses;

f.   Merrill Lynch shall comply with NASD Uniform Practice code Section 65 and NYSE Rule 412 Process Account Transfer forms so as to effect transfer of VanderWoude's client accounts within three business days;

g.   Merrill Lynch shall not interfere with the rights of the clients of VanderWoude to receive advice and service from her or her employer;

h.   This Order shall remain in effect until the Industry Panel hears and rules on the merits pursuant to NASD Section 47(g)(3); and,

2.   No ruling is made in this Interim Order with respect to Merrill Lynch's claim file pursuant to NASD Section 47(g) dated January 22, 1996.


Arbitrator's Signature

_____

Robert J. Gowing, Esq.
Presiding Interim Arbitrator


Date: _____ 29, 1996

**NASD**  **Arbitration & Mediation**

National Association of Securities Dealers, Inc. • 10 S. LaSalle Street • 20th Floor • Chicago, IL 60603-1002 • Fax 312-214-5230

**VIA FAX ONLY**

March 2, 1996

Thomas T. Loder, Esq.
Rubin & Associates, P.C.
MCS Building
10 South Leopard Road
Paoli, PA. 19301

Subject:       *NASD Arbitration Number 96-00330*
               *Marcia VanderWoude vs. Merrill Lynch, Pierce, Fenner & Smith, Inc. (consol.*
               *w/ 96-00332)*

Dear Mr. Loder:

This letter is to advise the parties of the panel's ruling on Merrill Lynch's Emergency Motion to Modify the NASD Order Dated January 26, 1996, Or, In The Alternative, Grant Merrill Lynch's Cross Motion for Injunctive Relief. At the request of Claimman Downing, this letter is also to provide the parties with a brief case summary of the above captioned matter.

First, this letter shall provide the parties with a brief case summary of the above captioned matter. On January 26, 1996 a telephonic hearing was held pursuant to Section 47(d)(1) of the NASD Code of Arbitration Procedure. Subsequent to the 47(d)(1) hearing, a NASD Interim Order was signed by Interim Arbitrator Robert J. Downing, and was served on the parties via fax on January 29, 1996.

On February 6, 1996 the parties were notified by overnight delivery that pursuant to Section 47(f) the hearing in the above captioned matter was scheduled on February 14, 1996. On February 8, 1996 counsel for Merrill Lynch sent a facsimile transmission to the NASD providing several objections to the scheduling of a "Section 47(f)" hearing for Chicago, Illinois on February 14, 1996. In the February 8, 1996 correspondence Merrill Lynch objected to venue and jurisdiction, lack of proper notice, and hearings not scheduled by a properly-appointed panel.

On February 11, 1996 the NASD sent the parties a letter that the February 14, 1996 hearing date was cancelled and that the date was to be used as an in-person pre-hearing conference before the full panel. The February 11, 1996 correspondence informed the parties that the purpose of the pre-hearing conference was to address outstanding preliminary issues and set hearing dates.

During the in-person pre-hearing conference on February 14, 1996 Merrill Lynch made several Motions, including a Motion to Change Situs to Grand Rapids, Michigan. The Motion to Change Situs was subsequently granted by the panel. On February 23, 1996 the NASD notified the

parties via fax that the hearing was rescheduled to April 15, 1996 with additional dates on April 16-17.

Second, this letter shall advise the parties of the panel's ruling on Merrill Lynch's Emergency Motion to Modify the NASD Order Dated January 26, 1996, Or, In The Alternative, Grant Merrill Lynch's Cross Motion for Injunctive Relief. After carefully considering Merrill Lynch's Emergency Motion to Modify the NASD Order Dated January 26, 1996, Or, In The Alternative, Grant Merrill Lynch's Cross Motion for Injunctive Relief, the panel has made the following ruling:

1.    Marcia VanderWoude shall escrow any and all commissions derived from any account transfers from any customers who VanderWoude solicited in the past at Merrill Lynch for the purpose of doing business with her present employer PaineWebber;

2.    Pre-hearing proceedings shall be conducted pursuant to the NASD Code of Arbitration Procedure;

3.    The hearing in the above-captioned matter shall be held on April 15-17 in Grand Rapids, Michigan; and

4.    In all other respects, Merrill Lynch's Emergency Motion to Modify the NASD Order Dated January 26, 1996, Or, In The Alternative, Grant Merrill Lynch's Cross Motion for Injunctive Relief is denied.

If you have any questions, please do not hesitate to contact me.

Very truly yours,

Todd Y. Saltzman, Esq.
Staff Attorney
CH/312-899-4440

TYS:TYS:LC53A
lr:9/95

RECIPIENTS:
    Thomas T. Loder, Esq., Merrill Lynch, Pierce Fenner & Smit
    Michael B. Roche, Esq., Marcia VanderWoude
    Robert J. Downing, Esq.
    John R. Wylie, Esq.
    Gregg Rzepczynski, Esq.



RECYCLED PAPER



UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FIRST OF MICHIGAN, a
Delaware corporation,

       Plaintiff,

v.                                          Case No. 1:97-CV-947

J.J.B. HILLIARD, W.L. LYONS,                HON. GORDON J. QUIST
INC., a Delaware corporation,

       Defendant.
_____/

## ORDER

For the reasons stated on the record following oral argument on November 13, 1997,

IT IS HEREBY ORDERED that defendant's Emergency Motion To Dissolve Temporary Restraining Order (docket no. 6) is GRANTED. The Temporary Retraining Order issued by this Court on November 10, 1997, is dissolved. The parties will have the opportunity to present argument in support of and in opposition to plaintiff's request for preliminary injunction at the hearing scheduled for November 20, 1997, at 10:00 a.m. before Hon. Gordon J. Quist.

Dated: November 13, 1997

ROBERT HOLMES BELL
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FIRST OF MICHIGAN CORPORATION,
a Delaware corporation,

     Plaintiff,

vs.                                          File No. 1:97-CV-947

J.J.B. HILLIARD, W.L. LYONS, INC.,
a Kentucky corporation,

     Defendant.
_____/

Hearing Re:  Defendant's Motion
To Dissolve Temporary Restraining Order

Before

THE HONORABLE ROBERT HOLMES BELL
United States District Judge
November 13, 1997

APPEARANCES

ALAN R. MILLER                          DENNIS K. EGAN
370 E. Maple, Fourth Floor              150 W. Jefferson, Ste. 900
Birmingham, MI 48009                    Detroit, MI 48226
Attorney for Plaintiff                  Attorney for Defendant


MICHAEL P. COAKLEY                      JAMES B. DOEZEMA
150 W. Jefferson, Ste. 2500             5650 Foremost Dr. S.E.
Detroit, MI 48226                       Grand Rapids, MI 49546
Co-Counsel for Plaintiff                Co-Counsel for Defendant


Kevin W. Gaugier, CSR-3065
U.S. District Court Reporter

2

Grand Rapids, Michigan

November 13, 1997

10:04 a.m.

- - -

P R O C E E D I N G S

THE COURT:  This is the matter of First of Michigan Corporation v. J.J.B. Hilliard and W.L. Lyons, Inc.  This is 97-CV-947.  I believe Mr. Miller is here and Mr. Coakley and Mr. Plopa are here representing the plaintiffs.  I believe Mr. Miller will be the spokesperson for the plaintiffs, is that correct?

MR. MILLER:  That is correct, Your Honor.

THE COURT:  Okay.  And the Hilliard defendants are represented by Mr. Egan and Mr. Doezema.  Mr. Egan, will you be the spokesman or Mr. Doezema?

MR. EGAN:  Yes, Your Honor, I will be.

THE COURT:  Okay.  This is the defendant's motion to dissolve an ex parte TRO, temporary restraining order that was issued by the Court on the 10th, being Monday of this week. This Court has been supplied with considerable paper in the last 24 hours and has attempted to review the same and revisited this issue that the Court has visited several times before and will hear arguments, brief, to the point on this

1    that the Court is hearing -- you may be seated, sir.  I heard

2    you.

3            MR. EGAN:  Oh, I should sit down?

4            THE COURT:  Yeah, yeah.

5            The Court has heard the position of both parties and

6    the Court hereby dissolves the injunction.  But the Court

7    wants to indicate why it is dissolving the injunction.

8            Judge Quist will hear this matter a week from today,

9    and by then the parties will have affidavits and motions in

10   preparation for a motion for a preliminary injunction.  That

11   will be scheduled before Judge Quist.  He will be rested and

12   refreshed and ready to hear this matter.  And as a footnote I

13   would add that Judge Quist's expertise in business law and

14   civil law before coming to this bench I think will be of great

15   benefit to the parties as well.

16          What is at issue here -- we've used that word perhaps

17   too tritely here, all of us in this matter, and certainly I

18   have -- are two tracks.  One track relates to the so-called

19   predatory practices, and I believe a lot of words have been

20   used here, of Hilliard-Lyons to secure 90 employees, 50 of

21   whom are brokers representing approximately 8,500 clients from

22   First of Michigan over a concerted period of four or five

23   months in a practice that is characterized here as

24   interference with business relationships and is characterized

25   as an unfair business practice.  And the Court will accept

1    those claims of the plaintiffs here in this matter in the

2    light most favorable to the plaintiffs because that's the

3    stage of these proceedings under Rule 65(a) and the Court must

4    do so in a temporary restraining order situation.  The Court,

5    however, may not turn a blind eye to logic or to the law as it

6    has been enunciated.

7         This matter involving brokerage firms either on the

8    NASDAQ or the New York Stock Exchange is a highly regulated

9    industry.  It is highly regulated in a number of facets, one

10   of which is rules and requirements of brokers and brokerage

11   houses and their fiduciary duties to one another, to the

12   clients, and to the big board.

13        And it seems rather unusual that despite the alleged

14   egregious nature here of that which went on, no NASDAQ or no

15   NASD codes have been cited to this Court indicating that what

16   was undertaken here and what was done by these people is

17   violative of Section 1(a) or Section 5(d) or Section 10335.  I

18   mean, there's nothing that has been cited, which is

19   troublesome to this Court.

20        MR. MILLER:  Your Honor, I --

21        THE COURT:  Nor -- excuse me.  Excuse me.  I'm

22   talking.

23        Nor has anything in the briefs that have been given

24   to this Court shown to be dispositive of this larger issue

25   that involves Hilliard and Lyons.  In fact, what has been

1   disclosed to this Court is arbitration hearings in which large

2   amounts of monies have been given for these predatory

3   practices.

4          So in terms of irreparability of harm, it appears

5   that under what one finds in Section 10335 of the National

6   Association of Dealers Code of Arbitration Procedures is that

7   these matters have gone to arbitrations and that awards of

8   monies have been given.  And one would assume from that, then,

9   that the irreparable harm is not irreparable; it is

10  calculable.  And here it's calculable by the number of

11  clients, the number of monies generated.

12         Now, there's this claim of loss of goodwill, and this

13  Court notes that a large number of judicial opinions can be

14  resurrected to talk about injunction for loss of goodwill.  If

15  that were the case, then virtually every injunction should be

16  issued because every time there is a spat or a dispute between

17  business entities, there is always the possibility of loss of

18  goodwill as a result of publicity and other things.  So loss

19  of goodwill, I would submit, is a not very sound basis to

20  premise injunctive relief on, particularly when one sees that

21  this is a money business.  This is a business that has

22  calculable numbers.  This is a business that in fact --

23  profession that in fact it can be quickly quantified.

24         That's on one level, and this Court believes that

25  First of Michigan Corporation has in fact set forth a cause of

63

20

1   action against this defendant on the basis of the unfair

2   business practice and interference with business

3   relationships.  But there's another level that the injunction

4   addresses itself to, and that injunction appears to restrain

5   the customer from being given the choice of whether the

6   customer can go with a personal broker to the broker's new

7   place of business or whether the customer is bound to stay

8   with the brokerage company that is presently handling the

9   customer's account.

10          Now, the injunction has the effect of telling the

11   customer, You don't have a choice.  You stay with the broker,

12   the brokerage company.  Now, in fact if we're talking about

13   serving the public interest, the public interest in a free

14   country -- we haven't heard much about that today, but this is

15   a free country, this is a competitive environment -- in a

16   competitive environment the customer should have the

17   presumptive ability to make a choice.

18          And this may be a wonderful time for First of

19   Michigan to contact these clients and say, Hey, look, we've

20   served you well.  We'll continue to serve you well.  And

21   besides, we now have a new computer that can serve you even

22   better, et cetera, et cetera.  Just as the broker can say,

23   I've left, I'm now with another entity, and I'd like to keep

24   serving you in your business.

25          Now, it seems to me quite revealing that when we come

64

1   to a person-by-person basis, that it's a different rule that

2   applies as the Court found in questioning Mr. Miller.   A

3   different rule applies.   If it's an individual broker leaving

4   for whatever laudatory or not so laudatory reason and going

5   back to his presumed friend or business acquaintance and

6   saying, Oh, by the way, if you call First of Michigan, you're

7   not going to find me there, I'm over here with Hilliard and

8   Lyons and I can help you if you want to leave, this question

9   of account transfers is a choice that is left with the client,

10  not with the brokerage firm.

11      And so this Ccurt believes if it is to err in this

12  case, it should err in giving the client public a choice as

13  opposed to erring in saying to the client, You don't have a

14  choice.   Your account is locked here with us until some judge

15  someplace decides that maybe it can be released.   Now, the

16  question, then, of the impact on the public interest I think

17  clearly favors the public having a choice.

18      The irreparable harm, this Court finds that the

19  irreparability of harm is not at issue because it is

20  quantifiable.

21      As to the likelihood of success on the merits of the

22  action, the Court again wants to separate these two larger

23  issues.   Plaintiff has indicated very, very preliminarily a

24  likelihood of success on the larger question of the unfair

25  business practice and the interference with a business

1

1    relationship.  This Court is not so satisfied of the

2    likelihood of success on the subset issue of the ability to

3    solicit the prior customer of the broker saying, By the way, I

4    just moved.  This Court is not so satisfied with that.

5          The possibility of substantial harms to others, this

6    Court senses that First of Michigan Corporation clearly may be

7    harmed by the solicitation by the former brokers.  But the

8    public may be harmed by the failure of solicitation being

9    locked with a broker that they don't want, they haven't asked

10    for, they haven't had any prior contact with.  The public may

11    be harmed too.  So there's a balance on the substantial harm

12    to another, and the DeLorean Motor Company case which is cited

13    frequently, 755 F.2d 1223, talks about the interplay of these

14    Rule 65(a) criteria as the Court weighs them for purposes of a

15    preliminary injunction, certainly for a temporary restraining

16    order.

17          So this Court would require the parties to continue,

18    both parties to continue to pursue the jurisdiction and the

19    injunctive aspects of the NASD arbitration procedures,

20    believing that that is a better use of resources than the

21    public expenditures of the courthouse.  But certainly the

22    courthouse is available.

23          Secondly, this Court would be of a mind to believe

24    that a developed preliminary injunction record, developed by

25    both parties with affidavits, maybe even depositions, and

1    documentations given to the trial judge, Judge Quist, next

2    week or whenever it's convenient with all the parties will

3    give a better opportunity for Judge Quist to look at the

4    competing evidence and to look at the law in this area and

5    come to a better informed decision than this Court has been

6    able to in the brief period of time it has had to review this

7    matter.

8         One final note here, and this Court will prepare the

9    order in this case.  One final note that is upsetting to the

10   Court.  I suppose it's part of the legal profession now, but

11   to come to court before a holiday at 4:30 in the afternoon and

12   represent to the Court that the other party knows exactly

13   what's going on when the other party really doesn't know, and

14   to represent that the other party is fully apprised of what is

15   going on, which in fact the other party is not, is disturbing

16   to this Court.  Surprise in filing a case like this doesn't

17   really benefit anyone.  What it does for a judge who deals

18   with these matters on a regular basis is it makes this Court

19   pause because once one's reputation is established, it can

20   also be eroded very quickly.

21        Miller, Canfield, Paddock & Stone made certain

22   representations to this Court last Monday, and they weren't

23   exactly what happened.  They were not actual, good

24   representations.  So the reputation of Miller, Canfield,

25   Paddock & Stone is to a certain extent at issue in this case,

1    and the representations which they made, and that is the other

2    party was fully apprised that they were here, the other party

3    knew what was going on, and was not true, in fact has an

4    impact upon a judge.  The next time Miller, Canfield, Paddock

5    & Stone comes in, the Court's going to take a little more time

6    to look at that.

7             Now, we have dual obligations as lawyers to this

8    Court.  One is to represent your client fully and fairly in

9    accordance with the rules of procedure and the law.  The other

10   is to be an officer of this Court.  And as an officer of this

11   Court, absolute candor is required at all times.  And that

12   candor means that we don't exaggerate and we don't leave off

13   part of the truth of the case.

14            It is truly a pleasure when I'm dealing with parties

15   and I want to always deal with parties who are absolutely

16   honest with me, tell me the bad side of their case and tell me

17   the good side of their case.  When that occurs, I sit back, I

18   feel better about it.  I can go to the law.  I think I can get

19   a grasp on it.

20            But when I have a moving target and I'm getting part

21   of the evidence from one party, part of the evidence from the

22   other party -- and the clear example is whatever happened up

23   in Midland.  There was no denial of an injunction.  But there

24   was no granting of an injunction.  It could have been very

25   easily set forth exactly what happened.  That judge deferred

68

2

1    making a decision, and during the deference to make a decision

2    the case was dismissed.  That would have made a real simple,

3    quick record of what happened up there.  Instead, the Court

4    has to piece together what happened.

5         Now, you kind of get a judgment from the judge that

6    you ask for if you give the judge the straight story.  But if

7    the judge has to keep piecing it together -- I'm talking to

8    both sides here -- if the judge has to piece together what

9    actually happened, then you end up sometimes with something

10   nobody likes.

11        So as officers of this Court I plead with you and beg

12   with you, particularly as you deal with my good friend and

13   esteemed colleague, Judge Quist, give him the straight story

14   of where this case is.  Give him everything, the good and the

15   bad.  He'll sort it out and he'll issue, I am very confident,

16   a very considered, thoughtful opinion that you can work with

17   in this matter.

18        That's all.  Thank you, gentlemen.  I'll draft an

19   order immediately.

20   (Proceedings concluded at 11:42 a.m.)

21

22

23

24

25



RECYCLED PAPER



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION



MERRILL LYNCH, PIERCE, FENNER       §
& SMITH, INC.,                       §
                                     §
           Plaintiff,                §
                                     §      Civil Action No. 3:96-CV-0059-D
VS.                                  §
                                     §
WILLIAM E. STOCKUM,                  §
                                     §
           Defendant.                §

## ORDER

Plaintiff Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") applies for a temporary restraining order to enjoin defendant William E. Stockum ("Stockum") from using, disclosing, and transmitting confidential information and soliciting and accepting business from certain Merrill Lynch customers whom defendant served while a Merrill Lynch financial consultant. The court denies the TRO application, and establishes a scheduling order for consideration of Merrill Lynch's preliminary injunction motion.

I

Without prior notice, Stockum resigned his employment with Merrill Lynch on Friday, January 5, 1996 and went to work for one of its competitors, PaineWebber, Incorporated ("PaineWebber"). On Monday, January 8, 1996 Merrill Lynch filed this action seeking a temporary restraining order. In a contemporaneously-filed complaint for injunctive relief, Merrill Lynch contends that Stockum is liable for (1) conversion of trade secrets, customer lists, and confidential business information, (2) breach of contract; (3) breach of fiduciary duty; and (4)

unfair competition. Merrill Lynch seeks a TRO to prevent Stockum from using, disclosing, and transmitting certain information contained in Merrill Lynch records and from soliciting and accepting business from customers he served while employed at Merrill Lynch.

The court denies Merrill Lynch's motion for a TRO because Merrill Lynch has failed to demonstrate the need for immediate relief. As of January 3, 1996, the National Association of Securities ("NASD") Dealers Code of Arbitration Procedure ("Arbitration Code") provides a mechanism for Merrill Lynch to obtain the relief it seeks in this application. Section 47 of the Arbitration Code provides that an arbitrator will hold a hearing on a request for a temporary restraining order between one and three days after receipt of the request. Thus Merrill Lynch appears to have no need to seek immediate relief from this court.

Although this court has in the past granted TRO's in litigation of this type, and has rejected arbitration-based opposition to such relief, the Arbitration Code now provides for accelerated hearings in matters such as this. Merrill Lynch's application for temporary restraining order is denied without prejudice to its moving anew for a TRO in the event it does not obtain a prompt arbitration hearing before the NASD.

## II

Although the court has denied Merrill Lynch's TRO application, it is nevertheless entitled to consideration of its motion for a preliminary injunction. Pursuant to Fed. R. Civ. P. 43(e), the court will consider this motion on affidavits, deposition excerpts, and exhibits. See, e.g., FSLIC v. Dixon, 835 F.2d 554, 558-59 (5th Cir. 1987); E. E. Maxwell Co. v. Arti Decor, Ltd., 638 F. Supp. 749, 751 n.3 (N.D. Tex. 1986). Merrill Lynch shall file with the court, and serve upon Stockum by hand or courier, its supporting materials and brief. Stockum shall file with the court,

and serve upon Merrill Lynch by hand or courier, his brief and any opposition materials within ten days thereafter. Merrill Lynch may file a reply brief (but not new evidentiary materials) within five days after Stockum files his responsive materials. The court will hold a mini-hearing, upon appropriate notice, if it determines that a controlling credibility issue is presented. Otherwise, the preliminary injunction application will be decided on the papers.

* * *

Merrill Lynch's TRO application is denied. The clerk of court shall advise counsel by telephone of the entry of this order.

**SO ORDERED.**

January ___11___, 1996.


SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

- 3 -



RECYCLED PAPER

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., | ) ) ) | No. 99 C 5968 |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Chicago, Illinois September 10, 1999 3:52 p.m. |
| PAUL J. OBLON, CARLOS A. GONZALEZ, CHRIS MARZEC, MAURICE MATHY, JASON STALLMANN, JEFF THORNE, SCOTT M. ZAGURSKY, and TODD ZAGURSKY, | ) ) ) ) ) ) | |
| Defendants. | ) | Motion |

APPEARANCES:

For the plaintiff:      Lord, Bissell & Brook,
                        by:  RONALD M. LEPINSKAS and
                             JOSEPH M. TALARICO,
                        115 South LaSalle Street,
                        Chicago, Illinois 60603

For the defendants:     Neal, Gerber & Eisenberg,
                        by:  H. NICHOLAS BERBERIAN,
                             ROBERT J. MANDEL, and
                             L. ROGER BOORD,
                        Two North LaSalle Street,
                        Chicago, Illinois 60602

JAMES P. DOLAN
OFFICIAL REPORTER — U.S. DISTRICT COURT
219 SOUTH DEARBORN STREET
CHICAGO, ILLINOIS 60604

1          THE CLERK:  99 C 5968, Merrill Lynch v. Oblon,

2   et al.

3          MR. LEPINSKAS:  Good afternoon, your Honor.  Ron

4   Lepinskas on behalf of plaintiff, Merrill Lynch.

5          MR. BERBERIAN:  Good afternoon, your Honor.  Nick

6   Berberian on behalf of the defendants.

7          THE COURT:  Good afternoon to both of you.

8          I've had an opportunity to review the

9   complaint and the memorandum in support of the motion for

10  temporary restraining order, and briefly I've had a chance

11  to review the defendants' response.

12          Before we get into a discussion of the

13  arguments that you desire to make in connection with your

14  respective positions, have you talked with one another about

15  settling the case at all, or settling this issue?

16          MR. LEPINSKAS:  Your Honor, if I may, up until

17  yesterday, when our district manager first found out about

18  this situation, --

19          THE COURT:  Yes?

20          MR. LEPINSKAS:  -- he attempted to talk with -- as

21  you can see from the affidavit --

22          THE COURT:  Right.

23          MR. LEPINSKAS:  -- Mr. Graham tried to talk with

24  these people, --

25          THE COURT:  I reviewed that, as well.

```
 1          MR. LEPINSKAS:  -- right -- and under advice of
 2     counsel, supposedly, one of the defendants said that they
 3     weren't willing to talk about these matters, so --
 4          THE COURT:  Right.  But now that they've got
 5     counsel, can counsel see if you can work something out?
 6          MR. BERBERIAN:  Oh, we're more than delighted to
 7     try to do so, your Honor.
 8          That conversation yesterday was
 9     confrontational.  They were threatened with all kinds of
10     legal action.  It was not the kind of a conversation
11     conducive to leading to any kind of resolution.
12          THE COURT:  Oh.  Well, --
13          MR. LEPINSKAS:  Your Honor, I'd be happy to do so
14     as long as we reach closure on this matter today, if
15     possible.
16          THE COURT:  Why don't we sit down right now and
17     see if we can work something out.
18          MR. LEPINSKAS:  I'd be happy to do so, your Honor.
19          THE COURT:  I've got a jury out.  I'm bringing the
20     jury back in to see what their desires are, whether they
21     want to continue to deliberate or not, at 4:30.  I can
22     devote between now and 4:30 to you folks.
23          MR. LEPINSKAS:  Okay.
24          THE COURT:  If it's necessary that we conduct a
25     further hearing after I send the jury home in this case, we
```

4

1   can do that, as well.  I'm hearing this case for Judge

2   Aspen, who is the assigned judge to this case.  I think we

3   can probably work something out.

4           MR. LEPINSKAS:  I'd be happy --

5           THE COURT:  There's a lot of history in this type

6   of activity, and I've often thought that there really ought

7   to be some guidelines for everyone, and maybe we can sit

8   down and informally work out those guidelines.

9           MR. BERBERIAN:  Your Honor, the guidelines our

10   clients tried to follow are the very guidelines that you set

11   forth in the Pinzker case.

12           THE COURT:  I understand.  All of these cases are

13   fact-specific.

14           MR. LEPINSKAS:  Right, and, obviously, we think

15   it's different, but if you want to go in chambers, I'd be

16   happy to join you with counsel.

17           THE COURT:  I was actually going to sit down out

18   here in the courtroom because we've got so many people, but,

19   yes, why don't we come on back into chambers.  I'll have my

20   clerk come on back as well.

21               You can come get me at 4:30 when we bring the

22   jury out.

23       (Conference off the record.)

24           THE CLERK:  99 C 5968, Merrill Lynch v. Oblon,

25   et al.

5

1          MR. BERBERIAN:  Good afternoon, your Honor.  Nick
2     Berberian on behalf of defendants.
3          MR. LEPINSKAS:  Good afternoon, your Honor.  Ron
4     Lepinskas on behalf of plaintiff, Merrill Lynch.  At my side
5     is Tom Lydon from Merrill Lynch.
6          THE COURT:  Yes.  Good afternoon again to all of
7     you.
8               Since we first called the case this afternoon
9     and I suggested we have a settlement conference, we have
10    engaged in that settlement conference, and have been engaged
11    in that settlement conference -- you lawyers have been -- I
12    had to turn my attention to other matters.
13              We worked on the parameters of a possible
14    settlement, but it appears that that cannot be accomplished.
15    I do understand, though, that what was accomplished is that
16    a hearing on the defendants' request for arbitration with
17    the NASD has been commenced -- or has been arranged, and
18    will take place on Thursday or Friday of next week.
19              Is that everyone else's understanding, as
20    well, the 16th or 17 of September?
21         MR. BERBERIAN:  On behalf of the defendants, that
22    is correct, your Honor.
23         MR. LEPINSKAS:  Well, on behalf of the plaintiffs,
24    I don't know that I can commit the particular lawyer who
25    will be arguing to Thursday or Friday, but that is our

6

```
1    intention at this point.
2                THE COURT:  Okay.
3                MR. LEPINSKAS:  I mean that date may give by a day
4    or two.
5                THE COURT:  Okay.  Well, my understanding is that
6    Mr. Berberian contacted the people there, and whoever he
7    talked with, that was the available time, and it will take
8    place shortly, so that process has been at least commenced.
9                    I've reviewed your respective materials, and
10   your motions to file a brief in support of 15 pages, both
11   sides, will be granted, and I understand that there is some
12   further comment that counsel desire to present.  In view of
13   the hour, it being 5:14 by the clock on the wall, I would
14   ask that you keep them as brief as possible, but I certainly
15   want to hear everything you desire to say.
16               MR. LEPINSKAS:  Your Honor, further comment from
17   the plaintiff will come from Mr. Lydon.
18                    If you want to approach the podium --
19               THE COURT:  All right, Mr. Lydon, I understand you
20   got a phone call and you came over to the courthouse to
21   assist me in evaluating this case.
22               MR. LYDON:  Right, Judge, I did.
23               THE COURT:  What is your position with Merrill
24   Lynch?
25               MR. LYDON:  I'm the district administrative
```

7

1    manager with the Chicago District of Merrill Lynch, your

2    Honor.

3            THE COURT:  All right, and is Mr. Graham a

4    superior of yours?

5            MR. LYDON:  Right, Mr. Graham is the district

6    director.  I report to him.

7            THE COURT:  He was the affiant in these

8    proceedings, --

9            MR. LYDON:  Correct.

10           THE COURT:  -- and provided me with an affidavit,

11    which I've reviewed.

12           MR. LYDON:  Right.

13           THE COURT:  Go ahead.

14           MR. LYDON:  Your Honor, I'm not an attorney, --

15           THE COURT:  That's okay.

16           MR. LYDON:  -- and I don't purport to be, but if I

17    can just very briefly state our position, it's our position,

18    Judge, that our clientele is our most important asset.

19    These clients were developed utilizing Merrill Lynch

20    resources, research, our good name, our reputation, and it

21    is our position, your Honor, that, although we can't say

22    that we own anything, and the clients -- it's a free country

23    -- they can go where they want, it is our position that the

24    clients were -- are Merrill Lynch clients.

25                Again, Judge, I'm not going to interpret our

8

1   contract, but we feel that there are restrictions on the
2   contact of our clients.  We would like an opportunity to
3   show -- to speak to our clients -- our clients -- and
4   explain to them.  Once again, they obviously are our clients
5   for a reason, the value of Merrill Lynch.
6              In particular, Judge, we have something
7   called the Merrill Lynch Unlimited Advantage Program, which
8   is a new program.  Merrill Lynch is changing the industry.
9   It's an entirely new pricing structure, which is very, very
10  advantageous to our clients.
11             What we are asking for, your Honor, is simply
12  an opportunity to speak to our clients, to explain to them
13  the advantages.  They may have already been spoken to by the
14  departing FCs, but we feel very strongly, your Honor, that
15  these are developed with Merrill Lynch resources.  I will
16  not -- I'm not going to say anything bad about Smith Barney.
17  Smith Barney is a good firm.  I'm not here to do that, your
18  Honor.  I'm just here to appeal to your good judgment, that
19  these are -- we consider these our clients -- quote -- and
20  we would just like the opportunity to reach them, and we
21  would like our employees, our former employees, just to live
22  up to the terms of the agreement that they signed.
23             THE COURT:  All right, well, I appreciate that.
24             Does anyone desire to ask any questions of
25  Mr. Lydon?  Even though he is not under oath, I accept his

9

1    word as his word.

2                MR. BERBERIAN:  We do not, your Honor.

3                THE COURT:  Okay.

4                     All right, anything further you desire to

5    say, Mr. Lydon?

6                MR. LYDON:  Your Honor, we feel very strongly

7    about this.  I jumped out of my office and came over here.

8                THE COURT:  I understand.  I used to office in the

9    Sears Tower, myself, so --

10               MR. LYDON:  And it just -- you know, we do have

11   the clients' best interests at heart here, and I would hope

12   that our former employees do, as well.  I don't know if they

13   do or not, Judge.

14               THE COURT:  All right, well, thank you, and I

15   appreciate your coming over.

16                    All right, is there anything further that

17   counsel desire to say in support of or in opposition to the

18   motion?

19               MR. LEPINSKAS:  Your Honor, you've heard my pitch

20   again and again that this is an orchestrated raid, and that

21   all of these are solicitations, all of these contacts.

22   There is no other straight-face purpose that they could come

23   up with to say why they're doing what they're doing.

24                    I understand your Honor has his good reasons

25   for what he's doing, and I respectfully disagree.

1           THE COURT:  All right.  We had a lot of discussion
2      in the settlement conference off the record regarding the
3      facts and respective positions, but my understanding of the
4      facts at this point are that the defendants have sent to the
5      customers whose names and addresses they remember a notice
6      that was identical in nature and different only as to the
7      name of the broker, as was utilized in the Pinzker case that
8      was brought before me in December of last year.
9                Based on that fact, the announcement of the
10     broker that the broker has gone to Salomon Smith Barney,
11     providing the phone number and other information -- I don't
12     have a copy of the notice that was shown to me at the
13     settlement conference in front of me -- but if that's the
14     nature of the notice that's provided, it is my ruling that
15     that type of contact is not for the purpose of inviting,
16     encouraging, or requesting any account to transfer from
17     Merrill Lynch, or to open a new account at Salomon Smith
18     Barney, or to otherwise have the customer of Merrill Lynch
19     discontinue its patronage from Merrill Lynch, or its
20     business relationship with Merrill Lynch.
21                That notice is for the purpose of informing
22     the customer that the broker with whom the customer had been
23     working at Merrill Lynch has moved to Salomon Smith Barney,
24     and since it's for the purpose of informing, and since
25     informing is not one of the restricted purposes in the

```
 1    Merrill Lynch financial consultant employment agreement, I
 2    believe that that type of a contact is not a violation of
 3    that employment agreement by the defendants.
 4              Likewise, to answer Mr. Lydon's comments,
 5    Merrill Lynch has every right to contact these customers of
 6    Merrill Lynch, to solicit these customers of Merrill Lynch,
 7    to tell the customers of Merrill Lynch about the new
 8    arrangement that Mr. Lydon commented on, to tell the
 9    customers of Merrill Lynch that their accounts will now be
10    serviced by whomever it is at Merrill Lynch that will be
11    servicing these accounts, to provide these Merrill Lynch
12    customers with inducements to remain at Merrill Lynch, and
13    the defendants cannot invite, encourage, or request any of
14    these Merrill Lynch customers to move their accounts,
15    transfer their accounts, or open a new account, or
16    discontinue their patronage of Merrill Lynch.  So the
17    advantage still remains with Merrill Lynch with regard to
18    these customers.
19              The employment agreement does not prohibit
20    contacts that are informative contacts, contacts that merely
21    inform the customer.  And since the Merrill Lynch employment
22    contract deals with contacts or communications, one must
23    look to the contact and the communication and the purpose of
24    the contact or communication, and if the purpose is
25    something other than inviting, encouraging, or requesting
```

1   any account to transfer or open a new account or otherwise

2   discontinue its patronage at Merrill Lynch, it is not a

3   violation of paragraph 2 of the Merrill Lynch employment

4   agreement.

5           There has been no showing at this point that

6   the defendants have in their possession -- no showing --

7   there have been allegations -- but there's been no showing

8   that they have in their possession any confidential

9   information or records of Merrill Lynch that they are using

10  in any manner to further their business at Smith Barney, and

11  there's no indication or no proof, other than just

12  allegations, that these defendants have divulged, or have

13  agreed to divulge, any information to any third party that

14  is confidential information at Merrill Lynch.

15          And so at this point, even though these

16  defendants have acknowledged in the employment agreement the

17  extreme value to Merrill Lynch of confidential information,

18  there is no showing at this point that would cause me to

19  believe that, on the merits of the case, Merrill Lynch would

20  prevail.

21          I believe that the public has a right to know

22  when a broker leaves one company and goes to another

23  company, and I believe that at this point there has been no

24  showing that the defendants have done anything other than to

25  inform their customers, Merrill Lynch's customers, of their

13

1   change of employment.

2              There is nothing that violates the employment

3   agreement if the former Merrill Lynch employee accepts

4   business that was neither invited, encouraged, or requested,

5   as long as there was not a solicitation, as long as there

6   was not an invitation or an encouragement or a request to

7   transfer, or open a new account, or otherwise discontinue

8   patronage at Merrill Lynch.

9              And the public has a right to change brokers

10  at any point in time.  Mr. Lydon said it.  As he said,

11  people can go wherever they want.

12             And I realize that this is important, that

13  this is the lifeblood of Merrill Lynch, but at this point

14  there isn't sufficient evidence from the affidavit of Mr.

15  Graham or any of the other information provided to me that

16  these defendants have violated their agreement or any of the

17  laws that restrict their activities at this point.

18             Anything else?

19       MR. LEPINSKAS:  Your Honor, if I may be heard,

20  first I'd like to thank you for your time, patience, and

21  energy today.  It's no fun, I know, at the end of a long

22  week.

23             Mr. Lydon here would like to add -- with the

24  Court's indulgence -- Mr. Lydon would like to add a further

25  comment.

14

1           MR. LYDON:  Your Honor, I just --

2           THE COURT:  If you can stand up.  As I get older,

3     I have difficulty hearing.

4           MR. LYDON:  Your Honor, I just want to say that

5     with respect to confidentiality, and, again, I'm not a

6     lawyer, but where would they get the information, the names

7     and addresses of their clients, if not from Merrill Lynch's

8     records, which we consider confidential, number one.

9               Number two, I appreciate the spirit that the

10    client has a right to be informed.  The public does have a

11    right to be informed in terms of a change from one firm to

12    another.  I got here late, your Honor, and maybe I'm not

13    completely understanding exactly what the total ruling is,

14    but if this -- if they are allowed to make phone calls,

15    which I don't know if they are or not, but it would be --

16    being in the business for almost 20 years -- it would be

17    hard for me to believe that someone could make a phone call

18    simply to inform.  I would say that a phone call to our

19    clients would be, in fact, the basis for a solicitation.  If

20    I wanted to be informed of moving from one firm to another,

21    and I had a wedding announcement or some little card, that

22    would be fine.  Maybe I'm not -- I didn't hear your whole

23    ruling, your Honor, so --

24          THE COURT:  All right, well, let me try to

25    explain it.

1            Under the law there is no restriction on the
2    defendants from making a phone call that's informative.  If
3    that phone call turns into a solicitation that invites or
4    encourages or solicits in violation of the agreement, then
5    the defendant, the former broker of Merrill Lynch, has
6    violated the agreement.

7            I had proposed, as part of the settlement,
8    that the defendants be required to keep a list of everyone
9    they contact by phone or any other way, and that they keep
10   -- or provide information as to the nature of the
11   conversation so that Merrill Lynch could follow up and find
12   out from the customer if in fact there had been a violation
13   by the defendants of the agreement.  That's not required by
14   the agreement that the defendants keep this list.

15           Since we've gone to a hearing, and I'm
16   denying the motion for temporary restraining order, and
17   there hasn't been any discovery served yet, the information
18   may not be as readily available.

19           I agree with you when you think, "Okay, how
20   could it not be?"  Well, it could not be by merely having
21   the defendant say, "I've now moved to Smith Barney, and I
22   just wanted to let you know that, and that's why I called.
23   Have a good weekend."

24       MR. BERBERIAN:  And, your Honor, perhaps you may
25   want to ask Mr. Lydon if they're going to advise these

1    customers where these individuals are when they call in.

2         THE COURT:  All right, well, you see, under the

3    law that I've got in front of me, there is no obligation on

4    the part of Merrill Lynch to tell a customer of one of these

5    -- or who was serviced by one of these defendants that that

6    defendant has gone to Smith Barney.

7         I believe it's good business practice.  I

8    believe it's an obligation that Merrill Lynch has as part of

9    its business to provide information to its customers, and

10   included in that information is the information that the

11   person, the former broker of Merrill Lynch that the customer

12   has been dealing with in the past, has now gone to Smith

13   Barney.  But I can't compel that, and I can't order it, so

14   I'm not going to ask Mr. Lydon if he's going to do that.

15   That would have been part of the deal if a settlement had

16   been reached.  And I think it's just good business practice,

17   because, frankly, I would think that the customer some day

18   is going to find out, and if the customer believes that

19   Merrill Lynch kind of hid that information from the

20   customer, then the customer may trust Merrill Lynch a little

21   less.  But I'm not in that business.  I'm a judge.

22         Is there anything else we need to address at

23   this point?

24         MR. BERBERIAN:  Thank you, your Honor.

25         MR. LEPINSKAS:  Just one other matter, your Honor.

```
 1                THE COURT:  Yes?
 2                MR. LEPINSKAS:  It has come to our attention that
 3     Mr. Carlos Gonzalez -- the "Naperville Seven" has gone to
 4     the "Naperville Eight" -- has also left the office, and we'd
 5     like to orally amend the complaint to add Carlos Gonzalez to
 6     the proceedings --
 7                THE COURT:  Oh, okay, well, --
 8                MR. LEPINSKAS:  -- if that's okay with opposing
 9     counsel.
10                MR. BERBERIAN:  Your Honor, not only is it all
11     right, but we filed our opposition naming Mr. Gonzalez.
12                THE COURT:  Okay.
13                MR. BERBERIAN:  We couldn't figure out why he
14     wasn't included.
15                MR. LEPINSKAS:  We didn't know about him.
16                THE COURT:  Yes, the only defendant not listed in
17     the complaint is Mr. Gonzalez, but the opposition does list
18     him as the second defendant in the pleadings, so the
19     complaint can be orally amended to include as a defendant
20     Carlos A. Gonzalez.
21                MR. LEPINSKAS:  Thank you, your Honor.
22                THE COURT:  All right, anything else?
23                MR. BERBERIAN:  Thank you, your Honor.
24                THE COURT:  This is Judge Aspen's case, so any
25     further orders and any further matters involving this
```

18

1   litigation should be brought before him or before the

2   magistrate judge if the matter is referred to the magistrate

3   judge by Judge Aspen.  But I hope you can resolve this in

4   your arbitration.

5            MR. BERBERIAN:  Thank you very much, your Honor.

6            MR. LEPINSKAS:  Thank you.  Have a good weekend.

7            THE COURT:  Thank you.  You too.

8       (Adjournment at 5:35 p.m.)

9

10

11                        CERTIFICATE

12   I certify that the foregoing is a correct transcript of the

13   record of proceedings in this matter on September 10, 1999.

14

15   _____        _____9/12/99_____

16   Official Court Reporter                      Date

17

18

19

20

21

22

23

24

25





RECYCLED PAPER

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

Michael W. Dobbins                                    Office of the Clerk
    CLERK


        H. Nicholas Berberian
        Neal, Gerber & Eisenberg
        Two North LaSalle Street
        Suite 2300
        Chicago, IL  60602


---------------------------------------------------------------------------
        Case Number:  1:00-cv-02065


        Title:  Merrill Lynch Pierce v. O'Connor

Assigned Judge: Honorable Elaine E. Bucklo


MINUTE ORDER of 4/12/00 by Hon. Elaine E. Bucklo : Status
hearing set for 10:00 a.m. on 06/16/00. Plaintiff's motion
for a temporary restraining order is denied [3-1] and its
motion for preliminary injunction [3-2] is referred to Hon.
Magistrate Judge W. Thomas Rosemond Jr. to conduct
necessary proceedings and submit reprot and recommendations
(See reverse of minute order.) Mailed notice


This docket entry was made by the Clerk on April 13, 2000


ATTENTION:  This notice is being sent pursuant to Rule 77(d) of the
            Federal Rules of Civil Procedure or Rule 49(c) of the Federal
            Rules of Criminal Procedure.  It was generated by ICMS,
            the automated docketing system used to maintain the civil and
            criminal dockets of this District.  If a minute order or
            other document is enclosed, please refer to it for
            additional information.

For scheduled events, motion practices, recent opinions and other information,
visit our web site at www.ilnd.uscourts.gov

Check our web site for CourtWeb--a concise listing of rulings by judges.
Check for rulings on noticed motions.  Also, subscribe to CourtWatch--a free
service--to receive e-mail notification of CourtWeb postings.

To apply for a PACER account, call 1.800.676.6856





RECYCLED PAPER



**618**                    **194 FEDERAL RULES DECISIONS**                    **MERRILL LY**

ed not to filed charges with the EEOC within the requisite [limitations period]." *Id.* at *6. Because "individuals with time-barred claims may not be included within a proposed class," only those who could have filed charges with the EEOC on or after February 26, 1996 may be included. *Sample v. Aldi Inc.*, No. 93C3094, 1994 WL 48780, at *4 (N.D.Ill. Feb. 15, 1994).

[25–27] Finally, Defendant argues that the class should be limited to only claims of failure to promote non-managers in the Chicago office. "[F]or purposes of class certification, it is generally true that supervisory and nonsupervisory employees should not be placed in the same class." *Sample*, 1994 WL 48780, at *4. Furthermore, "[t]he existence of separate divisions or departments does not negate the possibility of company-wide discrimination. However, a pervasive discriminatory policy cannot be presumed based on discrimination within one particular division." *Id.* at *5. In this case, Plaintiffs have failed to allege that discrimination took place outside of the Chicago office. Even though Plaintiffs raise other claims, this Court found that issues regarding failure to promote were common to the class, therefore, those are the only claims suitable for the class.

IT IS SO ORDERED.



**MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Plaintiff,**

v.

**Timothy J. O'CONNOR, Defendant.**

No. 00 C 2065.

United States District Court, N.D. Illinois, Eastern Division.

May 19, 2000.

Brokerage brought suit seeking to retrain broker formerly in its employ from

soliciting any business from or initiating any contact with any client of brokerage serviced by broker or known to broker while he was employed by brokerage, accepting any business or account transfers from any of such customers, or using any information contained in the files of brokerage. On plaintiff's emergency motion for expedited discovery schedule and for preliminary injunction hearing, and defendant's motion for deposition, the District Court, Rosemond, United States Magistrate Judge, held that plaintiff was not entitled to expedited discovery in order to prepare for preliminary injunction hearing.

Motions denied.

**1. Federal Civil Procedure ⚖ 1261**

Expedited discovery is not the norm, and plaintiff must make some prima facie showing of the need for the expedited discovery.

**2. Federal Civil Procedure ⚖ 1261**

Brokerage which brought suit to restrain former employee from soliciting its customers was not entitled to expedited discovery in order to prepare for preliminary injunction hearing, where discovery sought by brokerage showed an intent to harass, and where it appeared that brokerage was attempting an "end-run" around arbitration process to which it was contractually bound.

**3. Federal Civil Procedure ⚖ 1261**

Requirement that a plaintiff obtain leave of court for expedited discovery serves to maintain the fairness of civil litigation; courts should not grant such leave without some showing of the necessity for the expedited discovery, and must also protect defendants from unfair expedited discovery.

Terrence Patrick Canade, Kevin Patrick McJessy, Steven Todd Whitmer, Andrew R. Gifford, Lord, Bissel & Brook, Chicago, IL, for plaintiff.

Jerry Michael Santangelo, H. Nicholas Berberian, Neal, Gerber & Eisenberg, Chicago, IL, for defendant.

**MERRILL LY**

*ORDER*

ROSEMOND, United St Judge.

Before the Court is plai *Motion For Expedited L And For Preliminary Inj* and "*Motion For Deposit* Timothy J. O'Connor wit days. **Both motions are a** nary injunction hearing is 12th, 2000 at 10 A.M.

At the outset of the Merrill, Lynch, Pierce, F Inc. sought issuance of a t ing order prohibiting def O'Connor, who quit his job on March 31, 2000, from : ness from or initiating an client of Merrill Lynch ser or known to O'Connor \ ployed by Merrill Lynch, a ness or account transfers customers, or using any tained in the files of Merr **Lynch was unsuccessful i**

As noted by the District rary restraining order Lynch would have ess "O'Connor from doing any one he ever did busines Lynch even if the custom O'Connor at his new empl be unlikely since Merrill L Court to prevent O'Connor his former customers that new employer." [1] Taking position is in and of itself *i* on the part of Merrill Lync

In any event, upon due to the evidentiary prese Merrill Lynch in support restraining order motion. found and concluded that failed to demonstrate a su

**1.** April 12, 2000 *Order* o (Docket Entry No. 22).

**2.** April 12th *Order*.

SIONS

business from or initiating any
ny client of brokerage serviced
or known to broker while he was
y brokerage, accepting any busi-
t transfers from any of such
.. using any information con-
e files of brokerage. On plaintiff's
tion for expedited discovery
or preliminary injunction hear-
tendant's motion for deposition,
Court, Rosemond, United States
ige, held that plaintiff was not
edited discovery in order to
preliminary injunction hearing.

enied.

Civil Procedure ⊙⇒1261

discovery is not the norm,
must make some prima facie
he need for the expedited discov-

Civil Procedure ⊙⇒1261

ee which brought suit to re-
employee from soliciting its
not entitled to expedited dis-
der to prepare for preliminary
ing, where discovery sought
showed an intent to harass,
t appeared that brokerage was
n "end-run" around arbitration
h it was contractually bound.

Civil Procedure ⊙⇒1261

ment that a plaintiff obtain leave
xpedited discovery serves to
arness of civil litigation; courts
grant such leave without some
necessity for the expedited
must also protect defendants
xpedited discovery.

rick Canade, Kevin Patrick
ven Todd Whitmer, Andrew R.
Bissel & Brook, Chicago, IL.

hael Santangelo, H. Nicholas
r, Gerber & Eisenberg, Chica-
dant.

## ORDER

ROSEMOND, United States Magistrate
Judge.

Before the Court is plaintiff's "*Emergency Motion For Expedited Discovery Schedule And For Preliminary Injunction Hearing*" and "*Motion For Deposition*" of defendant Timothy J. O'Connor within the next ten days. **Both motions are denied.** A preliminary injunction hearing is set for September 12th, 2000 at 10 A.M.

At the outset of the litigation, plaintiff Merrill, Lynch, Pierce, Fenner and Smith, Inc. sought issuance of a temporary restraining order prohibiting defendant Timothy J. O'Connor, who quit his job at Merrill Lynch on March 31, 2000, from soliciting any business from or initiating any contact with any client of Merrill Lynch serviced by O'Connor or known to O'Connor while he was employed by Merrill Lynch, accepting any business or account transfers from any of these customers, or using any information contained in the files of Merrill Lynch. *Merrill Lynch was unsuccessful in this regard.*

As noted by the District Judge, the temporary restraining order sought by Merrill Lynch would have essentially prohibited "O'Connor from doing any business with anyone he ever did business with at Merrill Lynch even if the customer somehow found O'Connor at his new employer, which would be unlikely since Merrill Lynch ask[ed] th[e] Court to prevent O'Connor from even telling his former customers that he ha[d] gone to a new employer."[1] Taking such an extreme position is in and of itself *indicia* of bad faith on the part of Merrill Lynch.

In any event, upon due consideration given to the evidentiary presentation made by Merrill Lynch in support of its temporary restraining order motion, the District Judge found and concluded that Merrill Lynch had failed to demonstrate a substantial likelihood of success on the merits. In addition, the District Judge found that Merrill Lynch had not met its burden of proving that it would be irreparably harmed without the issuance of an injunction, or that the public interest, or balance of harms was in its favor. She concluded that with respect to irreparable harm, "the amount of commissions generated from clients leaving Merrill Lynch to go with O'Connor to his new job [could] be readily ascertained."[2] Continuing in the same vein, she reasoned that:

> Even if there [was] the possibility of irreparable harm from the loss of customers to which Merrill Lynch claim[ed] ownership, the potential harm to O'Connor from a prolonged loss of all his customers would seem to be much greater than the potential loss to Merrill Lynch of customers who may or may not choose to deal with another Merrill Lynch broker. Finally, as numerous courts have noted, the relationship between broker and client is, in many cases at least, personal and, particularly in a time of uncertain markets, they may be harmed, or feel that they will be harmed, by being deprived of that relationship. *On this record, the balance of harms does not favor Merrill Lynch.*[3]

As noted above, the overbreadth of the injunctive relief initially sought by Merrill Lynch is *indicia* of bad faith, since by its very overbreadth it prohibits legitimate customer contact by O'Connor, particularly, with those customers with whom he had had a pre-existing brokerage relationship long before his association with Merrill Lynch, and who chose and will choose to follow him to his new employment, as is their right. Obviously, customers who had a pre-existing relationship with O'Connor prior to his association with Merrill Lynch constitute a customer base that was developed at no cost to, or at best little cost or expenditure by Merrill Lynch. Thus, the initial injunctive relief sought by Merrill Lynch reflects not a con-

---

1. April 12, 2000 *Order* of the District Judge (Docket Entry No. 22).

2. April 12th *Order.*

3. April 12th *Order* (Docket Entry No. 22) (emphasis added).

**620**                    **194 FEDERAL RULES DECISIONS**                                          **MERRILL L**

cern for protecting itself from unlawful theft of customers, but more a goal of teaching O'Connor and any individuals who might act as he has to obtain better employment benefits and opportunities elsewhere "a lesson".

It would be unlawful, as well as unreasonable, for Merrill Lynch to seek to prohibit O'Connor from giving his former customers an announcement of his intent to move to other employment and notice where he could be reached should the customers wish to contact him:

> As Judge Gettleman noted [4], otherwise customers with longstanding trust in their brokers with immediate need of advice would not be able to contact them. [5]

Certainly, when the markets were as volatile as they were in the weeks surrounding the filing of Merrill Lynch's complaint, an informational announcement regarding O'Connor's new employment was essential. Had Merrill Lynch been truly concerned about the welfare of its customers, it would have circulated such an announcement on its own.

In none of its moving papers before the Court does Merrill Lynch state the it has any standard office announcement notice of any nature whatsoever for brokers who leave its employ which tells the broker's customers when he is expected to leave, the brokerage firm to which he is going, at what telephone number he can be reached, if desired, and who at Merrill Lynch is taking over the client's account. Failure to have such a written announcement, or effective oral recitation or other similar notice procedure in place, suggests bad faith on the part of Merrill Lynch. If Merrill Lynch were truly concerned about its clients' welfare, it would have such a notification system in place. Its clients have a right to know such matters. And, employees have a right to seek and obtain the best employee benefits and opportunities that the marketplace can offer.

The evidence submitted by Merrill Lynch at the hearing on its TRO motion is further *indicia* of the bad faith force behind its charges against O'Connor:

> [T]he [evidence] indicates [that] the persons upon which Merrill Lynch ... [relies] to support its argument that O'Connor was soliciting Merrill Lynch customers were in fact *close friends* of O'Connor. One of the two about which Merrill Lynch complains is, according to O'Connor, a family member of people he had talked to, *people with whom he had a relationship going back to his high school years. The other was someone with whom he also had a personal relationship, and with whom he had a standing luncheon engagement.* [6]

As noted by the District Judge, unless O'Connor's affidavit testimony was untrue, it is *inconceivable* that such close friends and high school "chums" would not follow O'Connor to his new employment, or that they would be likely to stay with Merrill Lynch if O'Connor were to be enjoined from doing business with them. [7] Indeed, as noted earlier, the close friends and high school chums were never *originally* Merrill Lynch's clients since O'Connor brought them with him when he came to work at Merrill Lynch. The examples of harm tendered by Merrill Lynch show neither irreparable harm nor unlawful solicitation, but rather Merrill Lynch's harassment goal in bringing the suit against O'Connor.

At the respective hearings on its *"Emergency Motion For Expedited Discovery Schedule And For Preliminary Injunction Hearing"* and *"Motion For Deposition"*, Merrill Lynch essentially reiterated the same arguments that it had made before the District Judge in support of its unsuccessful temporary restraining order motion. The evidence and arguments remained unchanged. And, they were just as unpersuasive the, as they were before.

It appears undisputed t of the National Associ Dealers and contracts ex ties that the parties are the dispute between them the National Association ers Code of Arbitration. petitioned for the selecti panel. Under the rule already begun the proces discussing their respecti arbitrators. If the par agree upon and assembl tors by May 24th, under panel will be selected for days thereafter. Once ar selected, defendant will n proceedings in federal c to be granted. Once an been assembled, injuncti priate. Notwithstanding process is well on its way seeks expedited discover injunction hearing *befor* an NASD arbitration pa its pursuit in this regard bad faith.

Plaintiff's *"Emergenc dited Discovery Schedul Deposition"* of defendar nor seek unfettered and discovery, and a limitle defendant. No effort w tailor the discovery sou straints proposed by th specific issues that will preliminary injunction attempt is made to ar

*"Plaintiff's First Set Defendant"* contains nu are irrelevant to any p case, overbroad on the seemingly propounded harassment. Example follows:

*Interrogatory No. 1:*

1. Please identify ar ords, documents.

---

4.  *Merrill Lynch v. Oblon.* (N.D.Ill. Sept. 10, 1999): *Merrill Lynch v. Gurtin.* (N.D.Ill. January 29, 1999).

5.  April 12th *Order* of the District Judge.

6.  April 12th *Order* (emphasis added).

7.  April 12th *Order.*

8.  Exhibit C. at 4. "De Plaintiff's Emergenc M covers Schedule And For Hearing."

S

bmitted by Merrill Lynch
its TRO motion is further
ad faith force behind its
'Connor:

indicates [that] the per-
h Merrill Lynch . . . [relies]
gument that O'Connor was
Lynch customers were in
...s of O'Connor. One of the
h Merrill Lynch complains
O'Connor, a family mem-
ad talked to, *people with
a relationship going back
ool years. The other was
hom he also had a per-
ip, and with whom he
g luncheon engagement.*[8]

District Judge, unless
. testimony was untrue, it
that such close friends and
" would not follow O'Con-
nployment, or that they
stay with Merrill Lynch if
o be enjoined from doing
.[7] Indeed, as noted earli-
ls and high school chums
ally Merrill Lynch's clients
ught them with him when
at Merrill Lynch. The
.endered by Merrill Lynch
parable harm nor unlawful
rather Merrill Lynch's
bringing the suit against

hearings on its *"Emer-
r Expedited Discovery
r Preliminary Injunction
Motion For Deposition"*,
tially reiterated the same
ad made before the Dis-
pport of its unsuccessful
ing order motion. The
.uments remained un-
ey were just as unpersua-
vere before.

mphasis added).

It appears undisputed that under the rules of the National Association of Securities Dealers and contracts executed by the parties that the parties are bound to arbitrate the dispute between them. And, pursuant to the National Association of Securities Dealers Code of Arbitration, the defendant has petitioned for the selection of an arbitration panel. Under the rules, the parties have already begun the process of exchanging and discussing their respective lists of proposed arbitrators. If the parties are unable to agree upon and assemble a panel of arbitrators by May 24th, under the NASD rules, a panel will be selected for them within a few days thereafter. Once an arbitration panel is selected, defendant will move for a stay of all proceedings in federal court, which is likely to be granted. Once an arbitration panel has been assembled, injunctive relief is inappropriate. Notwithstanding that the arbitration process is well on its way, Merrill Lynch still seeks expedited discovery, and a preliminary injunction hearing *before* the empaneling of an NASD arbitration panel. On this record, its pursuit in this regard is further *indicia* of bad faith.

Plaintiff's *"Emergency Motion For Expedited Discovery Schedule"* and *"Motion For Deposition"* of defendant Timothy J. O'Connor seek unfettered and unrestrained written discovery, and a limitless deposition of the defendant. No effort whatsoever is made to tailor the discovery sought to the time restraints proposed by the plaintiff, or to the specific issues that will be determined at the preliminary injunction hearing. Indeed, no attempt is made to articulate those issues.

*"Plaintiff's First Set Of Interrogatories To Defendant"* contains numerous requests that are irrelevant to any potential issue in the case, overbroad on their face, or otherwise seemingly propounded for purposes of harassment. Examples of the same are as follows:

*Interrogatory No. 1:*

1. Please identify and describe any records, documents, or information per-

taining to any Merrill Lynch Account that O'Connor provided to Dean Witter and state:

  (a) The date(s) on which O'Connor provided such records, documents or information to Dean Witter;

  (b) Whether such records, documents, or information were used in any way by Dean Witter or O'Connor to prepare mailings O'Connor sent to the Merrill Lynch Accounts; and

  (c) Whether such records, documents, or information are currently in Dean Witter's possession or in any database maintained by Dean Witter.[5]

The above-noted interrogatory is unrestrained as to time and scope and, therefore, seeks wholly irrelevant matter.

*Interrogatory No. 3:*

3. State the names and office locations of any persons (including headhunters) who had any involvement in the hiring of O'Connor at Dean Witter, including, without limitation, any persons with whom O'Connor interviewed and the dates on which such interviews took place.[9]

The above-noted interrogatory is pure harassment. Dean Witter is not a party in the lawsuit. No issue or potential issue in the case could possibly center or focus on Dean Witter's hiring of the defendant, or the defendant's job hunting processes.

*Interrogatory No. 4:*

4. Identify O'Connor's current supervisors and subordinates at Dean Witter.

The above noted interrogatory seeks wholly irrelevant matter. O'Connor's supervisors and subordinates at Dean Witter are not parties to this action. This request is pure harassment of O'Connor's bosses.

*Interrogatory No. 5:*

5. State in detail all aspects of O'Connor's compensation package at Dean Witter,

---

8. Exhibit C, at 4, *"Defendant's Opposition To Plaintiff's Emergency Motion For Expedited Discovery Schedule And For A Preliminary Injunction Hearing."*

9. Exhibit C, at 5.

including up-front loans, commission pay-outs, asset payments, back-end bonuses or payments, salary guarantees, etc.

At the outset, the request is overbroad in scope and time and, therefore, seeks wholly irrelevant matter. O'Connor's salary or compensation package or arrangements with Dean Witter have nothing to do with the lawsuit. Even if O'Connor received an increase in salary due to the number of individuals he soundly expects to follow him from Merrill Lynch to Dean Witter, such evidence would not be probative of whether or not he had unlawfully solicited Merrill Lynch's clients. That some clients will follow him to his new employment is to be expected, particularly, of those that had had a pre-existing relationship with O'Connor prior to his being hired by Merrill Lynch. Indeed, it is a reasonable expectation.

Before O'Connor joined the ranks of Merrill Lynch, he was a broker with the I.D.S. brokerage firm. Assertedly, while with I.D.S., O'Connor developed his book of business there. When he came to Merrill Lynch, assertedly, 90% of his customer base consisted of individuals who were his clients at I.D.S. If these people followed him from I.D.S. to Merrill Lynch, they undoubtedly will follow him to Dean Witter. If the customers were not solicited, and otherwise leave Merrill Lynch voluntarily, they are free to do so, and Merrill Lynch can not prevent them from doing so. The key issue is what, if anything, did the defendant do prior to or after his departure from Merrill Lynch that amounted to unlawful solicitation. Whether he had a salary related motive for doing so strikes us as being at most tenuously relevant. Certainly, such a discovery pursuit ought not to be the basis for or the subject of expedited discovery.

*Interrogatory No. 6:*

6. State whether Dean Witter and O'Connor ever discussed potential litigation

10. Exhibit C, at 5.

11. Exhibit D, at 3 and 4, *"Defendant's Opposition To Plaintiff's Emergency Motion For Expedited*

by Merrill Lynch (outside the presence of counsel) prior to the time O'Connor was hired by Dean Witter, and, if so:

(a) identify all persons who participated in these discussions;

(b) state the dates said discussions occurred; and

(c) state whether Dean Witter agreed to pay money to indemnify and/or resolve litigation and, if so, in what amount.[10]

The above-quoted interrogatory seeks wholly irrelevant matter. It too suggests harassment.

*"Plaintiff's First Request For The Production Of Documents To Defendant"* fares no better than its *"First Set Of Interrogatories To Defendant"*. The request contains ten document requests. Document Request Nos. 1 through 6 are overbroad and otherwise seek wholly irrelevant matter.[11] Document Request No. 7 seeks information that is in Merrill Lynch's possession. Merrill Lynch should know which of its customers have transferred their accounts to Dean Witter. It is not the type of discovery request that should be the subject of expedited discovery, and its inclusion smacks of harassment. The remaining document requests speak for themselves in terms of pure harassment, to-wit:

*Document Request No. 8:* All letters, memoranda, telephone logs, account forms, and other DOCUMENTS which reflect contact with any MERRILL LYNCH ACCOUNT on behalf of Dean Witter during the year 2000.

*Document Request No. 9:* All letters, memoranda, telephone logs, account forms, and other DOCUMENTS which reflect contact in the year 2000 on behalf of Dean Witter with any person who was NOT a MERRILL LYNCH ACCOUNT.

*Document Request No. 10:* All statements, reports, memoranda, notes, and

*Discovery Schedule And For A Preliminary Injunction Hearing."*

other DOCUMENTS whi counts for which O'Conno ity at Dean Witter or for receives any compensation ter.[12]

The above-quoted document overbroad in scope that th irrelevant matter. Indeed, misdirected that they can o intentional harassment of b his new employer, Dean W to this action. *Via* its di Merrill Lynch seems more to obtain information to pro colorable charge against De than finding out what happ fendant O'Connor and clients.

Since *all* of the docume pounded by Merrill Lynch matter, and virtually all of ries propounded seek matt any possible injunction issue in the case, Merrill Lynch need such discovery at all, expedited basis. We find th the discovery requests, pa time and scope, and the issues, strongly suggestive o

[1] Federal Rule of Civ gives a trial court wide disc the discovery process. Ex] is not the norm. Plaintiff *prima facie* showing of t expedited discovery. *No su been made here by Merrill*

[2] Given that the recor more intent to harass tha expedited discovery is sim; ate. Given that the record that the charges leveled

12. Exhibit D, at 5. *"Defend.. Plaintiff's Emergency Motion covery Schedule And For A Pr Hearing".*

13. *Notaro v. Koch,* 95 F.R.D 1982)

h (outside the presence
r to the time O'Connor
Dean Witter, and, if so:

rsons who participated
ssions;

ites said discussions oc-

Dean Witter agreed to
to indemnify and/or re-
n and, if so, in what

terrogatory seeks wholly
It too suggests harass-

Request For The Produc-
To Defendant" fares no
Set Of Interrogatories
request contains ten
Document Request Nos.
rbroad and otherwise
t matter.[11] Document
s information that is in
session. Merrill Lynch
of its customers have
unts to Dean Witter.
f discovery request that
t of expedited discovery,
cs of harassment. The
requests speak for
of pure harassment, to-

No. 8: All letters,
none logs, account forms,
MENTS which reflect
ERRILL LYNCH AC-
of Dean Witter during

No. 9: All letters,
ne logs, account forms,
MENTS which reflect
2000 on behalf of Dean
rson who was NOT a
ACCOUNT.

st No. 10: All state-
emoranda, notes, and

ind For A Preliminary In-

---

other DOCUMENTS which reflect all accounts for which O'Connor has responsibility at Dean Witter or for which O'Connor receives any compensation from Dean Witter.[12]

The above-quoted document requests are so overbroad in scope that they seek wholly irrelevant matter. Indeed, their focus is so misdirected that they can only be viewed as intentional harassment of both O'Connor and his new employer, Dean Witter, a non-party to this action. Via its discovery requests, Merrill Lynch seems more intent on trying to obtain information to provide a basis for a colorable charge against Dean Witter, rather than finding out what happened between defendant O'Connor and Merrill Lynch's clients.

Since *all* of the document requests propounded by Merrill Lynch seek irrelevant matter, and virtually all of the interrogatories propounded seek matter irrelevant to any possible injunction issues that may arise in the case, Merrill Lynch clearly does not need such discovery at all, much less on an expedited basis. We find the overbreadth of the discovery requests, particularly, as to time and scope, and the misfocus of the issues, strongly suggestive of harassment.

[1] Federal Rule of Civil Procedure 26 gives a trial court wide discretion to manage the discovery process. Expedited discovery is not the norm. Plaintiff must make some *prima facie* showing of the *need* for the expedited discovery. *No such showing has been made here by Merrill Lynch.*

[2] Given that the record to date shows more intent to harass than anything else, expedited discovery is simply not appropriate. Given that the record to date suggests that the charges leveled by Merrill Lynch

---

against O'Connor are "trumped up" or stretched to make a colorable suit against him, expedited discovery is highly inappropriate. Given that much of the discovery sought is irrelevant, expedited discovery is not appropriate. Given that empanelment of a National Association of Securities Dealers arbitration panel is imminent, and the fact that interrogatories and depositions are not permitted in such arbitration proceedings, expedited discovery is all the more inappropriate on this record, because it appears that Merrill Lynch is attempting the proverbial "end-run" around the arbitration process to which it is contractually bound.

[3] It must be remembered that the requirement that a plaintiff obtain leave of court for expedited discovery serves to maintain the fairness of civil litigation.[13] As we have emphasized, courts should not grant such leave without some showing of the necessity for the expedited discovery.[14] Courts must also protect defendants from unfair expedited discovery.[15]

We are well aware of the *Notaro* factors frequently used by some courts to consider whether expedited discovery is appropriate. The *Notaro* factors are (1) irreparable injury; (2) some probability of success on the merits; (3) some connection between expedited discovery and avoidance of the irreparable injury; and (4) some evidence that injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted.[16] The factors to be considered for issuance of a preliminary injunction are much the same, *to-wit:* (1) irreparable injury coupled with an inadequate remedy at law; (2) the plaintiff's likelihood of success; (3) the harm to the defendant if granted balanced against harm to the plaintiff if not granted;

---

12. Exhibit D. at 5. "Defendant's Opposition To Plaintiff's Emergency Motion For Expedited Discovery Schedule And For A Preliminary Injunction Hearing".

13. Notaro v. Koch, 95 F.R.D. 403, 405 (S.D.N.Y. 1982)

14. Id.

15. Id.

16. Id.

**624**          **194 FEDERAL RULES DECISIONS**                                              SMITHK

and (4) the public interest.[17] Three of the four *Notaro* factors are identical to the preliminary injunction factors. The only differences in the *Notaro* analysis are that causation is considered and the public interest is not considered.

We have not embraced the *Notaro* analysis, because we do not find it appropriate. In *Notaro*, the plaintiffs were seeking a permanent injunction.[18] The plaintiffs sought expedited discovery *in lieu of* a preliminary injunction hearing. In such *circumstances*, it may well have made sense to utilize the preliminary injunction factors to consider whether expedited discovery was appropriate.

On the other hand, where, as here, a plaintiff seeks expedited discovery in order *to prepare for a preliminary injunction hearing*, it does not make sense to use preliminary injunction analysis factors to determine the propriety of an expedited discovery request.[19] Rather, where a plaintiff seeks expedited discovery to prepare for a preliminary injunction hearing, it makes sense to examine the discovery request, as we have done, on the entirety of the record to date and the *reasonableness* of the request in light of all of the surrounding circumstances, similar to what was done in *Philadelphia Newspapers*.[20]

*Accordingly, it is adjudged, decreed, and ordered as follows:*

1.  Plaintiff's *"Emergency Motion For Expedited Discovery Schedule And For Preliminary Injunction Hearing"* is hereby denied.

2.  Plaintiff's *"Motion For Deposition"* is hereby denied.

3.  As in any Rule 37 discovery dispute, the successful party is entitled to an award of attorneys' fees, and we award defendant Timothy J. O'Connor his reasonable attorneys' fees necessarily incurred in opposing plaintiff's discovery motions.

4.  Attorneys' fees are additionally awarded on the ground that the record to date shows that the plaintiff's discovery motions were completely baseless, and otherwise interposed for purposes of harassment.

5.  The preliminary injunction hearing for this cause is hereby set for September 12th, 2000 at 10 A.M.

6.  The defendant may file his fee petition within 15 days of the date of this Order. Any opposition to the hourly rate charged or the work performed must be filed 15 days thereafter. Any reply briefs be filed 15 days after that.

7.  Pursuant to Rule 72(a) of the Federal Rules of Civil Procedure, the parties are given 10 days after being served with a copy of the Order to file exceptions thereto with The Honorable Elaine E. Bucklo. Failure to file objections within the specified time period waives the right to appeal the Magistrate Judge's Order.[21]

*So Ordered.*



**SMITHKLINE BEECHAM COR-
PORATION and Beecham
Group, Plaintiffs,**

v.

**APOTEX CORPORATION, Apotex Inc.,
and Torpharm, Inc., Defendants.**

**No. 98 C 3952.**

United States District Court,
N.D. Illinois,
Eastern Division.

June 27, 2000.

On plaintiffs' motion for reconsideration of order granting in part defendants' motion

to compel, the District C
ed States Magistrate Jud
would be denied insofar a
arguments addressed in o

Motion granted in 
part.

**1. Federal Civil Proced**

The Federal Rules o
not provide for a "moti
tion" of an interlocutory
such motions are tolerate
limited purpose, but the
ties to rehash old argum
evidence that could have
sented.

**2. Federal Civil Proced**

Plaintiffs' motion for
order granting in part de
compel would be denied, 
ply rehashed arguments 
in the order and attemp
with evidence that should
previously.

**3. Witnesses ⊕219(3)**

Where the client i
attorney-client privilege 
munications are disclose
did not need access to

———

Richard J. O'Brien, S
cago, IL, Kenneth 
Henderson, Farabow, 
Washington, DC, plaintif

William A. Rakoczy
Brooks Chicago, IL, for

17.  *MacDonald v. Chicago Park Dist.*, 132 F.3d 355, 357 (7th Cir.1997); *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1114 (7th Cir.1997); *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1067 (7th Cir.1994).

18.  *Notaro*, 95 F.R.D. at 404.

19.  *See Philadelphia Newspapers, Inc. v. Gannett Satellite Info. Network, Inc.*, 1998 WL 404820 at *2 (E.D.Pa. July 15, 1998) (footnote # 1).

20.  1998 WL 404820 at *3.

21.  *Video Views, Inc. v. Studio 21, Ltd.*, 797 F.2d 538 (7th Cir.1986). See also, *Provident Bank v. Manor Steel Corporation*, 882 F.2d 258, 261 (7th

Cir.1989) (when a matter
Magistrate Judge, acting
§ 636(b)(2) jurisd... a par
appeal if he has not pr





RECYCLED PAPER



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

Michael W. Dobbins                                    Office of the Clerk
       CLERK


        H. Nicholas Berberian
        Neal, Gerber & Eisenberg
        Two North LaSalle Street
        Suite 2300
        Chicago, IL  60602


-------------------------------------------------------------------------
        Case Number:  1:00-cv-02065


        Title:  Merrill Lynch Pierce v. O'Connor

Assigned Judge: Honorable Elaine E. Bucklo


MINUTE ORDER of 6/29/00 by Hon. Elaine E. Bucklo :
Plaintiff's objections to the Magistrate Judge's 05/19/00
order are overruled. Judge Rosemond acted within his
discretion in denying expedited discovery sought by Merrill
Lynch and in setting date for hearing. Mailed notice


This docket entry was made by the Clerk on June 30, 2000


ATTENTION:  This notice is being sent pursuant to Rule 77(d) of the
            Federal Rules of Civil Procedure or Rule 49(c) of the Federal
            Rules of Criminal Procedure.  It was generated by ICMS,
            the automated docketing system used to maintain the civil and
            criminal dockets of this District.  If a minute order or
            other document is enclosed, please refer to it for
            additional information.

For scheduled events, motion practices, recent opinions and other information,
visit our web site at www.ilnd.uscourts.gov

Check our web site for CourtWeb--a concise listing of rulings by judges.
Check for rulings on noticed motions.  Also, subscribe to CourtWatch--a free
service--to receive e-mail notification of CourtWeb postings.

To apply for a PACER account, call 1.800.676.6856

U. .ED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

'ichael W. Dobbins                                    Office of the Clerk
      CLERK


      H. Nicholas Berberian
      Neal, Gerber & Eisenberg
      Two North LaSalle Street
      Suite 2300
      Chicago, IL  60602


-------------------------------------------------------------------------------
      Case Number:  1:00-cv-02065


      Title:  Merrill Lynch Pierce v. O'Connor

Assigned Judge: Honorable Elaine E. Bucklo


MINUTE ORDER of 8/24/00  by Hon. Elaine E. Bucklo : Merrill
Lynch's motion to clarify [38-1], modify [38-2] or
reconsider the Magistrate Judge's order of 06/29/00 is
'enied [38-3]. Mailed notice


This docket entry was made by the Clerk on August 28, 2000


ATTENTION:  This notice is being sent pursuant to Rule 77(d) of the
            Federal Rules of Civil Procedure or Rule 49(c) of the Federal
            Rules of Criminal Procedure.  It was generated by ICMS,
            the automated docketing system used to maintain the civil and
            criminal dockets of this District.  If a minute order or
            other document is enclosed, please refer to it for
            additional information.

For scheduled events, motion practices, recent opinions and other information,
visit our web site at www.ilnd.uscourts.gov

Check our web site for CourtWeb--a concise listing of rulings by judges.
Check for rulings on noticed motions.  Also, subscribe to CourtWatch--a free
service--to receive e-mail notification of CourtWeb postings.

To apply for a PACER account, call 1.800.676.6856

1



RECYCLED PAPER



IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MERRILL LYNCH, PIERCE, FENNER | ) | No. 98 C 7979 |
| & SMITH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Chicago, Illinois |
| v. | ) | December 11, 1998 |
| | ) | 5:53 p.m. |
| JAMES R. PINZKER, | ) | |
| | ) | |
| Defendant. | ) | <u>Motion</u> |

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE JAMES F. HOLDERMAN**

APPEARANCES:

For the plaintiff:              Seyfarth, Shaw, Fairweather
                               & Geraldson,
                               by:  JEROME F. BUCH,
                               55 East Monroe Street,
                               Chicago, Illinois 60603-5803


For the defendant:             Neal, Gerber & Eisenberg,
                               by:  JERRY M. SANTANGELO,
                               Two North LaSalle Street,
                               Chicago, Illinois 60602

2

```
 1                THE COURT:  All right, let me ask my clerk to call
 2      the case.
 3                THE CLERK:  Merrill Lynch v. James Pinzker.
 4      Motion for temporary restraining order.
 5                THE COURT:  All right, we have no number assigned
 6      to this case yet.  The documents pertaining to this
 7      litigation were received by me and are accepted by me as
 8      received at 5:30 this afternoon, December 11, 1998.  As soon
 9      as the Clerk's Office opens on Monday morning, this
10      complaint and motion for temporary restraining order and
11      memorandum in support of that motion for temporary
12      restraining order will receive a number and an assigned
13      judge.
14                I have lawyers here in front of me, and I
15      understand there's a counsel on the telephone as well.  Let
16      me ask the lawyers here in the courtroom to identify
17      themselves for the record and the parties they represent.
18                MR. EUCH:  Yes, Judge.  Good afternoon.  Jerry
19      Buch on behalf of plaintiff, Merrill Lynch.
20                THE COURT:  Good afternoon.
21                MR. SANTANGELO:  Jerry Sant --
22                MR. STIEF:  On the telephone this is Chris Stief,
23      also on behalf of Merrill Lynch.
24                THE COURT:  Mr. Stief, could you spell your name
25      for the record, sir.
```

3

1       MR. STIEF:  Yes, your Honor.  The first name is
2  Christopher, last name is Stief, S-t-i-e-f.
3       THE COURT:  All right, Mr. Stief, and where are
4  you presently located?
5       MR. STIEF:  I am in Paoli, Pennsylvania, just
6  outside of Philadelphia.
7       THE COURT:  All right.  We've placed your phone
8  call on the speaker phone so that you can hear what occurs
9  in the courtroom.
10       I do want to mention to you, though, when you
11  are speaking, you cannot hear if there's anything further
12  taking place in the courtroom, such as comments by me or
13  comments by other counsel, so I just wanted you to be aware
14  of that.  It's possible that on occasion lawyers or even
15  myself talk over one another.  We're going to try to avoid
16  that if possible.
17       Let me ask counsel for the defendant to
18  identify himself.
19       MR. SANTANGELO:  Thank you, your Honor.  Jerry
20  Santangelo, Neal, Gerber & Eisenberg, on behalf of the
21  defendant, Mr. James Pinzker.
22       THE COURT:  All right, good afternoon to all of
23  you.
24       Let me ask my clerk to turn that microphone
25  here at the clerk's station around and to turn it on to make

4

1  sure that everyone is amplified.  The one at the podium also
2  amplifies your voice.  I have my microphone, which amplifies
3  my voice as well.  Typically, I don't need a microphone in
4  the courtroom, but I think it enhances the phone
5  transmission if I do have a microphone.
6                All right, I have before me, as I mentioned,
7  this complaint and this request for a temporary restraining
8  order.  I did meet with the counsel here in the courtroom
9  off the record before we went on the record.
10                I believe I understand what is being sought
11  here by the motion for temporary restraining order, and, as
12  I understand it, the defendant, Mr. Pinzker, agrees to not
13  take any further action with regard to his change of
14  position from the Merrill Lynch position that he held to the
15  Salomon Smith Barney position, other than to send a document
16  over the name "Salomon Smith Barney" which states, and I
17  will quote, "We are pleased to announce that James E.
18  Pinzker has joined our firm as a Second Vice President -
19  Investments, 233 South Wacker Drive, Suite 3400, Chicago,
20  Illinois 60606."  The phone number is area code 312 441-3563
21  or area code 800 334-2446.
22                I understand that what Mr. Pinzker is
23  desirous of doing at this time and throughout the weekend
24  when he has an opportunity is to send out these documents.
25  And the issue, at least as I understand it from talking with

5

1    counsel off the record, is whether this announcement type

2    document constitutes a solicitation in violation of Mr.

3    Pinzker's agreement, which is attached -- a copy of the

4    agreement is attached as Exhibit A to the complaint that has

5    been received by me and will be officially filed on Monday

6    morning.

7                    Is that the issue?

8              MR. SANTANGELO:  Very good, Judge.

9              MR. BUCH:  Yes, your Honor.

10              THE COURT:  All right.  And Mr. Stief, are you

11    still with us?

12              MR. STIEF:  Yes, I am, your Honor.

13              THE COURT:  Okay, good.

14                    All right, well, let me hear from the moving

15    party, Merrill Lynch's counsel, on this point, and then I

16    will hear from defendant's counsel on this point, since it

17    seems that that is the key point that I need to address with

18    regard to the temporary restraining order request.

19              MR. STIEF:  Your Honor, I think that is the key

20    point, because ultimately the core facts, I think, are more

21    or less undisputed, and the question is whether what Mr.

22    Pinzker proposes to do is acceptable under his contract, and

23    Merrill Lynch has cited some case law to you which I think

24    makes clear that it's not acceptable under Illinois law, and

25    that what he is doing is soliciting the customers -- or what

1  he proposes to do is a solicitation, which violates the

2  contract.

3                    And the reason for that is under Illinois

4  law, which is laid out in the Merrill Lynch v. Cross

5  decision by Judge Kocoras, any contact like this which is

6  directed specifically at the customers who he knows from his

7  prior employment are predisposed to need the particular

8  service he sells, contacting them directly regarding his new

9  employment constitutes a solicitation.

10             MR. BUCH:  Exhibit B, Judge.

11             MR. STIEF:  That's --

12             THE COURT:  I'm sorry, Mr. Stief, -- Mr. Stief,

13  we've got to stop you now --

14             MR. BUCH:  Chris, Chris, Chris --

15             THE COURT:  The transcript should reflect that

16  counsel on the telephone was speaking so quickly that I

17  could not continue to follow him, and --

18             MR. BUCH:  Chris, --

19             THE COURT:  -- he is continuing to speak without

20  interruption --

21             MR. BUCH:  Chris, Chris, stop.

22             THE COURT:  -- in a way that has now become

23  unintelligible.  I don't know if he's sitting there reading

24  an argument or what, but I warned him that --

25             MR. BUCH:  Judge, may I?

1            Chris, please.  What happens over here,

2     Chris, is this is a voice-activated telephone.  You have to

3     slow down.  The judge was making statements while you were

4     talking because we could not get it, the court reporter

5     couldn't get it.

6            Could I ask you to just go back and go slowly

7     through the issue you're citing to, the case before Judge

8     Kocoras, and the opinion that you cite there, and go through

9     it slowly, and please try to pause a little bit.

10            MR. STIEF:  I think the --

11            THE COURT:  Well, I wanted to interrupt you, Mr.

12     Stief -- I wanted to interrupt you, Mr. Stief, because,

13     frankly, I have reviewed Judge Kocoras's opinion.  I have

14     evaluated the facts in connection with Judge Kocoras's

15     opinion in the Cross case, and Judge Kocoras's opinion in

16     the Cross case makes clear that the facts in the Cross case

17     are not precisely the facts here.

18            The issue in the Cross case that Judge

19     Kocoras found dispositive was that Mr. Cross was providing

20     these transfer forms, and that is what prompted Judge

21     Kocoras to issue the injunctive relief.

22            Here Mr. Pinzker is not seeking to provide

23     any transfer forms, and, in fact, I want to get a concession

24     now from his counsel that Mr. Pinzker is not going to send

25     any transfer forms to any prior customer that he had at

1    Merrill Lynch until further order of Court.

2         MR. SANTANGELO:  You have that concession, your

3    Honor, nor until further order of an arbitration panel.

4         THE COURT:  Okay, all right, or order of an

5    arbitration panel.

6              One thing we have not mentioned, and I don't

7    know if you were aware of, Mr. Stief, but there was a

8    request made today, a petition made today, by Mr. Pinzker

9    before the National Association of Security Dealers for

10   arbitration, and I understand that that arbitration must

11   take place no later than Tuesday, December 15, and that that

12   request was not just mailed to the National Association of

13   Security Dealers requesting arbitration and setting forth a

14   verified statement of facts demonstrating that necessity for

15   interim and permanent injunctive relief in that arbitration,

16   but was in fact filed today.

17              The question that I asked Mr. Buch -- the

18   question that I asked Mr. Buch, Mr. Stief -- was whether --

19         MR. BUCH:  Chris, --

20         THE COURT:  Mr. Stief, -- Mr. Stief, -- I am

21   sorry, but you will not be allowed to discuss this case

22   further, because you apparently cannot understand the

23   mechanism that we are working with here, and so,

24   consequently, Mr. Stief, I am not going to allow you to

25   comment further.  You have a counsel here, and we will have

1   to deal with that counsel who is present, since you can't

2   apparently deal with the mechanism that allows you to speak

3   at this time, and so, consequently, I am going to ask my

4   clerk, to the extent possible, to put Mr. Stief on mute so

5   that Mr. Stief can still hear, if he can, but we will not

6   entertain any further comments from Mr. Stief, because Mr.

7   Stief is not responsive to the questions that I am posing to

8   him, he merely runs off at the mouth, according to what I

9   can hear, and so, consequently, what I was asking Mr. Stief

10  is whether Mr. Stief was aware of that filing, and I will

11  ask now the counsel who is before me whether you are aware

12  of that filing.

13        MR. BUCH:  Yes, your Honor, I am aware of that

14  filing, but, as I understand it, your Honor, like in this

15  case -- like in this Court, until the check for the filing

16  fee is actually cashed, that filing is not a filing, and

17  that's exactly --

18        THE COURT:  Well, and likewise, until $150 is paid

19  to the Clerk on Monday morning, this isn't a filing, either.

20  But I understand your position.  I do.

21        MR. BUCH:  In that regard, then, Judge, we do not

22  think that the filing in New York, the attempted filing in

23  New York, has any bearing on what this Court can or cannot

24  do here today.

25        THE COURT:  Okay, all right.

1          MR. BUCH:  And, Judge, I guess what Mr. Stief was

2     attempting to say, and I apologize for him -- I think it was

3     difficult under the circumstances -- I appreciate the

4     Court's patience, first of all, for letting us be here, and

5     also for allowing Mr. Stief to attempt to try and argue at

6     these proceedings.

7               But, Judge, in the case of -- the Tomei case,

8     Judge, the solicitation there was much like the solicitation

9     here.  The facts of Tomei are like the case that's before

10    you, Judge, not the case that was before Judge Kocoras.  The

11    facts in Tomei are very limited.  It was just a private

12    communication that was sent to the customers.  And again it

13    was --

14         THE COURT:  And help me out.  The Tomei case is --

15         MR. BUCH:  The cite is 602 N.E. 2d 23, at page 26.

16    It's cited at page 4 of Judge Korcoras's opinion, which is

17    Exhibit B to the memorandum which we filed this afternoon.

18         THE COURT:  Okay, all right -- well, you actually

19    didn't file it.  I've received it.

20         MR. BUCH:  Excuse me.

21         THE COURT:  It will be filed.  The Tomei v. Tomei,

22    Illinois district court opinion, which is an appellate

23    opinion, in 1992.  And there the Court explained, as you

24    articulated, "[T]he direct solicitation of ... customers, as

25    opposed to general advertisement, suggests a private

1    communication directed at a person ... known by the
2    solicitor to have an immediate or potential need for
3    insurance."  There it was apparently an insurance broker.
4              Go ahead.
5              MR. BUCH:  Judge, I guess the point of it is these
6    are our customers, customers in which we invested a lot of
7    money to develop, to solicit, to maintain, and he has agreed
8    to maintain them.  And, moreover, Judge, the agreement
9    provides -- and I can find the provision -- that the
10   exclusive jurisdiction for enforcement of this agreement is
11   here before this Court, not in some other jurisdiction, and
12   that's why we're before you.
13             THE COURT:  Well, I'm not addressing the fact that
14   there's an attempt at arbitration.  I just wanted everyone
15   to be aware of it, because it seemed to me to be something
16   that everyone should be aware of, but I am not saying that I
17   will not hear this case because there has been a filing
18   before the National Association of Securities Dealers.
19             MR. BUCH:  So, Judge, to put it this way, very
20   simply, what we're seeking is a status quo between now and
21   the time that we can get before the judge assigned to this
22   case, we can actually file our complaint, and prohibit Mr.
23   -- the defendant, Mr. Pinzker, from doing what he's agreed
24   to do, and that is not to solicit our customers.  And we
25   don't think that that's -- we think that's appropriate.  We

12

1   think the cases that we support -- that we have in our

2   filings support that relief on a temporary basis.

3            Again, as I say, they're our customers.  He's

4   agreed not to solicit our customers.  We think the Illinois

5   cases have found that even this announcement is a

6   solicitation.  And that's what he's doing.  He got the

7   information to solicit these customers by virtue of working

8   for us.  And so however he's going to do it between now and

9   Monday, we know he's going to do it.  It's, you know, based

10  on information he has in his head.  That's still our

11  confidential information that he's agreed not to disclose,

12  that he's agreed not to use to solicit our customers.

13            And that's where we're at, Judge.

14            THE COURT:  All right.

15            MR. SANTANGELO:  May I, your Honor?

16            THE COURT:  You may.

17            MR. SANTANGELO:  Thank you.

18            Two points.  Number one, the Court has before

19  it the restrictive covenant.  The issue is, as their counsel

20  said, is it acceptable under his contract.  And you look at

21  the contract, and the contract clearly defines what

22  constitutes a solicitation, and I submit to you, your Honor,

23  that what has been done here in such a limited capacity,

24  because, again, it hasn't gone out to all customers, does

25  not constitute a solicitation as defined in the very

1   agreement that's at issue.

2              And, secondly, even without that definition,

3   we've attached in our statement of claim in arbitration as

4   Exhibits B through F decisions on this very issue by

5   arbitration panels and courts concerning the use of this

6   exact kind of announcement that is sent.

7              The second issue, your Honor, sort of

8   dovetails this, and this is the notion that Merrill Lynch

9   keeps saying, "These are our customers." Well, Mr. Pinzker

10  has a responsibility, as well, as a Series 7 registered

11  representative under the federal securities laws, under the

12  NASD rules and regulations, under the New York Stock

13  Exchange rules and regulations, that they are also his

14  customers. He can be personally liable for events that

15  occur regarding these customers. He has an obligation, at

16  minimum, to advise them where he is. I suggest if Merrill

17  Lynch would send that out, we would agree to that. But at

18  minimum, they should have a right to know where this person

19  is, and they can choose what they want to do or not do.

20             But what Mr. Pinzker is not doing is sending

21  completed ACAT transfer forms, saying, "Please transfer your

22  account over to me. This is the reason why I think Salomon

23  Smith Barney is such a better place than Merrill Lynch, and

24  this is why you should transfer."

25             THE COURT: Okay, let me just ask you, what is the

14

1 exact name of those transfer forms that you just referred

2 to?

3    MR. SANTANGELO:  They are called ACAT transfer

4 forms, your Honor.

5    THE COURT:  How do you spell that?

6    MR. SANTANGELO:  A-C-A-T.

7    THE COURT:  And the --

8    MR. SANTANGELO:  Automated -- it's an --

9    THE COURT:  It's an acronym?

10    MR. SANTANGELO:  Yes.

11    THE COURT:  So they should be all caps?

12    MR. SANTANGELO:  Correct.

13    THE COURT:  I'm helping my court reporter -- or

14 trying to help my court reporter.

15    MR. SANTANGELO:  Thank you.  It's an automated

16 process that exists in the securities industry, your Honor,

17 for the transfer of a customer's assets from one brokerage

18 firm to another firm or to someplace else.

19    THE COURT:  And what does the acronym stand for?

20    MR. SANTANGELO:  ACAT.  It's automated account

21 transfers -- something like that -- I --

22    THE COURT:  All right.

23    MR. BUCH:  I don't know the second letter.

24    MR. SANTANGELO:  Everybody refers to it as "ACAT,"

25 so --

15

1          THE COURT:  All right.

2          MR. SANTANGELO:  I could find that out for you, if

3     you'd like, but I don't --

4          THE COURT:  That's quite all right.  You folks

5     know what you're talking about, --

6          MR. SANTANGELO:  Yes.

7          THE COURT:  -- and I think I understand what

8     you're talking about.

9          MR. SANTANGELO:  And the other thing is the

10    status quo order that's requested.  The status quo is not

11    going to be maintained.  Merrill Lynch is actually going to

12    be out actively soliciting these clients, actively

13    contacting these clients, in a much more significant way

14    than what Mr. Pinzker is doing, so there really is not going

15    to be a so-called status quo here.

16              We can get before an arbitrator, as the Court

17    is aware, by Tuesday.  I believe he has the right to do what

18    he is doing.  I think it's a practice that's sanctioned.

19    It's in the best interests of customers and the industry.

20    The industry has specifically sanctioned it.  Arbitration

21    panels in Chicago involving the same branch offices, your

22    Honor, allowed such announcements to go forward.

23              And, again, if you look at the agreement

24    that's at issue here, you see nothing that he's done that in

25    any way violates that agreement.  He is not requesting

1    customers "to transfer from Merrill Lynch to me or my new

2    employer, to open a new account with me or my new employer,

3    or to otherwise discontinue its patronage and business

4    relationship with Merrill Lynch."

5           We want to get before an arbitrator and then

6    talk to an arbitrator about what we can do and not do going

7    forward, because there will be other issues regarding this.

8           But for this purpose, what may occur is not a

9    violation, because it's not a solicitation.

10          MR. BUCH:  Judge, briefly, if I may respond?

11          THE COURT:  You may.  You're the moving party.

12    You may have the last word.

13          MR. BUCH:  Thank you, Judge.

14          The first point that this is not a

15    solicitation, Judge, you know, again, for the record, the

16    agreement, Exhibit A to our complaint, Judge, it's very

17    specific:

18           "My agreement 'not to solicit' means that I

19    will not, during my employment and for a period of one year

20    thereafter, initiate any" -- and I emphasize the word "any"

21    -- "contact or communication of any kind" -- and I again

22    emphasize the word "any" -- "whatsoever," and then it goes

23    on, "for the purpose of inviting, encouraging, or requesting

24    any account," and then it lists the three subparts.

25          Judge, this is clearly a communication.  This

1   is clearly a contact.  There's no question, Judge, that the

2   intent of what they're sending out is to cause the client to

3   whom it's sent to contact Mr. Pinzker at the number set

4   forth in the document, and I think the Tomei case is support

5   for that position.

6              Secondly, Judge, with respect to these

7   decisions by the arbitrators -- excuse me -- arbitration

8   panels, as I indicated before, Judge, the agreement that

9   Mr. Pinzker has signed means that he's given the United

10  States District Court -- and this is in paragraph 5 of their

11  agreement -- original jurisdiction to seek the kind of

12  relief we're seeking here this afternoon.

13             With respect to the status quo, Judge, the

14  problem we have here is that Merrill Lynch allowed this

15  gentleman to develop these customers, having been paid by

16  Merrill Lynch, having been trained by Merrill Lynch, having

17  used all the resources of Merrill Lynch to develop these

18  customer relationships, with the understanding in his

19  agreement they're our customers.  So he's had all of this

20  time to have those relationships.

21             Now, Judge, for us to be able to intercede

22  and to get another broker to try and retain, if you will,

23  what is already ours is just a totally different situation.

24  He's had all this time to build those relationships.  All he

25  has to do is send out the announcement he's seeking to send

1      out.  We have to do a lot more.  We have to get people

2      involved to find -- you know, to be able to find out how to

3      contact these customers, who can contact them.  And that, of

4      course, takes time.  And so we should have the same -- at

5      least we should have, we think, Judge, the time between now

6      and when this matter can be heard on a more formal basis to

7      have the status quo maintained so we can get to the same

8      place that we are supposed to be.

9                   Judge, they're our customers, not theirs.

10     Judge, we can solicit our customers because that's what they

11     are, they're our customers, and so we should be allowed to

12     do that, and there should be no prohibition against that,

13     but yet he shouldn't have an advantage --

14                  THE COURT:  There's no request by the defendant

15     that you not attempt to retain your customers, no request at

16     all.  There's no indication that the defendant is attempting

17     to have you somehow not contact your customers or inform

18     your customers of what's taking place.

19                  Right?

20                  MR. SANTANGELO:  Correct.

21                  THE COURT:  Okay.

22                  MR. BUCH:  Okay, Judge, that addresses that issue,

23     and that's really what I have to say, Judge.  What we're

24     looking for is a standstill between now and the time we can

25     get before a court and we can address this issue more

1    formally as to whether or not the arbitration panel can do

2    anything and can require Merrill Lynch to do anything.

3         THE COURT:  All right, well, I am not going to

4    address the issue of whether the arbitration panel should

5    have priority, or the parties have, by their agreeing to

6    abide by the National Association of Securities Dealers'

7    rules, have agreed to proceed with arbitration.  I do see

8    paragraph 5 of the agreement, which does state that Mr.

9    Pinzker agreed "... to submit to, and confer exclusive

10   jurisdiction on, the United States District Court or the

11   State Court which has original jurisdiction for judicial

12   district or county in which [he] last worked for Merrill

13   Lynch," which would, of course, be here in Cook County and

14   the Northern District of Illinois.  But the defendant has

15   not contested the jurisdiction of this Court at this point,

16   so we need not address that point further.

17         I have, however, looked very carefully and

18   reread several times paragraph 2 of the agreement, which is

19   Exhibit A attached to the complaint, which really is the nub

20   of the issue here, and in that paragraph 2, which defines

21   the conduct that the parties agreed to prohibit upon the

22   resignation by Mr. Pinzker from Merrill Lynch, it seems to

23   me that Merrill Lynch attempted to protect itself as fully

24   as would be possible under the law.  And we lawyers all

25   understand that these restrictive covenants must be

1  reasonable under the circumstances.  They must be reasonable

2  in scope and duration, and they must be reasonable with

3  regard to restricting the conduct that is being sought to be

4  restricted.

5           And so, consequently, the agreement does say

6  that Mr. Pinzker is not to "... initiate any contact or

7  communication of any kind whatsoever for the purpose of

8  inviting, encouraging, or requesting any account," meaning

9  his account, or any account whom he served -- from

10  "... inviting, encouraging or requesting any account (a) to

11  transfer from Merrill Lynch to me or to my new employment,

12  or (b) to open a new account with me or ... my new employer,

13  or, (c) to otherwise discontinue its patronage and business

14  relationship with Merrill Lynch."

15           The announcement, which is Exhibit -- I don't

16  know how otherwise to describe it -- Exhibit A to the

17  arbitration form -- I tried to articulate what it looked

18  like for the record since it's not attached to the

19  complaint, and I can certainly understand why it was not

20  attached to the complaint, because counsel for Merrill Lynch

21  didn't have access to the document, but the announcement

22  appears to me, as I have stated and described it, to not

23  engage in any of the prohibited activity.  It does not

24  invite, it does not encourage, and it does not request any

25  account to transfer from Merrill Lynch to Mr. Pinzker or his

1   new employer, it does not invite, encourage or request any

2   account to open a new account with Mr. Pinzker or his new

3   employer, and it does not invite, encourage or request any

4   account to otherwise discontinue its patronage and business

5   relationship with Merrill Lynch.  It does not do that.

6               What this announcement articulates is that

7   Mr. Pinzker has joined Salomon Smith Barney, and it would be

8   up to the account to make the determination of what to do as

9   a result of this information.

10               The restrictive covenant perhaps could have

11   been drafted to be more restrictive and may have been upheld

12   by the Court but may not have been upheld by the Court if

13   causing the restrictive covenant to be more restrictive such

14   as to stop at the word "communication" in the second from

15   the bottom paragraph before the lettered sequence, that

16   would be too restrictive, it would be unreasonable, and so

17   it seems to me to make the restrictive covenant reasonable,

18   what the parties did when they agreed to this restrictive

19   covenant was to put restrictions on the type of activity.

20   The restrictive covenant doesn't say there will be no

21   contact, the restrictive covenant does not say there will be

22   no communication.  The restrictive dovenant says, in

23   essence, there will be no contact or communication for the

24   purpose of inviting, encouraging, or requesting.

25               And it seems to me there is no restriction on

22

1    informing any account of the new location of the broker.
2    Since there's no restriction on that, it appears to me that
3    Merrill Lynch does not have a better than negligible chance
4    of success on the merits with regard to this announcement,
5    which is the only issue before me at this time, and so I'm
6    going to deny the request for temporary restraining order.
7              I will, however, set the matter back before
8    me if you cannot appear before the assigned judge, who will
9    be assigned as soon as the Clerk's Office opens on Monday
10   morning, if you can not appear before the assigned Judge, I
11   will ask you to appear before me on my motion call at 9:45.
12             I must advise you that I do have another
13   temporary restraining order scheduled for 10:00 a.m., but I
14   believe that the assigned Judge, because we know who the
15   assigned judge is in that other case, will be able to deal
16   with that temporary restraining order, and if the judge to
17   whom this case is assigned cannot, I will be available to
18   hear you further on any further requests for temporary
19   restraining order.
20             And so at that time, if you desire, you can
21   address any further issues raised as a result of the filing
22   of the arbitration request before the National Association
23   of Securities Dealers.
24             I also understand that Mr. Pinzker over this
25   weekend is not intending to engage in any other contact that

23

1   would violate the agreement, the restrictive covenant

2   agreement, in any manner, and so I -- no other request is

3   before me.  But if Merrill Lynch, plaintiff in this case,

4   learns that Mr. Pinzker has violated other terms, or even

5   paragraph 2 of the employment agreement as I have now

6   interpreted it, you can bring that to my attention at 9:45

7   on Monday morning, December 14.

8           MR. SANTANGELO:  Thank you.

9           MR. BUCH:  Thank you, Judge.

10          THE COURT:  All right.  Thank you.  And we will

11  have this filed immediately, and I will hear you at that

12  time.  You now understand my position on this issue, and I

13  would be happy to receive any further authority or any

14  further argument that you desire to make at that time to

15  either cause me to be more firm in my position or to change

16  my position.

17          MR. BUCH:  Thank you, Judge.

18          MR. SANTANGELO:  Your Honor, I'd like to thank you

19  and your staff for being here so late on a Friday night.

20          MR. BUCH:  And I echo that, Judge.  Thank you very

21  much.

22          THE COURT:  Yes.  And do apologize to Mr. Stief

23  that we had to him off.  It's, unfortunately, the equipment

24  that we have to work with.  And he's not the only lawyer

25  that I've had that problem with.

24

1            We'll see you on Monday.

2            MR. BUCH:  Thank you, Judge.

3            MR. SANTANGELO:  Thank you.

4

5                    CERTIFICATE

6    I certify that the foregoing is a correct transcript of the

7    record of proceedings in this matter on December 11, 1998.

8

9

10   _____              12/12/98

11   Official Court Reporter                    Date

12

13

14

15

16

17

18

19

20

21

22

23

24

25

15



RECYCLED PAPER

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MERRILL LYNCH, PIERCE, FENNER          )       No. 98 C 7979
& SMITH, INC.,                          )
                                        )
                    Plaintiff,          )
                                        )       Chicago, Illinois
        v.                              )       December 15, 1998
                                        )       Morning Session
JAMES R. PINZKER,                       )
                                        )
                    Defendant.          )       Hearing Excerpt

                TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE JAMES F. HOLDERMAN

APPEARANCES:

For the plaintiff:              TIMOTHY S. COLE and
                                JEROME F. BUCH

For the defendant:              JERRY M. SANTANGELO

JAMES P. DOLAN
OFFICIAL REPORTER — U.S. DISTRICT COURT
219 SOUTH DEARBORN STREET
CHICAGO ILLINOIS 60604

1          *          *          *          *          *          *

2              THE COURT:  All right, again, I want to thank

3     counsel for the fine presentations in this matter.

4              This matter has come before me as, first, a

5     motion for temporary restraining order in my capacity as

6     emergency judge, on Friday evening, December 11, and then by

7     chance before me on Monday morning when I was selected by

8     the computer wheel, the computer-designating mechanism of

9     the Federal District Court of the Northern District of

10    Illinois, to be the judge assigned to this case.

11             Having heard the evidence presented and

12    reviewed the documents presented, it is my determination

13    that Mr. Pinzker has not violated any of the employment

14    agreements and restrictive covenants that he had with

15    Merrill Lynch during the time of his employment.

16             The decision that I made on Friday with

17    regard to paragraph 2 and the conduct that at that point we

18    were aware of has not been changed by the testimony I have

19    heard regarding Mr. Pinzker's telephone contact with the few

20    customers that he has been in telephone contact with.  I've

21    heard no evidence that Mr. Pinzker at any time during any of

22    those phone conversations invited, encouraged, or requested

23    any of his customers to transfer from Merrill Lynch to his

24    new employer, to open a new account with his new employer or

25    himself, or to otherwise discontinue the customer's

                                                              2

 1    patronage and business relationship with Merrill Lynch.

 2                    So, consequently, I see no evidence of any

 3    breach of the agreement, employment agreement, and

 4    restrictive covenants that Mr. Pinzker has engaged in.

 5                    In fact, having presided over cases of

 6    similar nature during the course of my time on the bench, I

 7    actually believe that Mr. Pinzker has attempted to conduct

 8    himself in his post-Merrill Lynch activities in as honorable

 9    a way as possible to comport with the employment agreement

10    and restrictive covenants that he had with Merrill Lynch.

11                    Turning to the further argument by Merrill

12    Lynch of Mr. Pinzker's alleged misappropriation of trade

13    secrets under the Illinois Trade Secrets Act, which, of

14    course, is found at 765 Illinois Compiled Statutes 1065,

15    et seq., I do not believe that Mr. Pinzker has

16    misappropriated or has even threatened to misappropriate any

17    trade secrets.  The only information that Mr. Pinzker has

18    taken is the information that he recalls regarding names,

19    addresses, and phone numbers of certain of his customers at

20    Merrill Lynch.

21                    I have no information as to how those

22    customers were generated at Merrill Lynch, and, of course,

23    if those were customers that Mr. Pinzker brought with him to

24    Merrill Lynch when he started at Merrill Lynch, the

25    relationship with Merrill Lynch is certainly lessened under

                                                              3

1    the law, but assuming that none of them were, if they were
2    clients that were generated by Mr. Pinzker in the making of,
3    say, cold calls, as there was testimony that Mr. Pinzker
4    engaged in during his employment at Merrill Lynch, that type
5    of information would fall within the general parameters
6    addressed by Judge Shadur in American Hardware Mutual
7    Insurance Company v. Moran, at 545 Fed. Supp. 192, which was
8    affirmed by the 7th Circuit at 1005 F. 2d 219 in 1983.  That
9    case, although it was a long time ago, has not been modified
10   in any way, and I don't know from the information presented
11   that any of these customers and their names and addresses
12   were generated by cold calls, although we do have
13   information in evidence that Mr. Pinzker engaged in that
14   type of conduct, appropriately, while he was at Merrill
15   Lynch.
16           Likewise, there's been no showing that any of
17   these customers were customers that had a near permanent
18   relationship with Merrill Lynch that was generated by
19   activities of Merrill Lynch beyond those of Mr. Pinzker
20   during the time that Mr. Pinzker serviced their accounts.
21   Again, had there been some evidence of that, the strength of
22   that argument would cause me to believe that perhaps the
23   names, addresses, and phone numbers would fall closer to the
24   requirements of the Illinois Trade Secrets Act and fall
25   within perhaps the confines of the concept of trade secrets.

4

```
 1            But the Illinois law is clear and has been
 2    for many, many years.  An employer has no protective
 3    interest in the customers themselves, only merely a customer
 4    list that falls within the parameters of the trade secrets,
 5    and, of course, in the Stampede case that was cited by
 6    counsel, the Illinois Appellate Court addressed the question
 7    of customer lists, and customer lists there were developed
 8    through, and I'll quote, "... through the laborious method
 9    of prospecting, which requires a substantial amount of time,
10    effort, and expense, by Stampede."
11            There's no indication that here there was any
12    laborious method of prospecting other than the information
13    regarding the cold calls that Mr. Pinzker himself made.
14            And so, consequently, under a number of
15    Illinois Appellate decisions, Reinhardt Printing Co. v.
16    Feld, at 142 Illinois Appellate 3d, page 9, Lee/O'Keefe
17    Insurance Agency v. Ferega, 163 Illinois Appellate, a
18    4th District case, and also Southern Illinois Medical
19    Business Associates v. Camillo, at 190 Illinois Appellate 3d
20    664, a 5th District case from downstate Illinois, the
21    Illinois law with regard to trade secrets and customer lists
22    is that unless there is further information beyond names and
23    addresses, or whether the names and addresses were developed
24    through some laborious process, as stated in the Stampede
25    case, the Stampede Tool case, in Illinois names and
```

1   addresses of customers do not fall within the parameters of

2   trade secrets unless there is some additional showing that

3   just hasn't been shown here.

4            Additionally, however, even if there had been

5   some showing, the efforts to maintain the secrecy have to be

6   reasonable under the circumstances, and, frankly, when Mr.

7   Thorndyke authorized and approved of Mr. Pinzker having

8   these backup files, these personal backup files, using the

9   Broker Ally mechanism, which apparently was not a Merrill

10   Lynch mechanism, what Mr. Thorndyke, as supervisor of Mr.

11   Pinzker, was doing was authorizing Mr. Pinzker to go outside

12   the protected mechanisms of Merrill Lynch, to go beyond the

13   circumstances utilized at Merrill Lynch to maintain the

14   secrecy, and, basically, have his own records.

15            Now, some dispute could be made with regard

16   to whether these backup files that Mr. Pinzker has could

17   perhaps contain information that would be trade secret

18   information, and so, consequently, with the concession today

19   of Mr. Pinzker that he is not going to utilize the backup

20   discs that he has, there is no threatened misappropriation

21   through the use of any of that information, and so,

22   consequently, there need not be any further order with

23   regard to enjoining Mr. Pinzker on that point other than he

24   is ordered to comply with his agreements stated here by his

25   counsel in open court.

1           Consequently, based on the information
2    presented here, the mailing out of what has now been marked
3    as Plaintiff's Exhibit P-4, which are merely announcements
4    and are not solicitations, they're merely informational
5    announcements that do not invite, encourage, or request any
6    transfer, but merely inform the clients that Mr. Pinzker's
7    service at Merrill Lynch -- or of Mr. Pinzker's new
8    location, there is no violation of the Illinois Trade
9    Secrets Act, because to mail those out is not utilizing what
10   has been shown to be a trade secret.  There's no use of any
11   trade secret information because of the nature of the
12   evidence presented here, and, likewise, there's no
13   violation, as I earlier had ruled, of the employment
14   agreement or restrictive covenant.
15           With regard to the irreparable harm, since
16   the parties have agreed to arbitration, in fact, expedited
17   arbitration, there's a question about whether there could be
18   irreparable harm.  Granted, arbitration is not a matter in a
19   court of law, but money damages can suffice and can be
20   properly provided during the course of an appropriately
21   administered arbitration proceeding, and so if there has
22   been a breach or a violation of the customer information
23   that Mr. Pinzker is bound to maintain in secret pursuant to
24   his employment agreement and restrictive covenant, or under
25   the Illinois Trade Secrets Act, that can be addressed.

1          And so I do not believe there's been any
2     showing of irreparable harm based upon the providing of
3     information that Mr. Pinzker has thus far provided, and I
4     have no reason to believe will not continue to abide by and
5     provide in an appropriate, lawful manner.
6          With regard to the public interest, I believe
7     the public interest in this particular case, under these
8     particular unique facts -- and, frankly, I have to say they
9     are unique, because I have not presided over any other case
10    involving a broker leaving a financial institution of any
11    manner in which the individual has been as scrupulous as Mr.
12    Pinzker -- but with regard to the public interest I believe
13    there is a duty, and the public would be best served if the
14    customers that were previously serviced by Merrill Lynch --
15    or by Mr. Pinzker while he was at Merrill Lynch would be
16    informed that Mr. Pinzker has left and where he has gone to
17    and be provided with the information that is contained on
18    Plaintiff's Exhibit 4, the public would be best served by a
19    financial institution such as Merrill Lynch, a financial
20    institution such as Salomon Smith Barney, and individuals
21    who are in the financial industry, such as Mr. Thorndyke or
22    Mr. Pinzker, providing full information to the customers
23    regarding any individual that those customers previously had
24    a relationship with, and so not only do I believe the public
25    interest would be best served by enjoining Mr. Pinzker in no

8

1    manner, but I believe that the public would be best served

2    by Mr. Pinzker continuing to provide the information that is

3    contained on Plaintiff's Exhibit P-4, and would be best

4    served by Merrill Lynch providing that same information, as

5    apparently Merrill Lynch is desirous and willing and will

6    do.

7              And so, based upon these factors that I have

8    considered, I am denying the request for preliminary

9    injunction against Mr. Pinzker engaging in any of the

10   conduct that the evidence shows he has engaged in because in

11   my opinion he has neither violated his employment agreement

12   with Merrill Lynch nor has he violated the Illinois Trade

13   Secrets Act.

14             This, of course, is an appealable decision,

15   and counsel may proceed appropriately as they desire.

16             I would encourage you to proceed promptly to

17   arbitration, and since it is your joint desires to proceed

18   with arbitration, let me just inquire, since really the

19   purpose of Merrill Lynch bringing this matter to the courts

20   was to obtain a prompt adjudication of the legality of Mr.

21   Pinzker's conduct, can we agree that this case could be

22   placed on my suspense calendar and basically closed until

23   further order of court or the necessity to enforce any

24   arbitration agreement or any arbitration award that's

25   provided?

 1          MR. SANTANGELO:  I believe that's appropriate,
 2    your Honor.
 3          MR. COLE:  Yes, your Honor, subject to, obviously,
 4    I will have to discuss this with my client and see whatever
 5    action they may want us to take, as far as a motion to
 6    reconsider, et cetera.  But other than that, --
 7          THE COURT:  Okay, well, a motion to reconsider
 8    would have to be filed within ten days.
 9          MR. COLE:  That's correct.
10          THE COURT:  And, of course, you'd have to have
11    some basis under Rule 59, which, given your position, if you
12    believe there is other evidence, by all means, you may still
13    bring the matter before me, unless it's being addressed in
14    the arbitration proceeding, and, of course, this would not
15    preclude any appeal within the appropriate time period.
16          MR. COLE:  I say that not to try to alert the
17    Court, just to say that I haven't, obviously, spoken with my
18    client.  Other than that, you know, as I think I've said to
19    the Court, it's our position that the issue of preliminary
20    injunctive relief should be addressed by the Court and when
21    the parties go to arbitration, and I think putting the
22    matter on the Court's suspense list, as the Court has
23    described, is appropriate.
24          THE COURT:  All right, I will set no further dates
25    at this time, then.  You may proceed as you have indicated

                                                              10

1   you will, and you may proceed likewise with any further

2   motions that would be appropriate under Rule 59, or a notice

3   of appeal could be timely filed as required under the

4   Federal Rules of Appellate Procedure.

5         MR. COLE:  Thank you, your Honor.

6         MR. SANTANGELO:  Thank you, your Honor.

7

8                     CERTIFICATE

9   I certify that the foregoing is a correct excerpt of the

10   record of proceedings in this matter on December 15, 1998.

11

12   _____      __12/16/98__

13   Official Court Reporter             Date

14

15

16

17

18

19

20

21

22

23

24

25



RECYCLED PAPER



# SALOMON SMITH BARNEY

A member of citigroup

We are pleased to announce that

James E. Pinzker

has joined our firm as a

Second Vice President - Investments

233 South Wacker Drive
Suite 3400
Chicago, IL 60606
(312) 441-3563 or (800) 334-2446

Member SIPC                                    149100210

.



CIRCUIT COURT FOR THE 19th JUDICIAL CIRCUIT

STATE OF ILLINOIS
COUNTY OF McHENRY  } SS

GEN. NO. 00CH510

☐ Jury  ☐ Non-Jury

Merrill, Lynch, Pierce Fenner & Smith, Inc.

vs.

Jeffrey Bobrowicz Charles Bee

Date 10-3-00   Plaintiff's Attorney RYA MCGC   Defendant's Attorney N AT CYS RN

## ORDER

This cause coming on for hearing on Plaintiff's telephonic notice for hearing a Preliminary Injunction; the Defendants having appeared and filed their Memo-randum in opposition; The Court having considered the same along with both parties affidavit and now being fully advised finds that Plaintiff have not demonstrated a likelihood of success on the merits

It Is Hereby Ordered that Plaintiff's Motion for Temporary Restraining Order is hereby denied. These proceedings are stayed + the parties are directed to NASD arbitration. This Order is entered without prejudice to the parties right under §10335 D of the NASD Arbitration Code, including to move for injunctive relief.

Prepared by: CBQN

Attorney for: _____

Attorney Registration No.: _____

Judge _____

FILED
McHenry County, Illinois
OCT - 3 2000
VERNON W. KAYS, JR.
Clerk of the Circuit Court

IN ARBITRATION BEFORE THE
NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.

| | | |
|---|---|---|
| Jeffrey Bobrowicz and Charles Boe, | ) | |
| Claimants, | ) | |
| | ) | |
| v. | ) | No. 00-4349 |
| | ) | |
| Merrill, Lynch, Pierce, Fenner & Smith, Inc., | ) | |
| | ) | |
| Respondents. | ) | |

## AWARD

A hearing was held at the NASD Office of Dispute Resolution in Chicago on
October 4, 2000. Claimants were represented by attorney Jerry M. Santangelo.
Respondents were represented by attorney Daniel P. O'Meara. No other
representatives of the parties were present. At the request of the attorneys
no witnesses were called to testify, and the hearing was conducted upon the
pleadings, affidavits, documentary submissions, and representations of the
attorneys. The hearing was conducted solely as to Claimants' request for
interim injunctive relief and pursuant to Respondent's counter-request for
interim injunctive relief.

The arbitrator ruled as a preliminary matter that Respondent was not
precluded by the NASD Rules from seeking interim injunctive relief in this
hearing because of having previously filed a similar action in the Circuit
Court for the 19th Judicial Circuit of the State of Illinois. Nor did the
Judge in that case intend to prevent this hearing from going forward. The
judge's order, entered October 3, 2000 by Judge Maureen McIntyre, stated that
her denial of respondent's request was "without prejudice to the parties
rights under Sec. 10335 D of the NASD Arbitration Code including to move for
injunctive relief."

This case revolves around the actions taken by Claimants in contacting their
customers when they left the employ of Respondent on Friday September 29,
2000 and began working for a competing firm, Morgan Stanley Dean Witter.
Respondent sought to enforce rights it claims under certain contracts with
Claimants. Claimants sought a declaration that Claimants' actions were not in
violation of those contracts and to prevent Respondent from taking certain
actions.

At the outset of the hearing, Claimants and Respondent agreed that there were
several classes of customers involved in this case:

CLASS I - Customers whom either Claimant serviced while Claimants were at
other firms prior to beginning their employment with Respondent.

CLASS II - Customers whom either Claimant developed while in the employ of
Respondent upon referrals from members of CLASS I or from prior acquaintances.

CLASS III - Members of Claimants' family and relatives.

CLASS IV - Customers whom either Claimant first serviced while they were

employed by Respondent who are not a member of any other CLASS.

Respondent stated it was not seeking any interim injunctive relief with regard to Claimants' involvement with members of CLASS I or CLASS III, but reserves its right to seek relief as to these CLASSES at a later arbitration.

Lee Hugh Goodman, as arbitrator for the NASD, finds as follows:

1) All proceedings in this case shall be conducted through arbitration at NASD Dispute Resolution. This is pursuant to NASD rules and is consistent with the ruling of Judge McIntyre referred to earlier in this award which states: "These proceedings are stayed and the parties are directed to NASD arbitration."

2) Claimants are not enjoined from further contact with members of CLASS I, II, III, or IV pending the final award in the arbitration of this case. The arbitrator finds that neither Claimants nor Respondent have met their burden of showing a likelihood of success on the merits of the case. This is not to say that neither side wins, for ultimately someone will. It is just that for reasons that differ as to each party, the arbitrator is unable to say upon the record that has been made at this stage which side is likely to prevail.

Initially, Respondents have established, and Claimants appear to admit, that Claimants signed certain contracts that may bind them. However, serious allegations about Respondent's conduct have been raised which make them ineligible for injunctive relief on an equitable basis at this time. Specifically, it is alleged that when Respondents hired Claimants, Respondents encouraged Claimants to engage in exactly the type of conduct they now complain of, to wit, taking customer files from Claimants' former employer to use in soliciting customers to move with Claimants to Respondent. It is not clear whether Claimants were contractually bound to refrain from such conduct, but the fact that Claimants' former employer took legal action to restrain Claimants from appropriating its trade secrets, and that Respondent provided a defense for Claimants, tends to indicate that Respondent began its relationship with Claimants on exactly the same basis that it now wants to keep Claimants and Morgan Stanley Dean Witter from establishing their relationship upon. Respondents may believe that those who live by the sword should die by the sword, but they should not expect the arbitrator to hold the sword.

Additionally, Claimants have alleged that for a period leading up to Claimants' departure from Respondent, Respondent was setting out to undermine the relationships between Claimants and their customers. Furthermore, Respondent does not appear to refute Claimants' allegations that Respondent set out to appropriate to itself all of Claimants' customers whose account balances fell below $100,000, without any compensation to Claimants. If these allegations are eventually proven, they would cast serious doubt on Respondent's good faith and fair dealings with Claimants.

With regard to Respondent's request for the return of any records Claimants may have taken, it appears that Respondent's concern was that Claimants' not be able to use the records to compete with Respondent. There was no indication that Respondent was hampered in the conduct of its business because it did not have access to its own records. The request for injunctive relief is therefore denied, because there does not appear to be any threat of irreparable harm that cannot be adequately compensated at the conclusion of

the arbitration by an award of damages.

In response to Claimants' request for injunctive relief, no sufficient showing has been made which would allow a declaration at this stage of the proceedings regarding the propriety of Claimants' contacts with any of the members of the CLASSES. As a practical matter, this leaves Claimants unrestrained from contacting anyone until the full arbitration panel has heard the case and rendered an award. This should not, however, be seen as approving of any such contact. Ultimately, the panel will determine whether Claimants' contacts with customers was proper or not, and damages may be assessed if the decision is against Claimants.

Claimants should be cautioned that the arbitrator took note of their representation at the hearing that as to members of CLASS IV, they sought only to contact these people to inform them of their new affiliation and would not solicit these people for their business. Though this AWARD does not bind Claimants to this course of action, any contrary activity may not be looked upon favorably by the full panel.

With regard to Claimants' request that Respondent be ordered to cease making disparaging comments about Claimants to Claimants' customers, there was very little indication that Respondents have made or will make such comments. This request is therefore denied.

/s/ Lee Hugh Goodman, Arbitrator

Dated October 4, 2000



RECYCLED PAPER



National Association of Securities Dealers, Inc.

In the Matter of the Arbitration between

Manish Choksi,

     Claimant,

And

Merrill, Lynch, Pierce, Fenner & Smith, Inc.

     Respondent.

NASD No. 97-05701

## Order

     A hearing was held by telephone on December 10, 1997. Christopher P. Stief, Eric J. Schreiner participated on behalf of Respondent. Jerry M. Santangelo participated on behalf of Claimant. Claimant participated in the hearing. Lee Hugh Goodman, as arbitrator for the NASD, finds as follows:

1) The arbitrator has jurisdiction to decide the Claimant's Statement of Claim requesting interim injunctive relief pursuant to NASD Code of Arbitration Procedure Section 10335. All relief granted herein will be effective immediately, and shall stay in effect unless modified by an award of arbitrators upon Claimant's request for permanent relief.

2) Claimant may send the announcement card that is attached to his Statement of Claim as Exhibit "B" to all of his clients that he personally serviced while at Respondent. Respondent will immediately provide Claimant with a list of his clients' names and addresses for this purpose. Although in another case the Financial Consultant Employment Agreement and Restrictive Covenants which were Exhibit "A" of Respondent's Opposition to the Statement of Claim might be enforceable, the uncontradicted representation at the hearing was that Claimant was not asked to sign this Agreement until after he had terminated his prior employment based upon an agreement to work for Respondent. It was also represented at the hearing that Respondent had jeopardized Claimant's prior employment by prematurely making contact with Claimant's prior employer, although there was no indication that this was done willfully. Under these circumstances, it would be inequitable to prevent Claimant from making the limited contacts, which he has requested.

3) Claimant may speak with and send ACAT transfer forms to the persons listed in Exhibit "C" to the Statement of Claim.

4) Respondent acknowledged at the hearing that it is in possession of certain personal property of Claimant, including a computer and disk drive(s). Respondent indicated a willingness to return the property to Claimant, but was reluctant to do so until it inspected the computer to determine whether it contained any information that was the property of Respondent. Respondent did not represent that it was aware or had reason to believe that any information on the computer was in fact the property of Respondent. Respondent will immediately return to Claimant his computer and hard disk drive(s) and any other personal belongings. Respondent will not access or inspect any information on the computer or disk drive(s), and will not do anything to damage the information. Claimant will return to Respondent any information which is on the computer or disk drive(s) which is the sole property of Respondent, and will delete any such information from his computer, make no use of it and not allow anyone else to use it.

5) Claimant and Respondent agreed at the hearing that there is no issue regarding Claimant's compensation.

6) Claimant and Respondent agreed at the hearing that there is no issue regarding U-5 clearances.

7) Claimant and Respondent agreed at the hearing that there is no issue regarding processing of account transfer forms.

8) Respondent may service clients who were previously serviced by Claimant while Claimant was employed by Respondent. However, for a period of 90 days beginning with the date this order is issued, if any such former client of Claimant asks Respondent how to contact Claimant, Respondent will give that person whatever phone number and address which Claimant supplies to Respondent for this purpose.

9) Claimant and Respondent agreed at the hearing that there is no issue regarding representations about claimant's ability to serve his clients.

10) Except for the relief stated herein, all further requests for interim relief are denied.

The arbitrator enters this order upon finding that Claimant has made a clear showing that he is likely to succeed on the merits, that he will suffer irreparable injury unless the relief is granted, and that the balancing of the equities lies in his favor.

Lee Hugh Goodman, arbitrator

Dated December 10, 1997







RECYCLED PAPER

NASD Arbitration Number 98-01012
Gary and Steven Nolen vs. Merrill Lynch, Pierce, Fenner & Smith, Inc

**Order on Claimants' application for Immediate Injunctive Relief**

A hearing was held by telephone on March 23, 1998 on Claimants Gary and Steven Nolen's Statement of Claim and Statement of Facts Demonstrating the Necessity for Interim and Permanent Injunctive Relief ("Statement of Claim"). The Chairperson has reviewed and considered the Statement of Claim, all responsive documents and the oral arguments of counsel and hereby rules as follows:

(1). That the arbitrator has jurisdiction to decide the Claimants' request for injunctive relief pursuant to the NASD Code of Arbitration Procedure Rule 10335. All relief granted in this order, will be effective immediately, and shall stay in effect unless modified by an award of arbitrators upon Claimants' request for permanent relief;

(2). That Merrill, Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") shall instruct its employees that they are to give the new business address and phone number of Steven Nolen to any customer who so inquires;

(3). That Steven Nolen may service customers who were personally serviced by him while he worked at Merrill Lynch if the customer contacts Steven Nolen for this purpose;

(4). That other than the above, all requests for relief sought in Steven Nolen's Statement of Claim for injunctive relief are denied;

(5). That Merrill Lynch shall instruct its employees that they are to give the new business address and phone number of Gary Nolen to any customer who so inquires;

(6). That as agreed to by the parties during the March 23, 1998 telephonic hearing of this matter, Gary Nolen shall have no restrictions in contacting, soliciting or obtaining names and addresses from Merrill Lynch regarding customers who were Gary Nolen's customers prior to his joining Merrill Lynch;

(7). That Gary Nolen, who was not asked to sign an employment agreement until two months after his employment at Merrill Lynch began, may service, speak freely with and send ACAT transfer forms and announcements to customers obtained by Gary Nolen during the term of his employment at Merrill Lynch;

(8). That other than the above, all requests for relief sought in Gary Nolen's Statement of Claim for injunctive relief are denied.

Robin David, arbitrator



RECYCLED PAPER



NASD Arbitration Number 98-C2225
Martin v. Merrill Lynch
NASD Arbitration Number 98-C2239
Merrill Lynch v. Martin

RULING AND ORDER

The undersigned having been appointed by the NASD as a single arbitrator to hear and resolve the above consolidated Statements of Claim, and having received and carefully reviewed all pleadings and other documents furnished, including, but not limited to the Temporary Restraining Order (TRO) entered June 19, 1998 by United States District Court Judge Ann Aldrich, and having heard extensive oral argument by counsel for Martin and counsel for Merrill Lynch respectively;

Finds that under NASD rules and applicable court decisions, the single arbitrator is without authority to disturb the previously entered June 19, 1998 TRO by Judge Aldrich.

With respect to certain injunctive relief sought by Martin, which does not touch upon matters encompassed by the TRO, injunctive relief is ordered:

1.   Effective immediately, Merrill Lynch and its officers, employees and agents shall inform any customers asking about Martin, that he has "resigned". If asked by customers where Martin is presently employed, the customer shall be informed that "Martin is now employed by McDonald & Co. Securities, Inc. (McDonald)".

2.   Effective immediately Martin may send the announcement card that is attached to his Statement of Claim as Exhibit "A" to all customers that came to Merrill Lynch because they were contacted by Martin as a result of their friendship or relationship with Martin.

This order shall remain in effect pending the earlier of the issuance of any subsequent order pertaining to injunctive relief or a decision on the merits of the controversy by an arbitration panel duly appointed under the NASD Code of Arbitration Procedure.

This order is without prejudice to either party to apply for further interim or for permanent injunctive relief.

Entered June 24, 1998

Jerome B. Haddox
Arbitrator

MERRILL LYNCH, PIERCE, FENNER
& SMITH, INC.

NASD NO. 98-02209
(consol. w/98-02225)

v.

BRIAN MARTIN and
McDONALD & CO. SECURITIES, INC.

INTERIM ORDER

And now this 30th day of June 1998, upon consideration of
the motions of the parties, and after hearing thereon, this
Panel makes the following INTERIM ORDER:

Effective immediately, Merrill Lynch and its officers,
agents and employees shall take no action that might delay
processing of account transfer requests through the ACAT
system.

It is further ORDERED that hearings on this matter in
accord with the agreement of the parties, are hereby
scheduled to commence on July 15, 16 or 17, 1998.

All other requests from the parties for interim relief
are denied.

BY THE PANEL:

Chair  Jerome B. Haddock

Arbitrator  Robert V. Shepard



RECYCLED PAPER



```
 1   STATE OF WISCONSIN          CIRCUIT COURT        DANE COUNTY
                                 Branch 11
 2
     ------------------------------------------------------------
 3
     MERRILL LYNCH, PIERCE,
 4   FENNER & SMITH, INC.,

 5                               Plaintiff,

 6             vs.                             Case No. 00 CV 1483

 7   ROGER M. McDOWELL,

 8                               Defendant.

 9   ------------------------------------------------------------

10
     DATE:                  June 2, 2000
11

12   BEFORE:                The Honorable DANIEL R. MOESER

13
     PROCEEDINGS:           Hearing re Plaintiff's Motion
14                          for a Temporary Restraining Order

15   APPEARANCES:           DANIEL P. O'MEARA, Attorney at Law,
                            Rubin & Associates, Paoli,
16                          Pennsylvania, and LESTER PINES,
                            Attorney at Law, Cullen, Weston,
17                          Pines & Bach, Madison, Wisconsin,
                            appeared on behalf of the Plaintiff.
18
                            JERRY M. SANTANGELO, Attorney at Law,
19                          Neal, Gerber & Eisenberg, Chicago,
                            Illinois, and ROBERT J. DREPS,
20                          Attorney at Law, LaFollette, Godfrey
                            & Kahn, Madison, Wisconsin, appeared
21                          on behalf of the Defendant.

22

23                          ANN M. ALBERT, RMR
                               Court Reporter
24

25


                                    1
```

```
 1              P R O C E E D I N G S
 2         (Partial Transcript of 6-2-00 Hearing re
 3    Plaintiff's Motion for Temporary Restraining
 4    Order - Judge's Decision)
 5              *  *  *  *  *
 6         THE COURT:  Okay.  Well, thank you for all
 7    the information.  I would enjoy sometime hearing
 8    the two of you on the opposite side of the case.
 9    I suspect that happens more often than not.
10         When I read the materials, I was troubled
11    and concerned about a lot of parts of this.  And
12    I'm not going to enter the temporary injunction,
13    and let me try to explain why.
14         But before I get into that, I want to make
15    it very, very clear that there is nothing I am
16    doing that should in any way affect the
17    arbitrator.  I don't know their practices and I
18    don't know their policies and I don't know that
19    process, but I certainly do not intend to bind any
20    arbitrator.
21         I feel pretty strongly that this entire case
22    belongs in the arbitrator system.  That's what the
23    parties have agreed to.  And this shouldn't be
24    decided by a race to the courthouse.  And if I had
25    entered the injunction, I would have only entered
```

2

1    it until something like 5:00 on Monday to make it

2    very clear that this doesn't belong here, it

3    belongs there.

4         But my reasons for not entering the

5    injunction today are that I don't believe it has

6    been demonstrated that there is an irreparable

7    harm.  It seems to me that, while complicated and

8    while tedious and while perhaps expensive, it

9    seems to me that a dollar figure can be put on the

10   harm through statistics, through histories,

11   through past practices.  We are dealing with huge,

12   huge numbers here nationally, I assume, and I

13   would think experts could very easily project and

14   predict what would have been lost by each lost

15   account.

16        So I don't think the plaintiffs today, at

17   least on the information I have, have met their

18   burden on the irreparable harm side of the

19   question.

20        I think the announcement that was sent out

21   wasn't an announcement.  I don't debate for one

22   second that Mr. McDowell probably hoped by sending

23   out the announcement that some of those customers

24   would call him.

25        The follow-up call, I think it's closer to

3

1  solicitation.  But we don't have information as to

2  what was said here today in those calls.  And the

3  burden is on the plaintiff, and I simply don't

4  have the information that would allow me to

5  conclude that that was solicitation.  I don't want

6  to get into a Clintonesque-type definition, and

7  we'll get close to that, but I can certainly

8  understand the argument that follow-up calls are

9  solicitation.  But I need to know what was said,

10  and we don't know that.

11        The cases of courts of equal jurisdiction in

12  Wisconsin provide some insight into thinking, but

13  they are not precedent, and I don't know all that

14  went into those arguments, and I don't know who

15  was there, and I don't know what affidavits were

16  filed, and it's very hard for me to rely on those.

17        So on the brief record I have -- and I

18  realize both sides did a lot of work in a very

19  short time -- I cannot find that there's a

20  likelihood of success on the merits, and I cannot

21  find that there would be irreparable harm.  So I

22  deny the temporary injunction.

23        MR. SANTANGELO:  Thank you.

24        THE COURT:  Anything else you want me to

25  clarify?

4

1          MR. O'MEARA:  Can I ask for one

2    clarification?  It's my understanding from your

3    initial comment that it wasn't your intent to

4    preclude Merrill Lynch from taking any position in

5    arbitration; that we would be free to move for

6    what we wanted.

7          THE COURT:  It's not my intent.  I think

8    that's where the expertise is.  I think that's

9    what the parties have contracted for, and I think,

10   frankly, that's where the decision should be made.

11         Whoever it is may or may not agree with me,

12   but I don't want anything I'm doing to preclude

13   the opportunity for either side to deal with this

14   issue there.

15         MR. SANTANGELO:  Your Honor, can we stay

16   this case and compel it to arbitration?  Would you

17   be willing to do that?

18         THE COURT:  That's where we're headed

19   anyway.  Mr. O'Meara?

20         MR. O'MEARA:  Sure.  Stay it, I guess, with

21   the right of either party to, in light of future

22   events, to somehow seek to modify that.  But I

23   don't think we'll be back.

24         THE COURT:  I don't either, but --

25         MR. SANTANGELO:  I would just like -- I

                           5

1    would like to have the case actually dismissed and

2    compelled to arbitration, 'cause the arbitrators

3    are fully empowered to do whatever may happen in

4    the future.

5             THE COURT:  I can't imagine how this gets

6    back in our system, but things happen.

7             MR. O'MEARA:  As co-counsel -- well,

8    basically, he suggested that we stay the case, and

9    if an injunction is entered, the Court will retain

10   the jurisdiction to enforce it.  But hopefully,

11   there would be full compliance with any order.  So

12   the bottom line is that we agree with opposing

13   counsel's proposal that the action be stayed in

14   the light of arbitration.

15            THE COURT:  Okay.  This case will be stayed,

16   and it will be Judge Foust's decision if and when

17   the stay is ever lifted.

18            MR. SANTANGELO:  Your Honor, thanks for your

19   time this afternoon.

20            THE COURT:  Thank you, folks.

21

22

23

24

25

```
 1   STATE OF WISCONSIN )
                        )   ss:
 2   COUNTY OF DANE     )

 3                         I, ANN M. ALBERT, Court Reporter,

 4   do hereby certify that I reported in Stenographic

 5   machine shorthand the hearing held in the above-

 6   entitled matter before the Honorable DANIEL R.

 7   MOESER, on the 2nd day of June, 2000, and that

 8   the foregoing is an accurate and complete

 9   transcript of my shorthand notes and the whole

10   thereof.

11

12           Dated this 4th day of June, 2000.

13

14

15           Ann M. Albert
16           Court Reporter

17

18

19

20

21

22

23

24

25
```

7

**Daniel R. Moeser**

RECD JUN  9 2000

**Dane County Circuit Court, Branch 11**
210 Martin Luther King Jr. Blvd., Rm. 308
Madison, WI 53709

Telephone: (608) 266-4377

Facsimile: (608) 267-4151

Betty Linnerud, Clerk

Ann Albert, Court Reporter

June 6, 2000

Attorney Lester Pines
Cullen, Weston Pines & Bach
122 W Washington Ave., Ste 900
Madison, WI 53703

Attorney Robert Dreps
LaFollette Godfrey & Kahn
P.O. Box 2719
Madison, WI 53701-2719

RE:   Merrill Lynch v.
      Roger McDowell
      Case No. 00 CV 1483

Dear Attorneys:

I am writing to correct the record.

The court reporter at our hearing in this matter on June 2, 2000 has informed me of the confusion in the transcript with the sentence starting on line 2 of page 42 (line 20, page 3 of the partial transcript).

I clearly intended to say that "I think the announcement that was sent out wasn't a solicitation."

I am sorry for the confusion and I trust this letter clarifies the matter. Thank you.

Respectfully yours,

Daniel R. Moeser
Dane County Circuit Judge

DRM/bl





RECYCLED PAPER



## NATIONAL ASSOCIATION OF SECURITIES DEALERS

ROGER McDOWELL

vs.                                                    Case No: 00-2300

MERRILL LYNCH, PIERCE,
FENNER & SMITH. INC.

MERRILL LYNCH, PIERCE,
FENNER & SMITH, INC.

vs.                                                    Case No: 00-2239

ROGER McDOWELL,

### INTERIM INJUNCTIVE RELIEF

Argued by telephone on Wednesday, June 7, 2000, Emanuel V. Gumina, Esq., Arbitrator

This matter having come before Emanuel V. Gumina, Esq., Arbitrator, on June 7, 2000, at 10:00 a.m. CST, by consolidation pursuant to NASD Rule 10335. The Claimant, Roger McDowell, (hereinafter referred to as "McDowell") represented by Jerry M. Santangelo, Esq. and the Consolidated Claimant, Merrill Lynch, Pierce, Fenner & Smith, Inc., (hereinafter referred to as "Merrill Lynch"), represented by Daniel P. O'Meara, Esq..

After hearing arguments, reviewing the tendered documents and weighing all the evidence, the arbitrator orders as follows:

1.     That by consent, the above mentioned cases, Case No. 00-2300 and Case No. 00-2239 are hereby consolidated.

2.     Pursuant to the jurisdiction conferred in the Consolidated Request for Interim Injunctive Relief as provided in Sec. 10335 of the NASD Code of Arbitration, all relief granted herein will be effective immediately and shall stay in effect unless modified by an award of a panel of arbitrators upon the Claimants' Request for Permanent Relief. This Order is without prejudice upon the merits to the position of any of the parties hereto for presentation before the full panel.

3.     Pursuant to 10335 and 10106 of the NASD Code of Arbitration, all the parties hereto shall not, during this arbitration process, prosecute, commence or continue any suit, action or proceeding, in any form against the other or any other party touching upon any of the issues

referred to in the Consolidated Arbitration Claims.

4.     That Merrill Lynch shall allow McDowell to retrieve his personal property which was left behind when he departed Merrill Lynch.  This shall be accomplished forthwith.

5.     That McDowell may continue to send basic informational announcement cards to former clients he serviced as a financial consultant while at Merrill Lynch ("Former Clients").  The text of the announcements shall be essentially identical to that as exhibited and filed by McDowell with the arbitrator entitled Exhibit A which is attached hereto and made a part of this Order.

6.     McDowell must refrain from direct solicitation by himself or by other personnel at his new employer, by inviting, encouraging or requesting any customer to transfer their account to him or his new employer unless the request and conduct is initiated by the client or customer, in which case, McDowell can respond.

7.     McDowell can service any account which is transferred from Merrill Lynch to his new employer by customer choice or consent.

8.     Merrill Lynch and its personnel shall reply when asked about McDowell's whereabouts and current affiliation, the name, address and telephone number of McDowell's current employer, if known, or as supplied by McDowell for that purpose.  Merrill Lynch personnel will not mislead former clients or any client as to the circumstances of or reasons for McDowell's change of affiliation.

9.     Merrill Lynch, by its personnel shall take no action that might delay processing of account transfers requested by customers ("Former Clients") through the ACAT system or otherwise delay giving customers information pertaining to their accounts.  Further, McDowell can service any account which is transferred from Merrill Lynch to himself or his new employer by customer choice or consent.

10.     This Order applied to McDowell and Merrill Lynch and anyone acting with or for either of them.  This Order also applies to motions of McDowell and Merrill Lynch on his/its claim consolidated herewith for temporary interim injunctive relief and any relief that has not been specifically granted is hereby denied.

Entered this 7th day of June, 2000.

Emanuel V. Gumina, Esq.
Arbitrator





RECYCLED PAPER

INDEX

THOMAS E. SCHLENDER
Cross Examination by Mr. Richards      22
Direct Examination by Mr. Cass         34
Recross Examination by Mr. Richards    36

process?

THE WITNESS:  The process would be as
soon as their resignation is handed in, those
accounts are reassigned immediately.  And in my
case it was-- it was already done, because,
evidently, they must have had a notion that I was
going to leave.  But the next monthly statement
that that client receives will reflect the new
financial consultant's name on it.

THE COURT:  Thank you very much.

THE WITNESS:  You are welcome.

THE COURT:  All right.  Anything else
from either counsel?

MR. GASS:  No, Your Honer.

THE COURT:  All right.  The Court is
prepared to rule at this time.

At the best the temporary restraining
order is unclear, and at worst I believe it is
over-broad.  One thing that is true, and that is
that the mailing that occurred in this case is an
accomplished fact, and whether that mailing would
or would not have been a solicitation, the Court
can't restrain an act that has already occurred.
But for the purpose of this hearing only, the
Court determines that the mailing was not a

solicitation as that term is used in the contract. It was merely notice of the fact that the defendant was no longer employed at Merrill Lynch.

That notice was inevitable. It would have been provided to all of the customers anyway. In fact, Merrill Lynch employees made phone calls to each of the customers, advising them of the fact that there had been this change. And any customer with a phone book or access to an information number, could have determined the new brokerage firm with which defendant had become associated.

I think this was notice and nothing more. A solicitation, as that term is used, would include more than just a notice. It would include an affirmative act to take the business away.

And so the Court determines that the mailing that occurred here is not a solicitation and that parties who respond to that mailing or who respond by requesting that their accounts be transferred to McDonald are not restrained from transferring their accounts.

The Court is considering the fact that, first of all, it would be impossible to tell which person transferred their accounts by virtue of

Page 41

having received this notice and which people
transferred their accounts by virtue of having
been called by Merrill Lynch employees indicating
that the defendant had left and that their account
was being transferred.

Any harm to Merrill Lynch I think is
finite. I think it is subject to calculation in
the event that damages are awarded.

And I am very reluctant to order any
relief which is going to have substantial effect
on the defendant's employer, who is not a party to
this case, and the substantial rights of clients
who ought to be free to take their business to
whomever they want.

The Court does believe that the
temporary restraining order does clearly prohibit
the defendant from engaging in any solicitation.
And just to be clear, it should be known that that
will include any kind of further contact with
these clients, other than contact that is
initiated by the client, until they become a
client of McDonald.

The Court believes that the temporary
restraining order shall remain in effect--should
remain in effect. We will order that the eventual

preliminary injunction should remain in effect
until the final arbitration order, not until the
matter is submitted to arbitration.

The Court will also order that Merrill
Lynch shall pay the expedition fee within five
days, or the Court will reconsider the terms of
the temporary restraining order.

The Court does reaffirm, as part of its
previous order, requiring that the record of
Merrill Lynch in the possession of the defendant,
along with all copies of those records, be
returned to Merrill Lynch. And I think that,
given the practical problems of getting those
records here on the weekend, that they shall be
turned over on Monday. I don't think that that
will substantially increase Merrill Lynch
exposure.

It seems to me that there are two kinds
of customers at Merrill Lynch. There is probably
a group who have no idea who their broker is and
don't care and the important thing is that they
have their account at Merrill Lynch, and those
people are going to stay at Merrill Lynch
regardless of who the broker is as long as the
broker provides some kind of reasonable service,

and I think that makes common sense.

And there is another group who is wedded to their broker and will follow their broker wherever he or she goes as soon as they find out that the broker has left.

I think the key in this case is that the defendant by virtue of the agreement may not go out and solicit these customers and try to coach them away from Merrill Lynch. If they choose to leave Merrill Lynch on their own and pursue the defendant, that's their choice, and that is not prohibited by the agreement. But he may do no affirmative act to draw them away from Merrill Lynch, and that is the gist of the Court's order.

And, again, the mere notice of the fact that he is leaving, whether made by Merrill Lynch or by the defendant, as he has in Exhibit 2, in my judgment does not constitute a solicitation, at least for purposes of this hearing.

Now, are we clear? Do we --I don't know who is going to prepare the order. Mr. Gass, maybe you ought to do that.

MR. GASS: Yes, I would ask on Item E, the issue of discovery. It seems to me that this case will be promptly in the arbitration process,

Page 44

and it should proceed that way.

THE COURT:  I would hope that by virtue
of the Court's ruling today that there is no need
for further hearing in this matter.  This could
become a preliminary injunctive order and remain
in effect until the arbitration.

MR. GASS:  That's fine with us.  We
don't need a hearing.  In fact, we can live with
this order until the order from the arbitrators
through this expedited arbitration.

MR. SPERLA:  Your Honor, with all due
respect, we are more or less local counsel, and I
think we would like to leave the hearing on until
we have had an opportunity to confer with them
more fully.

With regard to the issue of discovery,
Your Honor, I would like to leave that open as
well.  Judge Quist entered an order today at about
noon on this very issue and held that the
discovery before the preliminary injunction
hearing should go forward, and it's reasonable
under the circumstances, so I would maintain that
as well.

Again, we had about two to two and half
hours notice of this hearing.

Page 45

THE COURT:  Is this case before Judge Quist?

MR. SPERLA:  No, this one is not, a totally different case.  But it is the same identical issue, and that is can discovery occur between the issuance of a temporay restraining order or request for such and a preliminary injunction hearing, and Judge Quist held that it should proceed, the discovery should proceed, and in fact it is scheduled for Monday.

So I would maintain that we would like to reserve the right to schedule discovery prior to Friday's hearing of next week.  If we decide not to go forward with that hearing, certainly, there would be no need for discovery.

THE COURT:  That would be my opportunity to get Judge Quist back for something that he did to me one time.  I walked to the back of his courtroom while he was conducting a hearing, and they had these tables full of blue-suited Chicago lawyers, and he saw me walk in and sit down in the back, and the lawyers were  arguing about something that the State Court Judge had ruled, and Judge Quist says, I don't give a damn what those state courts rule, they don't have any idea

Page 46

what is going on. And all these lawyers were
vigorously shaking their heads. So this would be
my opportunity to say, I don't really care what
Judge Quist has ruled with tongue in cheek.

All right. What kind of discovery is
being sought here?

MR. SPERLA: Your Honor, simply the
examination of Mr. Schlender. I can't imagine,
unless there are some issues that he claims I
don't have knowledge, and we would want to perhaps
take his manager, those are the only two that I
can imagine that we would need with respect to
anything that he might claim ignorance on.

THE COURT: Any objection to that?

MR. GASS: I object. If we are not
going to have a preliminary injunction hearing,
and I don't see a need for it at this point, then
why do we need to follow these procedures? Let's
just go into the arbitration, and they have got
detailed rules.

THE COURT: Under the arbitration rules
are you entitled to discovery of any kind?

MR. SPERLA: Your Honor, I think that
there are different types of arbitration rules,
and I don't profess to be an expert on that. I

know that there is at least one type of
arbitration process where that is not allowed, and
I don't know whether that's the tract this is on
or not.

MR. RICHARDS: Your Honor, I do have
some experience with NASDA arbitration.
Typically, depositions are not allowed. It is
written discovery, primarily.

THE COURT: If defendant is consenting
to this temporary restraining order becoming a
preliminary injunctive order, why would you be
entitled to any discovery in this case?

MR. RICHARDS: Your Honor, I think that
after we confer with lead counsel in Pennsylvania,
they are going to want an opportunity to bring
witnesses before the Court, specifically the
branch manager and others, to talk about some of
the contacts that were made here.

Once again, we weren't prepared to turn
this into a preliminary injunction hearing.

THE COURT: But they are agreeing with
it? They are saying, go ahead, you may have your
temporary restraining order, you may have your
preliminary injunctive order.

MR. SPERLA: One method we know that is

employed that allows Mr. Schlender get on the
stand and say, I didn't do. he has somebody else
do it at McDonald. And we suspect that may have
occurred. And that may change the Court's view on
this solicitation issue. If there were telephone
calls or other mailings that went out based on
information that Mr. Schlender gave to somebody
else at McDonald, then the relief that is being
afforded may not be adequate, and we would
certainly like to reserve the right to come before
the Court next Friday.

          MR. GASS: Your Honor, my only concern
is that there is really no reason to have a
preliminary injunction hearing, if this is the
Court's order and it's agreed upon. And I don't
want to see this Court being used to conduct
discovery that may or may not be allowed in the
arbitration proceeding.

          I have not been involved in the NASDA
arbitrations, but they have got their own
procedures, and let's follow those and not use
this Court to supplement or expand on any
discovery that may be allowed in those
proceedings.

          MR. SPERLA: Your Honor, I am not asking

Page 49

for discovery. I am just asking for an
opportunity to bring before this Court
everything that may be germane to the issue of the
temporary restraining order.

THE COURT:  The issue before the Court
is very narrow.  I have already granted a
temporary restraining order.  The only issue
before the Court on the order to show cause is why
the temporary restraining order   should not
become a preliminary injunction.  The defendant
says, go ahead, it can become a preliminary
injunction.

I think the next issue then becomes
whether or not they have violated in some way, and
you may be entitled to some sort of contempt
hearing, if you think that there has been a
violation.  But where the relief sought is not
contested, then I don't know the purpose of the
discovery.  Thanks.

MR. RICHARDS:  Your Honor, if I may
respond very briefly.  I think your ruling today
was based in part on the testimony from Mr.
Schlender that he just sent out the announcement
and that was it and he stood back and waited for
the customers to come to him.  We may be able to

develop information and evidence to contest that
and we would like an opportunity to present that
to the Court next Friday, if we have that
information, and that may cause you to reassess
your ruling today.

MR. SPERLA:  Your Honor, it may actually
promote not having a hearing next Friday, because
if that discovery were conducted, if we were to
conclude based on that that what we expect may
have happened didn't happen, and certainly with
the relief that the Court has granted and what Mr.
Gass has stipulated to would be adequate at that
point.

And just for clarification sake, as I
sit here and think about that order, it prohibits
the acceptance of the transfer of accounts.  So I
am assuming, based on what the Court has ruled,
that it is okay for him to accept that business,
as long as it is initiated by the client.  But,
otherwise, that provision within the order would
still be effective?

THE COURT:  Absolutely correct.

MR. GASS:  On a clarification on that,
if a client calls Mr. Schlender and asks that the
account be transferred, Merrill Lynch has to

Page 51

cooperate?

THE COURT:  Absolutely.

MR. CASS:  In making sure that takes place?

THE COURT:  It is the client's money, they can take it wherever they want.  But what we can't do is have Mr. Schlender soliciting that work, and that is the whole purpose.  And if there is evidence that he specifically solicited an account and that that account was then transferred, the Court will take whatever action is necessary.

I am going to allow -- do you want to take the defendant's deposition?

MR. RICHARDS:  Defendant's deposition and the manager of that office, Your Honor.

THE COURT:  I will allow that.  I understand why you want that testimony.  But beyond that, you would have to get leave of the Court to take any additional discovery.

MR. CASS:  Is there any limit in time? We are not talking about all-day depositions next week, I hope.

THE COURT:  It should be limited to the issues in dispute in the request for preliminary

Page 52

injunctive order.

MR. RICHARDS:  Thank you. Your Honor.

THE COURT:  If we can keep the Chicago lawyers in Chicago, we may be able to get it done in a couple hours.

MR. GASS:  And we will prepare the order.

THE COURT:  Yes.

MR. SPERLA:  Your Honor, can the order be submitted to us for approval?

THE COURT:  Yes, or either under the seven day rule.

MR. SPERLA:  Do I understand that the order that is in place and remains in effect --because if we are going to frog around with this for a week to ten days because we can't agree to it, we have to notice this out for a hearing. Either that we can waive the notice requirement and get over here on 24 hours and argue about the order.

MR. GASS:  That's fine.

MR. SPERLA:  I just don't want to end up in a situation we have got ten days and we are in a state of limbo.  We had an order, and I assume that will stay in effect until something else

Page 53

comes into play?

      MR. GASS:   Well, I don't understand
that.   I understand that  we can operate within
the Court's oral ruling today, and we will
document that in a formal order.

      THE COURT:  That is the nature of a
temporary restraining order, and that is that they
are subject to change.  And you may operate within
the Court's ruling today.  And if there is a
procedural violation, we will have to take that
up.

      MR. RICHARDS:  Thank you, Your Honor.

      THE COURT:  Thank you, Your Honor.

      (Proceedings concluded).

STATE OF MICHIGAN)

                           SS

COUNTY OF OTTAWA


I, Jill L. Jessup, Official Court Reporter for the 20th Judicial Circuit Court, State of Michigan, do hereby certify that the foregoing pages 1 through 54 is a true and accurate transcript of the proceedings heard October 16, 1998


Jill L. Jessup, CSR 3242


Oct 20, 1998
Grand Haven, MI


page 55

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OTTAWA

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.
                    Plaintiffs,
V                                    File No. 98-32079 CK
THOMAS E. SCHLENDER,
                 Defendant.

HEARING ON MOTIONS

BEFORE THE HONORABLE EDWARD R. POST

Circuit Court Judge - Grand Haven, Michigan

October 16, 1998.

APPEARANCES:

MICKA, MEYERS, BECKETT & JONES, PLC
BY:  JOHN T. SPERLA  P25623
and
BY:  ERIC S. RICHARDS P40338
Appearing on Behalf of the Plaintiffs:

MILLER, JOHNSON, SNELL & CUMMISKEY, PLC.
BY:  DAVID J. GASS  P34582
Appearing on Behalf of the Defendant.



RECYCLED PAPER





# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF KENT

MERRILL, LYNCH, PIERCE, FENNER
& SMITH INC.,

      Plaintiff,

v

ROBERT M. ZALOKAR,

      Defendant.

Case No. 00-00533-CK

HON. H. DAVID SOET

**ORDER**

---

James R. Peterson (P43102)
MILLER, JOHNSON, SNELL
& CUMMISKEY, P.L.C.
Attorneys for Defendant
800 Calder Plaza Building
250 Monroe Avenue, N.W.
Grand Rapids, Michigan 49503
(616) 831-1700

H. Nicholas Berberian
Robert J. Mandel
L. Roger Boord
NEAL, GERBER & EISENBERG
Co-Counsel for Defendant
Suite 2300
Two N. LaSalle Street
Chicago, Illinois 60602
(312) 269-8000

John T. Sperla (P25623)
Eric S. Richards (P40338)
MIKA, MEYERS, BECKETT & JONES, P.L.C.
Attorneys for Plaintiff
Suite 700
200 Ottawa Avenue, N.W.
Grand Rapids, Michigan 49503
(616) 459-5200

Joseph A. Dougherty
Elizabeth A. Lloyd
RUBIN & ASSOCIATES, P.C.
Co-Counsel for Plaintiff
10 S. Leopard Road
Paoli, Pennsylvania 19301
(610) 408-2009

---

At a session of said Court held in the City of Grand Rapids, County of Kent, State of Michigan this 28th day of January, 2000.

PRESENT:   HON. ~~GEORGE S. BUTH~~
Circuit Court Judge

This matter having come on for hearing on Plaintiff's, Merrill, Lynch, Pierce, Fenner & Smith, Inc.'s, Motion for a Temporary Restraining Order, and this Court having considered the affidavits and arguments of the parties and being otherwise fully advised in the premises,

IT IS HEREBY ORDERED that Plaintiff's Motion for a Temporary Restraining Order is denied.

_____
~~George S. Buth~~, Circuit Court Judge

Approved as to form only:

_____
Eric S. Richards (P40332)

_____
James R. Peterson (P43102)

We are pleased to announce that

**Robert M. Zalokar**

has joined our firm as a
**Vice President-Investments**
**Financial Consultant**

---

99 Monroe Avenue
2nd Floor
Grand Rapids, MI 49503
(616) 771-6167 or (800) 666-3999

## SALOMON SMITH BARNEY

A member of citigroup

Member SIPC                                    11254 06297



RECYCLED PAPER

1           UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF COLUMBIA
2

3
MERRILL LYNCH, PIERCE,                    .
4  FENNER & SMITH, INC.,                   .

5                                          . Docket No. CA 99-3000 JR

6           Plaintiff,                     .
                                           . Washington, D.C.
7           v.                             . Monday, November 15, 1999
                                           . 9:08 a.m.
   PAUL L. FOWLER, JR. and                 .
8  KIMBERLY H. WOLFF,                      .

9           Defendants.                    .
   .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

10

11          .       TRANSCRIPT OF MOTIONS HEARING
            BEFORE THE HONORABLE JAMES ROBERTSON
12               UNITED STATES DISTRICT JUDGE

13  APPEARANCES:

14  For the Plaintiff:        RUBIN & ASSOCIATES
                              CHRISTOPHER P. STIEF, ESQ.
15                            10 South Leopard Road
                              Paoli, Pennsylvania 19301
16                            DUANE, MORRIS & HECKSCHER
                              DENYSE SABAGH, ESQ.
17                            1667 K Street, N.W.
                              Washington, D.C. 20006
18
   For the Defendants:        WEST & MOORE
19                            JOHN WEST, ESQ.
                              Mercantile Building
20                            409 Washington Avenue
                              Towson, Maryland 21204
21
   Court Reporter:            Dennis A. Dinkel
22                            Official Court Reporter
                              Room 6818, U.S. Courthouse
23                            Washington, D.C. 20001
                              PHONE:  (202) 289-8661
24
   Proceedings reported by machine shorthand, transcript produced
25  by computer-aided transcription

Dennis A. Dinkel - Official Court Reporter - (202) 289-8661

<u>P R O C E E D I N G S</u>

(9:08 a.m.)

MR. STIEF: Good morning, Your Honor.

THE COURT: I was surprised not to find you in courtroom 16 where I normally go. My feet took me there automatically this morning. That's why I am a little late. We have a temporary restraining order. Excuse me, go ahead, Linda.

THE DEPUTY CLERK: Thank you, Your Honor. This is Civil Action 99-3000, Merrill Lynch, Pierce, Fenner & Smith, Incorporated versus Paul L. Fowler, Jr. and Kimberly H. Wolff. Representing the plaintiff Mr. Stief and Ms. Sabagh; representing the defendants, Mr. West.

THE COURT: On Friday afternoon, rather than hear and decide the temporary restraining order I had a telephone conference with counsel and was assured by defendant's counsel that the defendants would not make any telephone calls at all to former Merrill Lynch clients or customers from about 4:30 p.m. Friday afternoon until this morning.

And I was assured by plaintiff's counsel that they were not concerned that the period between then and now would bring about the demise of Merrill Lynch, Pierce, Fenner & Smith as we know it. So here we are hearing the temporary restraining order. Let me hear from plaintiff's counsel.

MS. SABAGH: Your Honor, my name its Denyse Sabagh.

3

1    I am co-counsel in the case.  I would like to introduce to the

2    Court Christopher Stief as co-counsel who will argue the case.

3    Mr. Stief is admitted to practice in Pennsylvania and Maine.

4            THE COURT:  Very well.

5            MR. STIEF:  Good morning, Your Honor.  Thank you.

6            THE COURT:  Good morning, Mr. Stief.

7            MR. STIEF:  Your Honor, I know you have another

8    matter.  We will be brief.  You have something coming up at

9    9:30.  I think as you gleaned from the telephone conversation

10   on Friday, that the key question in this case is not really the

11   enforceability under the District of Columbia law of the

12   covenant.

13           The covenant prevents solicitation of customers and

14   use and disclosure of records and information related to

15   Merrill Lynch customers.  The affidavits that we have

16   received -- and I guess the Court has received since

17   Friday -- indicate that the defendants are, in fact, making

18   contact with the customers they serviced at Merrill Lynch

19   regarding their employment at Dean Witter.

20           The defense that appears to be raised in the

21   affidavit is that these contacts were not -- quote --

22   solicitations but were something else, "announcements" they

23   term it.  Therefore they don't violate the contract.  But it is

24   important to note that that's really the -- that's really the

25   question that's posed for the Court.

4

1       I direct the Court's attention to the affidavit we

2   filed, which was the affidavit of Christopher Dupwee, the

3   manager of the Merrill Lynch office, in anticipation of this

4   question; and, frankly, in response to a request that was put

5   in the resignation letters, Mr. Dupwee made a lot of efforts to

6   make sure clients of Merrill Lynch would be able to find out

7   where the defendants were without the defendants making these

8   contacts apparently via telephone with them regarding their new

9   employment at Dean Witter.

10       Mr. Dupwee sent out a letter to all the customers.

11   In the letter it says the defendants have left and they have

12   joined Morgan Stanley-Dean Witter at the address given to

13   Merrill Lynch in their resignation letters.  That gives any

14   customer that they worked with in the past the ability

15   without -- essentially on their own initiative -- to contact

16   the defendants if they so choose.  That's really a ready-made

17   ability to protect any interest the customers might have

18   without the problem that we have now, which is the defendants

19   reaching out over the telephone making calls over the weekend

20   through -- since their resignation -- to the Merrill Lynch

21   customers they formerly serviced.

22       The defendants were informed of that.  Mr. Dupwee

23   notes in his affidavit he faxed over to the Dean Witter office,

24   as well as to the defendants, as well as the Dean Witter

25   manager a little memo styled letter saying we're going to send

5

1    out this letter.  Everybody will know where to find you.

2    Accordingly, there is no need and you should not be contacting

3    Merrill Lynch customers about your new employment.

4              Mr. Dupwee also took other steps.  He sent out

5    written instructions to the other financial consultants in the

6    office saying if any customer asks, be sure to tell them they

7    are over at the 1300 I Street of Dean Witter.  I think

8    particularly in light of all the defense that's being raised

9    here there's a suggestion there was a duty of some sort or need

10   to -- quote -- announce their new employment.

11             I think it begins to be revealed what is really going

12   on in these telephone calls and what the purpose is.  The

13   purpose is that it's not enough for the clients just to know

14   where they are.  They want to get them on the phone; and by

15   getting them on the phone as any salesperson will tell you --

16   you know -- you're a long way down the road.

17             These people do know the defendants individually.  It

18   is very difficult for a customer who has worked with one of

19   these defendants to hear -- taking the best case scenario for

20   them and we don't have evidence they're doing more, of course.

21   There is no way to tell what is being said on these calls --

22   but making the best scenario, the best case scenario would be

23   Kimberly Wolff called up and said, hi it is Kim Wolff.  I want

24   to let you know I left Merrill Lynch and am over here at Dean

25   Witter.

6

1          Factually, that's their best case scenario.  It is
2   very difficult for a customer to hear that who worked with
3   Kimberly before to say thank you and hang up the phone.  That's
4   not going to happen.  That's the idea of the telephone call.
5   It's a conscious exploitation of the social norms.  You get a
6   customer on the phone that's been working with you.  You give
7   them this line; and even if you just remain silent, there's a
8   compulsion to -- almost on the customer because of basic
9   politeness to enter into discussion.  Tell me about Dean
10  Witter.  Why did you make the move?  Whatever it may be.
11          THE COURT:  Mr. Stief, I understand your point.  What
12  I'm not sure about is what is the contractual basis either for
13  permitting Mr. Dupwee or for recognizing that Mr. Dupwee's
14  memorandum and other efforts can -- what's the word I'm groping
15  for -- interdict other efforts by the defendants to call and
16  say here I am?
17          And you talk about the conscious exploitation of
18  social norms.  What is there in the contract that does anything
19  more than forbid the defendants to make solicitation calls?  If
20  a call saying here I am morphs into a discussion of business,
21  well, that may be a social norm, that may be human nature.
22          But where does the contract say they can't do that?
23  The contract says they can't solicit.
24          MR. STIEF:  Exactly.  The initiation of the contact
25  regarding the new employment is the solicitation.  It's a

1   contact made for the purpose of setting into motion that chain

2   of events that leads to the transfer of the account.

3          The -- and that's -- that's the holding that's been

4   reached by a number of courts.  We cited Your Honor to a few of

5   them.  Judge Garbus' opinion from the District of Maryland is

6   an analysis of that in which his conclusion is when you

7   initiate contact, something that's targeted directly at the

8   customers you formerly serviced, that becomes a solicitation;

9   and an announcement is something more of a general broadcast, a

10  tombstone ad in the Washington Post or whatever it may be

11  that's broadcast and could be seen by those particular

12  customers you serviced, but it is not targeted at them.

13         It is ultimately the targeted nature of the contact

14  which renders it a solicitation because of that natural

15  inclination for when you call that customer that you worked

16  with the customer is going to go that way, and I think -- I

17  think Mr. Dupwee's efforts really illustrate why, in fact, it

18  is a telephone call solicitation and the -- the rationale

19  that's being offered for it is -- doesn't make sense.

20         THE COURT:  Okay.

21         MR. STIEF:  In addition, in the -- there's two

22  versions of the contract here.  One is a newer version and one

23  is an older version.  The newer version signed by Ms. Wolff

24  says no, don't initiate contacts for the purposes of

25  soliciting.  The older contract says don't solicit.  I think

8

1   from our perspective they essentially mean the same thing.

2   THE COURT:  The contract you want is one that says

3   don't call any former customers if we have sent out a

4   preemptive memorandum saying where you are?  That's the

5   contract you want?  But you don't have it.

6   MR. STIEF:  We don't have those specific words.

7   However, I think that the conduct that we have here does

8   constitute the solicitation so that it comes within the rubric

9   of this contract.

10   But no, you are right, Your Honor.  It does not spell

11   it out with that degree of specificity of what may constitute

12   solicitation under different circumstances; but I think this

13   conduct does, and it's been held to be so by a number of

14   courts.

15   I think one of the other things to look at, too, is

16   certainly any -- certainly any further contact with any

17   customer who has been contacted once must necessarily be for

18   another purpose because if it was an announcement and even

19   whether it is permissible or not the first time, whether it was

20   an announcement the first time, the follow-up, that bell has

21   been rung so to speak.

22   THE COURT:  Well, it has been rung, Mr. Stief, except

23   suppose in the first phone call, the customer says oh, I'm glad

24   to hear you're now at the X firm.  Call me if you have

25   something interesting.

9

1         Now, we both know that as a practical matter, Merrill
2    Lynch is never going to take the deposition of that customer to
3    find out if that's what the customer actually said because that
4    will kill that customer relationship forever; so you have
5    thousands of telephone calls, maybe hundreds, maybe dozens, I
6    don't know how many we're talking about.  You have a lot of
7    telephone calls out there.
8         MR. STIEF:  We do.
9         THE COURT:  Two versions of them probably.  Salesman
10   thinks he or she has received in that first notification --
11   phone call, whether or not it is a conscious exploitation of
12   social norms, as you call it -- believe that he or she has
13   received encouragement to make another call.  Certainly it
14   can't be that they can never call those people again.
15        MR. STIEF:  I think unless that customer has said
16   great, I want to transfer my account, if the customer has
17   indicated the intent to transfer or said send me information
18   about Dean Witter, then I think that -- you know -- then that
19   would be permissible.  I still think the first contact was
20   inappropriate; but at that point then -- that addresses a
21   separate question.  Obviously, I think the first contact is a
22   problem in any case.
23        THE COURT:  Just for an example, Mr. Stief, the order
24   you have filed that was signed by Judge Jackson on September 9
25   in the case against David Margulies simply enjoins the

1   defendant from soliciting.  I'm not sure how that advances the

2   ball.

3           MR. STIEF:  It -- that is -- that is what it

4   enjoins.  And we had a similar argument in front of Judge

5   Jackson.  I think one of the -- I think it advances the ball in

6   that I don't think there's much question between the two sides

7   here that the second contact, the follow-up contact would be a

8   solicitation.

9           Even under their analysis which is my first call was

10  an announcement, which we reject, but even if you accept that

11  for the sake of argument, I think even the cases they rely upon

12  say the second call would be a solicitation and that they have

13  got to rely on that first call for the customer to come to them

14  at that point.  And certainly, I think that's the

15  interpretation that we worked under under the Margulies case as

16  well as some of the other cases Mr. West is going to cite to

17  you.

18          You think it advances the ball in that regard.  I

19  think Judge Jackson did not end up deciding whether these

20  telephone calls in the same circumstances you're in right now

21  constituted solicitation or not.  I was really going to decide

22  that at the preliminary injunction hearing.  The case was

23  resolved before we got to the preliminary injunction hearing.

24  He enjoined solicitation prospectively with all the parties, I

25  think, operating under the impression -- at least my impression

11

1   of it is -- and Mr. West can tell you if he has a different

2   one -- that that meant no further -- sort of no reinitiation of

3   the contact regarding the employment.

4           THE COURT:  Okay.

5           Thank you, Mr. Stief.  I know you have another

6   deadline.  So do I.

7           MR. STIEF:  No.  I was talking about your own

8   deadlines.

9           THE COURT:  I will hear from Mr. West.

10          MR. WEST:  Thank you, Your Honor.  Good morning.

11          THE COURT:  Good morning.

12          MR. WEST:  Well, I think we're all pressed this

13   morning.  I'll just cut to the quick of the argument.

14          I think Your Honor touched on the very points that I

15   would make anyway.

16          The focal point here is what do the contracts of

17   these two people say?  The first contract says I will not

18   solicit.  If I have any documents I will give them back.

19   Interestingly enough, in that contract, it says that if I

20   violate this contract, I'll be subject to damages from Merrill

21   Lynch.  It mentions Merrill Lynch.  It mentions nothing about

22   injunctive relief.  That's Mr. Fowler's contract.

23          Ms. Wolff's contract says I will not solicit and goes

24   on to define "solicit" the way the dictionary does, which is I

25   will not ask anybody or invite anyone or encourage anybody to

12

1   move their account.

2            But as the Court properly pointed out, the

3   contract -- neither contract prohibits the broker from

4   contacting their customers to announce their change of

5   employment, which is a very natural thing for the broker to

6   do.

7            It has been recognized as such by a number of courts

8   that that is natural and appropriate; and I think one judge in

9   Baltimore even said they had a fiduciary responsibility or

10  close to a fiduciary responsibility to do that because the

11  customers want to hear from the brokers as to what their status

12  is in the event they need to contact them.

13           Now what Merrill Lynch has done in this case is try

14  to preempt the customers' rights -- I mean preempt the brokers'

15  rights to contact their customers by sending out this letter

16  which, in effect, if it is read closely, is a solicitation

17  letter by Merrill Lynch.

18           We want you to -- the brokers have left and then they

19  say -- you know -- the good brokers, the honest brokers stick

20  around; but these guys have left, and we would like for you to

21  stay with our business because we're the best.

22           Now, the affidavits that have been filed, the

23  affidavit by Mr. Dupwee for Merrill Lynch, it tries -- he

24  equates an announcement with a solicitation.  The affidavits by

25  my clients say that they have given notification or

13

1   announcement but they have not solicited.

2          In the case that Your Honor had a couple of years ago

3   that I recited on the telephone -- and I brought with me

4   actually the transcript from that case along with a few other

5   things -- I've given copies of these to Mr. Stief, but in that

6   packet there is the transcript of the proceeding in the case of

7   Merrill Lynch versus Wilkinson; and I believe it is the first

8   transcript which appears after several orders.

9          And in that transcript, I've highlighted for the

10  Court and for Mr. Stief -- just as a matter of expedition I

11  would point the Court out to a quote on page 34, the section

12  starts on page 33, at the bottom, "There's a dispute as to what

13  Mr. Wilson said when he called clients of Merrill Lynch; that

14  comes down to a question of whether it was solicitation, as

15  Merrill Lynch suggests as a matter of fact or a matter of law,

16  or an announcement, which is my word, notification which is

17  Mr. West's word.

18          "On the other hand I am not prepared on an

19  application for TRO to equate solicitation, on the one hand,

20  with notification or announcement, on the other hand."

21          In that case, Your Honor denied injunctive relief

22  recognizing that a TRO is an extraordinary remedy, and the

23  Court in that case ordered the parties to do discovery if they

24  wanted to do it, set a time for preliminary injunction, and let

25  it go at that.

1          That I would suggest is the appropriate result that
2   the Court should follow in this case.  If Mr. Stief contends
3   that there has been solicitation to make out a claim for that,
4   then perhaps he should be entitled to injunctive relief at
5   least with regard to Mrs. Wolff's -- or Ms. Wolff's case where
6   she stipulated in the event of a violation in her contract, she
7   could be enjoined.
8          I'm not so sure the same result would hold forth for
9   Mr. Fowler even if that were the case.  In any event, I think
10  that's for something down the road.  One point that I am sure
11  the Court is aware of is this case is pending before the NASD.
12  It has already been filed.  These cases have to go to expedited
13  arbitration.  The arbitrators have a full panoply of remedies
14  available to them, including injunctive relief.  There have
15  been some judges, including Judge Legg in the District Court in
16  Baltimore who refuse to grant a TRO in a case like this saying
17  if you want an injunction, go to the arbitrators because they
18  have to decide the case on the merits fully and finally in any
19  event.
20          So I believe that the appropriate result here is to
21  deny the TRO, direct the parties to arbitration, and let it go
22  at that.
23          THE COURT:  The plaintiff has handed up a whole
24  series of TROs that have been issued by other judges in other
25  cases.  It seems to me that the case for a TRO here amounts to

Dennis A. Dinkel - Official Court Reporter - (202) 289-8661

15

1   this:  We have a contract with our stockbroker saying they are

2   not to solicit.

3           They leave, they make phone calls to people in order

4   to consciously exploit social norms; and those phone calls may

5   turn into solicitations or are intended to turn into business

6   discussions.  Are intended to turn into business discussions.

7           And we try to preempt that by sending out memoranda

8   and letters to clients saying where these people are.

9           I don't think that makes it -- I don't think that

10  establishes the -- either the reasonable likelihood of success

11  on the merits or irreparable injury in a realm in which there

12  are damages to be had.

13          Indeed, it is a little hard for me to see how Merrill

14  Lynch is going to be irreparably injured by a couple of

15  stockbrokers.  This is obviously a recurring problem.  And it's

16  going to recur more and more as people hop around more and

17  more; but it seems to me in the absence of a clear contractual

18  obligation on the part of the departing stockbroker to make no

19  telephone contact at all with previous customers of Merrill

20  Lynch, you have what is very close to an unenforceable

21  contract.

22          You have an arbitration remedy.  The arbitration

23  remedy is under way.  It is an accelerated arbitration.  That

24  is what is designed to take care of these decisions.

25          I don't think even with the posting of a big cash

1   bond on the part of Merrill Lynch, which they wouldn't -- which

2   they wouldn't hesitate to post -- I don't think there's

3   adequate justification for the issuance of a TRO here.

4             And I will accordingly deny it.

5             Now the matter is off for an NASD arbitration that

6   presumably will start very quickly.  If it doesn't start very

7   quickly, and if the plaintiff believes there are continuing

8   violations and the plaintiff wishes to pursue those violations,

9   by means of discovery or otherwise, and bring the matter on for

10  preliminary injunction, well, I'm here.

11            MR. STIEF:  Your Honor, if I could address that

12  question?

13            I think it would be helpful to the parties to engage

14  in some narrow deposition discovery that.  Might actually help

15  shake out some of the factual issues we have been talking

16  about.  I propose we do that and then perhaps contact chambers

17  to set a date for a preliminary injunction.

18            THE COURT:  Well, what's the story?  I don't want to

19  overwhelm, interfere with, slow down, or otherwise put a thumb

20  on the scale of the NASD arbitration.  What's the timetable for

21  that?

22            MR. STIEF:  The timetable depends actually upon

23  whether there has been a TRO issued by the Court.  The issuance

24  of a TRO triggers expedited procedures at the NASD, so the

25  hearing then will be promptly considered on its merits at the

1  NASD.

2         THE COURT:  If you told me that I might have been

3  more disposed.

4         MR. STIEF:  That leads to another issue which is

5  typically what we're seeing is when there is an injunction

6  issued by a court, approximately a four- to six-week timeframe

7  between when the Court issues a temporary restraining order and

8  a final hearing on the merits is held at the NASD.

9         One thing I guess we'd ask the Court is whether we

10  can address -- Judge Jackson's approach in Margulies was to say

11  clearly there ought not to be solicitation between now and

12  then.

13         And that's why Judge Jackson issued the order he

14  did.  I would think even if -- even if the initial contacts

15  here, if the Court is inclined to think they were permissible

16  announcements, that the follow-up announcement -- so to

17  speak -- would then cross the line, and we would ask the Court

18  to address that so that we can all be heading towards

19  arbitration or a preliminary injunction hearing knowing what

20  everybody's obligations are.

21         I think that would be very helpful to us if we could

22  have that guidepost in place from the Court in terms of a

23  restraining order which would prohibit prospectively further

24  initiation of contact with anybody who's already been

25  contacted, that is.

18

1          THE COURT:  Well, anyone who has -- who hasn't -- who

2     has already been contacted who hasn't invited another telephone

3     call?

4          MR. STIEF:  Yes, Your Honor.

5          THE COURT:  Mr. West?

6          MR. WEST:  Well, Your Honor, I don't agree with

7     Mr. Stief on that.  I think if they wanted to have that in

8     their contract, they should have put that in their contract as

9     the Court said.

10          I think as a practical matter, the customers who have

11     indicated that they want to move their account to these

12     brokers, that's been done; and the transfer process is

13     occurring, and they're dealing with the customer in the

14     ordinary course.

15          The ones who said they would stay at Merrill Lynch

16     have indicated that preference, and the brokers are happy with

17     that -- I mean, they are not happy, I guess, but they are

18     satisfied that that is the case, and they're not contacting the

19     customers again.

20          THE COURT:  Well, I'm not going to issue any order to

21     that effect.

22          What do you say about discovery, Mr. West?

23          MR. WEST:  Well, the NASD does have a procedure for

24     discovery.  Now they don't generally allow for depositions in

25     NASD discovery.  It is somewhat restricted.  It is on a -- it

19

1    is a lot quicker than going to Court, I'll say that.  Even when

2    no injunction --

3              THE COURT:  I'm not sure it is quicker than going to

4    this Court.  You have a lawsuit on Friday.  Here we are on

5    Monday.

6              MR. WEST:  Well, I think for injunctive relief it is.

7    Of course, Mr. Stief has his option of going to the NASD to

8    seek injunctive relief which he can get within one to three

9    days.  If he decides he wants to go that route, then that route

10   is available to him, and he knows that.

11             THE COURT:  Well, I will give Mr. Stief this:  Since

12   I have not issued a temporary restraining order and will not

13   issue a temporary restraining order, apparently the accelerated

14   procedures of the NASD -- NASD will not kick in; and,

15   accordingly, if the plaintiff or either party wants to take a

16   couple of depositions, they may do so; and if anyone wants to

17   bring another motion back here, you may do that, too.

18             MR. WEST:  Thank you, Your Honor.

19             MR. STIEF:  What we'll do, Your Honor, is do the

20   depositions and then contact your chambers about a preliminary

21   injunction date.  Is that the right approach?  I think our

22   motion was for a temporary restraining order and --

23             THE COURT:  Yes.  If after completing the

24   depositions, you want to bring on a hearing on the motion for

25   preliminary injunction, you call my Courtroom Deputy,

22

1    Mr. Burgess, and that's how we'll get the process started.

2              MR. STIEF:  Thank you, Your Honor.

3              THE COURT:  Thank you

4         (Proceedings adjourned at 9:38 a.m.)

5                    * * * * * *

6                    CERTIFICATE

7              I, DENNIS A. DINKEL, Official Court Reporter, certify

8    that the foregoing pages are a correct transcript from the

9    record of proceedings in the above-entitled matter.

10

11

12              Dennis A. Dinkel

13

14

15

16

17

18

19

20

21

22

23

24

25



RECYCLED PAPER

UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY G. MANAIA,

      Plaintiff and
      Counter-Defendant,

      -vs-

MERRILL, LYNCH, PIERCE, FENNER
& SMITH, INC.,

      Defendant and
      Counter-Plaintiff.
_____/

Case No. 93-CV-74226-DT
Honorable George E. Woods
Motion

      Proceedings had in the above-entitled cause before

the HONORABLE GEORGE E. WOODS, United States District Court

Judge, at 272 United States Courthouse, Detroit, Michigan, on

Monday, October 18, 1993.

APPEARANCES:

| For the Plaintiff and Counter-Defendant: | ALAN R. MILLER (P17738)<br>DAVID JARVIS (P44702)<br>Alan R. Miller, P.C.<br>370 E. Maple Road, Fourth Floor<br>Birmingham, MI  48009-6300<br>(313) 644-8910 |
|---|---|
| For the Defendant and Counter-Plaintiff: | STEPHEN K. POSTEMA (P38871)<br>Bodman, Longley & Dahling<br>100 Miller, Suite 300<br>Ann Arbor, MI  48104<br>(313) 761-3780 |
| Official Court Reporter: | BARBARA C. CHATMAN, CSR-0077<br>277 United States Courthouse<br>Detroit, Michigan  48226 |

OPINION OF THE COURT

1
2       THE COURT:  Well, as everybody knows, there is
3   presently a TRO in place that was issued by this Court on the
4   8th of October, and it was amended on the 12th, which in
5   effect, as we have indicated earlier, maintained a level
6   playing field among the players in this action, hoping that,
7   against hope, the parties could come to their senses and work
8   this out to the mutual advantage of both, and they have
9   attempted to do so.
10      I know both counsel are men of goodwill and have
11  attempted to do so, but they just cannot effect an agreement
12  between themselves, so they will leave it up to the Court and
13  the Court will render an opinion.
14      The TRO, as you know, contains a further agreement
15  between the parties which states that they will attempt to
16  obtain an arbitration hearing within 90 to 100 days from
17  October 12, 1993, and here we are today, here for Merrill,
18  Lynch's Motion for Preliminary Injunction.  Of course, the
19  arbitration, since they both agreed to that, when they get that
20  done, this is moot as yesterday's newspaper.
21      The facts briefly stated are Anthony Manaia worked
22  for Merrill, Lynch as a financial consultant in the Rochester
23  office from September 1986 until his resignation on October 7,
24  1993.  Now, apparently he is employed by PaineWebber, who is an
25  out-and-out competitor, of course, of Merrill, Lynch.

From the information that has been made available to
the Court, Mr. Manaia left Merrill, Lynch, he was earning
$300,000.00 a year, or thereabouts. Counsel makes reference to
the fact that he has gotten, you would think he is a basketball
player, he has gotten a half million dollars up front. Really,
a good basketball player gets eight million. That is what Mr.
Webber is about to get.

As a Registered Representative, Mr. Manaia compiled
and maintained his clients' records pertaining to their
securities transactions, as required by the NYSE Rules and
Regulations. Manaia compiled and maintained these records in
his own personal computer system, as well as in records of
Merrill, Lynch itself.

From all the Court has been led to believe, Mr.
Manaia's clientele was made up of personal friends, some
relatives and some social acquaintances and referrals, as is
usual; as well as so-called "cold calls," to which they refer,
and then clients from direct mail solicitations; and there may
be other sources for all I know. According to Mr. Manaia's
affidavit, he had no so-called "house accounts" while he was at
Merrill, Lynch.

While he was employed at Merrill, Lynch, Mr. Manaia
was required to keep certain client records, including basic
client information – name, address, social security number – as
well as a description of each purchase and sale made on the

24

1    client's behalf of the entire period of time he serviced them.

2          This information, parenthetically, as we all know is

3    provided to the customer each month in the form of a monthly

4    statement.

5          In addition to that particular type of record

6    keeping, Manaia purchased his personal computer to keep his own

7    running account of all transactions from people with whom he

8    did business.  He was able to keep this computer to keep track

9    of his clients' investment objectives, their in-house holdings,

10   out-of-house investments and other information that would give

11   him a bird's eye view of where they had been, where they were

12   and where they were expected to go in their investments.

13         Well, before his resignation, Mr. Manaia made copies

14   of the records of his clients, so he states in his affidavit.

15   He stated that he did not copy the records of so-called "house

16   accounts" or of clients belonging to other financial

17   consultants working at Merrill, Lynch.

18         But, when Mr. Manaia commenced his employment with

19   Merrill, Lynch, eh signed an Account Executive Trainee

20   Agreement.  And by signing that Agreement Mr. Manaia agreed as

21   follows:

22         "1.  . . . None of such records, nor any part

23         of them is to be removed by me from the premises of

24         Merrill, Lynch either in original form or in

25         computerized, duplicated or copied form except with

the permission of an office manager for the purpose

of conducting the business of Merrill, Lynch . . .

"2.   In the event of termination of my services

with Merrill Lynch for any reason, I will (i) not

solicit, for a period of one year from the date of

termination of my employment, any of the clients of

Merrill, Lynch whom I served or other clients of

Merrill, Lynch whose names became known to me while

in the employ of Merrill, Lynch in the office of

Merrill, Lynch in which I was employed, and who

resides within one hundred miles of the Merrill,

Lynch office in which I was employed, and (ii)

return any original records and purge or destroy any

computerized, duplicated, or copied records,

referred to in paragraph 1 which have been removed

from the premises of Merrill, Lynch in any form.

"3.   I further consent to the issuance of a

temporary restraining order or a preliminary

injunction to prohibit the breach of any provision

of this contract, or to maintain the status quo

pending the outcome of any arbitration proceeding

which may be initiated."

Ending the quote of the agreement.

Well, Merrill, Lynch's Compliance Manual, which

Manaia signed on an annual basis, further emphasized the

16

1   confidential nature of client accounts.  Manaia states in his

2   affidavit that he does not recall signing the Account Executive

3   Agreement.  That is a pretty lame, feeble response in my

4   opinion.

5           As a matter of fact, he may have signed I don't know

6   how many, like every employee does, but there isn't any broker

7   consultant in the business who doesn't know very well whether

8   they signed one of these, and I just take that as so much

9   hogwash.  I am satisfied he did sign it and he knows that he

10  signed it.

11          So, Merrill, Lynch is here today seeking a

12  preliminary injunction.  The TRO having been issued pending the

13  results of arbitration to which both parties have agreed and

14  urgently hope that they will get the hearing arbitrator within

15  90 days or 180 days at the most.

16          Merrill, Lynch seeks to enjoin Manaia from taking

17  client records from Merrill, Lynch and from soliciting any

18  clients of Merrill, Lynch who reside within one hundred miles

19  from the Rochester, Michigan office for a period of one year,

20  which I assume, and based on inference from what else he says,

21  he denied he has done that as well.

22          Well, everybody here knows relief in the form of

23  either a TRO or preliminary injunction is extraordinary, and

24  this Court takes that word literally, not very often that this

25  Court enters TRO's, and I do it in extreme emergency

1   situations; and frankly I have been in this business 45 years

2   and I don't think I have ever seen more than four or five or

3   six genuine emergencies in 45 years.

4        The principal purpose of setting the TRO in place the

5   earlier ten days ago was indeed to bring everything to a

6   screeching, skidding halt so that wiser heads might prevail and

7   the parties could get together and solve their problems and

8   work out this arbitration, unless something be in place so that

9   nobody could get hurt and that their possible future damages

10  prospects might be lessened on both sides from the standpoint

11  of the parties freely agreeing that they should conduct

12  themselves in thus and such a manner.  They chose not to do

13  that, though I did everything but hit them with a two-by-four,

14  and here the Court will decide what happens.

15       The Sixth Circuit, as you undoubtedly are aware,

16  requires the Court to consider four factors in deciding a

17  motion for injunctive relief.  These are the old requirements,

18  as you know:  (1) whether the injunction will save Merrill,

19  Lynch from irreparable injury; (2) the likelihood of Merrill,

20  Lynch's success on the merits; (3) whether the harm to Merrill,

21  Lynch if relief is not granted outweighs the harm to others if

22  relief is granted; and (4) whether the public interest would

23  best be served by issuing of the injunction.

24       And that, of course, is the pronouncement in the

25  DeLorean Motor Company case out of the Sixth Circuit in 1985,

28

1   and we have talked about the long -- counsel talked long and

2   hard about Judge Pratt, and of course you may or may not know,

3   my childhood friend and a great jurist.  And the interesting

4   part is I was the judge who was behind Judge Pratt in that

5   case.  I am rather familiar with the DeLorean case and its

6   pronouncements.

7           Referencing irreparable harm.

8           In order for an injunction to issue, Merrill, Lynch

9   must show that it will suffer irreparable harm of Manaia is not

10  enjoined from taking records and soliciting clients.

11          "That," most assuredly, "is a fundamental and

12          traditional requirement of all preliminary

13          injunctive relief, since," as you know, "equity

14          cannot intervene where there is an adequate remedy

15          at law."

16          So said the Friendship Materials case and its progeny

17  from 1982 up to this date.

18          The absence of irreparable injury must, of course,

19  then end any inquiry by this Court.

20          Somebody made reference to Judge Taylor earlier.

21  Well, the Metrobanc v. Federal Home Loan Bank case had that

22  pronouncement by Judge Taylor, referencing two Sixth Circuit

23  cases, and your liking our late departed Judge Pratt, who

24  stated in his case, which is very similar to this case:

25          "In order to find irreparable harm,

1    compensatory damages must be shown to be

2    inadequate."

3         The old Merrill Lynch case v. S. F. Hutton.   Merrill

4    Lynch has been in this court more times than I can remember.

5    That goes clear back to 1975, and citing from that case as

6    follows:

7         "Thus, mere loss of profits, or relative

8         deterioration of competitive position, do not in

9         themselves suffice."

10        Furthermore:

11        "[t]he injury must be both certain and

12        great; it must be actual, and not merely

13        theoretical."

14        Well, if there is a standard by which money damages

15   may be reasonably calculated, with the fact finder giving its

16   approval or disapproval, then an injunction is not an

17   appropriate remedy.

18        Let's talk about solicitation.

19        Merrill, Lynch's position, as the Court understands

20   it, they assert that if they win an arbitration, the damages

21   flowing from Mr. Manaia's solicitation of clients and use of

22   records will be incapable of determination with any degree of

23   certainty.   According to Merrill, Lynch, at this very moment it

24   is impossible to determine the number of Merrill, Lynch clients

25   who will be "pirated" away by Manaia and his new employer.   But

1    that, of course, if you stop and think about it, is not the

2    proper first-hand analysis.

3             If the Court does not issue an injunction, it

4    certainly is going to become clear, and quickly so, just how

5    many clients followed Manaia to his new employer, PaineWebber.

6    It isn't going to take any magic solution for Merrill, Lynch to

7    figure that out.  It would be relatively easy, in this Court's

8    considered judgment, to make an assessment of how many dollars

9    in commissions these clients would have generated for Merrill,

10   Lynch had they not transferred their accounts, by using past

11   commissions, formulas and averages which must certainly exist

12   in the investment industry such as this.

13            This Court is also not troubled, frankly, by the

14   potential referrals which these "stolen" clients may have made

15   in years to come.  If such aspect of damages is not found to be

16   speculative and theoretical, the Court is confident that the

17   finder of fact can ascertain an appropriate figure to

18   compensate Merrill, Lynch for their loss.  I don't see any

19   problem with that.

20            So, having found that Merrill, Lynch will not suffer

21   irreparable injury if Manaia is not enjoined from soliciting

22   clients, the Court's analysis stops here.  Mr. Manaia is free

23   to solicit any of the clients with whom he had an advisor-

24   client relationship while at Merrill, Lynch, keeping in mind,

25   however, that he does so at his own peril.

3:

1   If this Court used that expression once, ten days

2   ago, it uses it two or three times today, everybody proceeds at

3   their own peril under the circumstances.

4       Now, true, counsel getting together and making an

5   agreement that they both behave themselves in such and such

6   fashion, they reduce all chances of peril here. But we are

7   about, gentlemen, to open up the floodgates and you will

8   proceed at your own peril.

9       If the panel of arbitrators concludes that the no-

10  compete clause in Manaia's contract should be enforced, then

11  Manaia will be faced with having to pay some hefty damages, and

12  he may need that $500,000.00 that he thinks he has in his sock

13  right now, or before taxes that is. Of course, Merrill, Lynch

14  is also free to solicit these same clients in an effort to

15  retain their accounts. They have apparently notified them that

16  they are available to service them.

17      So, let's go to the customer records issue.

18      Merrill, Lynch next argues that it will suffer

19  irreparable harm if Manaia is permitted to retain customer

20  records. Merrill, Lynch argues that clients have an

21  expectation that their financial information and dealings will

22  remain confidential, and if Manaia is permitted to take those

23  records to his new place of employment, Merrill, Lynch will

24  lose the trust and confidence of its customers.

25      Well, several district courts have held in unreported

1   opinions that a loss of client confidentiality and trust would
2   lead to irreparable harm to Merrill, Lynch.  These courts have
3   granted an injunction or temporary restraining order against
4   the former employee on a basis such as this.  No one knows this
5   better than the Court does.

6          Merrill Lynch v. Barnett case out of the Middle
7   District of Pennsylvania, 1988.  There is Merrill Lynch v.
8   DeBord case out of the United States District Court in the
9   Middle District of Pennsylvania, 1990.  There is Merrill Lynch
10   v. Barnett case out of the Western District of Michigan, 1990.

11          On the other hand, this Court is not bound by the
12   holdings of other district courts, nor is it bound necessarily
13   by decisions of other Circuit Courts of Appeals other than the
14   Sixth Circuit.  Neither party has presented this Court with a
15   Sixth Circuit decision on point, nor has the Court's own
16   research come across such an opinion.

17          In the view of this Court, any harm that will be done
18   to Merrill, Lynch by allowing Manaia to keep the client records
19   is theoretical and speculative at best.

20          The client was the one who gave all of the
21   information contained in the records to Manaia himself, within
22   the confines of their broker-client relationship.  There is
23   something to be said for the fact that the confidential issue
24   is best raised by the clients as opposed to the brokerage
25   house.

Granted, at the time the information was transmitted,

2   the client did not intend that it would make its way over to

3   PaineWebber or any other brokerage house that existed, but the

4   argument that the client will lose confidence in Merrill, Lynch

5   because Manaia took records with him is rather weak at best.

6   Actually, the clients' primary expectation is that his or her

7   financial portfolio will be maintained at all times with his or

8   her best financial interest in mind.

9        The way the situation is presented in this case,

10   Merrill, Lynch can continue to service the client's account

11   because they retain the pertinent records.  The client's

12   confidence and trust in Merrill, Lynch is maintained in this

13   respect.  As for the fact that employees at PaineWebber now

14   have access to the client's financial record, this is not the

15   sort of event that will result in certain harm to Merrill,

16   Lynch.

17        If the client is to lose confidence in anybody, who

18   is it going to be?  Probably going to be Mr. Manaia, because as

19   is claimed by the defendant, the movant, Manaia, took their

20   records to another firm and he might do it again even as

21   counsel suggests, if somebody offered him seven fifty, he might

22   go there or who knows.  There is no reason to believe that

23   Merrill, Lynch will lose customer confidence or goodwill

24   because Mr. Manaia was able to take records with him.

25        Because the harm that is alleged is not certain,

34

1    great or actual, the Court finds it is not irreparable for

2    purposes of granting a preliminary injunction.

3         Having found, as the Court has, that Merrill, Lynch

4    will not suffer irreparable injury if Manaia is not enjoined

5    from taking and using client records, the Court's analysis,

6    once again, stops here. Mr. Manaia is free to retain the

7    records he helped to create while at Merrill, Lynch.

8         It's like taking a wiretap, gentlemen. Everybody

9    thinks it's illegal to take a wiretap. Well, it is and it

10   isn't. You can take a wiretap, the only thing is you get

11   yourself in trouble when you disclose it. So if he has a

12   carload or railroad car full of records, I don't know what harm

13   that is basically going to do. What he does with it thereafter

14   is going to be the test of it all, and he does it at his own

15   peril and he will find out what his peril is, I assume, in the

16   hands of this arbitrator in the next 90 days or thereafter.

17        The third concern expressed by Merrill, Lynch is that

18   injunctive relief is necessary to protect the stability of the

19   Bloomfield Hills office and to discourage other competitors

20   from buying away Merrill, Lynch employees. Well, I think that

21   complaint amounts to not much more than remarks that are made

22   about and over natural competition that exists in the

23   marketplace.

24        If a competitor is willing to pay a broker more

25   money, ad the broker is willing to risk a breach of his

35

1    employment contract in order to change firms, then the reward

2    appears to outweigh the risk.  If he wants to throw the dice,

3    he just may have to dip in that sock of $500,000.00 that he got

4    from his employer.  The competitor may end up with an expensive

5    broker who is not allowed to take his book of business with

6    him, and the broker may end up owing more money in damages than

7    he can make in salary and commissions in out front payments.

8          The Court is not so naive as to believe that Merrill,

9    Lynch has never participated in such broker enticement

10    themselves.  In all likelihood, that is precisely why Merrill,

11    Lynch included the no-compete clause in their broker contracts

12    in the first place, because they knew that it was present and

13    rampant in the business.

14          So, gentlemen, the TRO previously issued by this

15    Court is dissolved.  The motion for preliminary injunction is

16    denied.

17          Mr. Miller, you prepare the appropriate order and

18    have it in to Ms. Henson by tomorrow, but it is effective as of

19    right now.

20          Court is in recess.

21          MR. POSTEMA:  Could I have a clarification, Judge?

22          Are you ruling in fact there has been a breach of the

23    agreement?

24          THE COURT:  I didn't say that.  There is no finding

25    to that.  I don't have to make a finding of that.

1      Sorry you gentlemen didn't work this out.  I did
2  everything but whack you.
3      MR. POSTEMA:  I have one more point.  The Sixth
4  Circuit is ruling on this issue right now.
5      THE COURT:  Perhaps they are.
6      MR. POSTEMA:  May we come back if the court rules
7  in —
8      THE COURT:  Counsel, I can't stop you from coming
9  back.  I am here to serve you on appropriate matters as
10  assigned to me, whether you file it or somebody else, just like
11  I got lucky and I got this one.
12      Good day, gentlemen.
13                    —    —    —

37

# REPORTER'S CERTIFICATE

I, BARBARA C. CHATMAN, Official Court Reporter for the United States District Court of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing proceedings were had in the within-entitled and numbered cause on the date hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my direction.

BARBARA C. CHATMAN, CSR-0077

Dated:  10/18/93

Detroit, Michigan



RECYCLED PAPER

IN THE DISTRICT COURT OF SHAWNEE COUNTY, KANSAS
DIVISION FOUR

| | | |
|---|---|---|
| U.S. BANCORP PIPER JAFFRAY INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 00C287 |
| | ) | |
| JUDY K. THOMAS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM DECISION AND ORDER

The above captioned matter is presently before the Court on Plaintiff's Emergency Motion for a Temporary Restraining Order. Defendant has replied, an evidentiary hearing has been held, and oral arguments have been presented to this Court. After careful consideration, the Court rules as follows:

### FINDINGS OF FACT

1.     Judy K. Thomas began working for Piper Jaffray Inc. (PJI) in 1992, and at that time entered into a Training Agreement with PJI in which PJI agreed to train Thomas which would lead to registration with the New York Stock Exchange, Inc. as an investment executive.

2.     In addition to the Training Agreement, Ms. Thomas entered into a Client Service Transition Agreement with PJI and Mr. Dennis Campbell on August 6, 1997. Mr. Campbell is a retired PJI stockbroker who had chosen Thomas to service his accounts. Mr. Campbell's "Core Book" of accounts were transferred to Thomas according to the Client Service Transition Agreement under which Campbell was entitled to a percentage of the commissions generated from those accounts, however, under the agreement this percentage was to decline over time.

Mr. Dennis Nelson, PJI Branch Manager, testified that at the time Thomas resigned the parties

were in the last year of the agreement with Campbell entitled to 20% of the commissions.

3.      The provisions of the Training Agreement at issue here are as follows:

> If your employment with Piper Jaffray Inc. ends, either through
> termination by Piper Jaffray Inc. or through resignation by you,
> you will surrender all training materials, account records, customer
> statements, customer files and other documents pertaining to Piper
> Jaffray customers, business methods and procedures, as well as all
> copies thereof.
> . . . .
> <u>Promise Not to Compete for 90 Days</u>. If your employment with
> Piper Jaffray Inc. ends either through termination, resignation or
> retirement:
> 1.      You will not engage directly or indirectly in the sale or
> trading of securities, commodities or deferred annuities for ninety
> (90) days following the end of your employment within an area of
> twenty-five (25) miles from any Piper Jaffray office in which you
> have worked;
> 2.      For ninety (90) days from the end of your employment, you
> will not directly or indirectly solicit, or assist in the solicitation of
> any customers of Piper Jaffray Inc. to purchase or sell securities,
> commodities or deferred annuities; and
> 3.      For ninety (90) days from the end of your employment, you
> will not directly or indirectly use for your benefit or the benefit of
> any other employer any of the customer or business information
> obtained by you from Piper Jaffray Inc. during the course of
> employment by Piper Jaffray Inc.

4.      The provision at issue in the Client Service Transition Agreement states:

> <u>Noncompetition</u>.  In the event that Piper shall appoint a substitute
> inheriting executive in accordance with the provisions of 5.6
> hereof, Inheriting Executive, for a period of two years from and
> after the date of such appointment, shall not directly or on behalf of
> any other person, firm or corporation, solicit any client who has an
> account included in the Core Book for the purpose of providing to
> any such client investment advice or such other investment or
> financial management services as are provided by Piper investment
> executives in the ordinary course of business.

2

5.      At the end of 1999, Thomas derived her income from management of assets of between $59 million and $65 million (more than $31 million being covered by the Client Service Transition Agreement).

6.      Thomas resigned from PJI on February 18, 2000, having accepted a position at Morgan Stanley Dean Witter Inc. located in Topeka, Kansas. This office is within 25 miles of PJI's Topeka office.

7.      There was testimony that prior to departure, Thomas took a customer's annuity file but returned the file when requested to do so. However, PJI maintains that other customer files were missing and when Thomas was questioned regarding those files, she advised a PJI representative that such inquiries should be addressed with her attorney. There was no evidence presented that anyone from PJI did address such a concern with Thomas' attorney.

8.      Clients from the "Core Book" were to be transferred to a Mr. Jason Newell at PJI, who was appointed the substitute inheriting executive, however, PJI received client requests that their accounts be transferred from PJI to Morgan Stanley's new Topeka office. Other clients not part of the "Core Book" also requested such transfers to Thomas at Morgan Stanley Dean Witter Inc.

9.      Some of the other employees of PJI were subject to a 25-mile non-compete agreement with Piper while others were not.

10.     Thomas sent notices out to customers that were clients of hers at PJI indicating her whereabouts. In addition, Mr. Nelson stated in his declaration that "representatives of Piper Jaffray have been informed by customers that Thomas has called those customers and they are now moving their accounts from Piper Jaffray to Morgan Stanley Dean Witter."

## CONCLUSIONS OF LAW

Plaintiff is seeking injunctive relief claiming Judy K. Thomas violated the non-compete clauses in her Training Agreement and Client Service Transition Agreement with Piper Jaffray Inc. by soliciting customers from PJI after leaving PJI to work for a local competitor. While it is undisputed that Thomas went to work for a competitor, Thomas contends she has not solicited customers but has merely fulfilled a duty to her customers to let them know of her whereabouts so that they may have the opportunity to freely choose whether to continue in their relationship with her or to remain with the brokerage firm which she chose to leave.

The injunction requested is an extraordinary remedy for which Plaintiff carries a strong burden. The court in *Wichita Wire, Inc. v. Lenox*, 11 Kan. App. 2d 459 (1986) cited *Crowther v. Seaborg*, 415 F.2d 437, 439 (10th Cir. 1969), stating, "[i]t has generally been held that the movant must establish a prima facie case showing a reasonable probability that he will ultimately be entitled to the relief sought. The movant has the additional burden of showing a right to the specific injunctive relief sought because irreparable injury will result if the injunction is not granted. *There must be a probable right and a probable danger.*" *Wichita Wire* at 462. The court then adopted a four part test, which the court stated is well established in federal cases. The four part test requires that the moving party seeking a temporary or preliminary injunction establish:

> "(1) substantial likelihood that the movant will eventually prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing parties; and (4) a showing that

4

> the injunction. if issued. would not be adverse to the public
> interest." [Citations omitted.]

*Wichita Wire* at 462.

Plaintiff contends all factors are met. Although the evidence has shown a substantial likelihood that it will be found Thomas has violated the promise not to compete for 90 days in the Training Agreement with PJI. it is not clear whether this clause will be found to be enforceable when scrutinized under a public policy analysis regarding the right of customers of brokers to freely choose to retain a broker where a fiduciary trust relationship has been established. In addition, it has not been clearly shown that there is a substantial likelihood it will be found Thomas has violated her promise not to *solicit* customers of PJI. However, the court in *Wichita Wire* stated that it is only necessary that a plaintiff seeking a preliminary injunction establish "a reasonable likelihood of success, and not an overwhelming likelihood of success." *Wichita Wire* at Syl. 6. In addition, "[a] trial court's decision to grant or deny an injunction is discretionary and will not be disturbed on appeal absent a showing of an abuse of discretion. [Citation omitted.]" *Wichita Wire* at 462. The Court notes that since both parties have cited to *Wichita Wire* in stating the test for issuance of a temporary restraining order, since this test is the law in Kansas and the well-established test in federal cases, and since neither party has argued that another state's law should govern at this juncture, the Court will use the test set out in *Wichita Wire.* —

Little case law on this issue exists in Kansas, and both parties have cited numerous federal cases involving similar non-compete clauses in employment contracts with brokerage firms. However, it appears there is a split among jurisdictions on several sub-issues involved

5

where temporary retraining orders or injunctions were sought with regard to such non-compete clauses. For instance, can loss of customers be calculated, or is there a loss of customer goodwill that is immeasurable? Does the public interest in favor of enforcement of contracts override a public interest in being able to choose to continue with a broker when a fiduciary relationship has been established with a particular broker whom the customer trusts in a volatile market? Would not granting an injunction enforcing such a non-compete clause cause greater injury to a large brokerage firm in potential irretrievable loss of customers or possible loss of reputation in the community than the hardship that issuing an injunction would cause the individual broker who may be left with no client base in the community resulting in loss of income and perhaps irretrievable loss of clients whom the broker may have served for years?

Many of the cases cited by both parties are either unpublished opinions or federal district court opinions throughout the country. Several cases cited by Plaintiff involved the sole issue of whether a district court could, or must, hear a motion for temporary restraining order where arbitration is pending or mandated. The few persuasive cases that are on point regarding these issues show that courts have been split on their ultimate outcome. However, this Court finds the case of *Merrill Lynch, Pierce, Fenner & Smith v. de Liniere*, 572 F.Supp. 246 (N.D. Ga. 1983), the better reasoned analysis as did our Kansas Court of Appeals in *Wichita Wire*. In that case, the Defendant, de Liniere, had signed an Account Executive Trainee Agreement which includes a provision similar to that found in Thomas' Training Agreemnt, although in *de Liniere* the contract provided de Liniere could not solicit customers nor purchase or sell stock on behalf of any Merrill Lynch customer he had served for a period of one year and within a 50 - mile radius.

6

In *de Liniere*, the Court cited the Georgia Supreme Court case of *Singer v. Habif, Arogeti & Wynne, P.C.*, 250 Ga. 376, 297 S.E.2d 473 (1982). That case involved an accountant who signed a restrictive covenant in which he could not solicit or accept clients from his employer. The court noted that the court in *Singer* "held that such a restriction was unreasonable because it overprotected the legitimate interests of the former employer and unreasonably affected the defendant." *de Liniere citing Singer* at 377. The court further quoted *Singer* as follows:

> [T]he restrictive covenant provides that Singer cannot accept employment from clients of HAW. This provision would prohibit Singer from accepting employment from a client of HAW who comes to him, without any prior solicitation on his part, and requests that he be their accountant. This provision prohibits more than the active solicitation for diversion of clients, and we find that it constitutes an unreasonable restraint of trade as it overprotects HAW's interests and unreasonably impacts on Singer and on the public's ability to choose the professional services it prefers.

*Singer* at 377.

The court in *de Liniere* noted that although Mr. de Liniere's contract differed in that it merely restricted him from accepting business from those whom he had served and not any client of his employer, "the opinion suggests, however, that either restriction alone is offensive, and the dictum concerning the effect on the public's ability to choose the professional services it prefers directly touches the issue of acceptance, as opposed to solicitation, of business." *de Liniere* at 248.

Here, Thomas agreed not only not to solicit clients from PJI or those whom she had served while at PJI, she agreed not to engage in the sale or trading of securities within 25 miles of the PJI Topeka office for 90 days. Thus, regardless of any *solicitation*, none of Thomas' clients have the option of requesting her services after her employment with PJI ends if Thomas

7

stays in Topeka. In this Court's view the covenant not to compete between PJI and Thomas has a strong detrimental effect on third parties and although this Court notes it is not presently deciding the case on its merits, it is possible such a covenant could be found to be unenforceable as violative of public policy.

However, several federal cases have found temporary retraining orders are warranted where such non-compete clauses are clear and unambiguous, finding that where arbitration is pending a TRO would maintain the status quo of the parties pending the outcome of the arbitration to prevent the arbitration being rendered a "hollow formality" and to preserve meaningfulness of arbitration. *Well v. Merrill Lynch*, 919 F. Supp. 1047 (Kentucky, 1994). Here, the non-compete clauses of the contracts are clear and it is undisputed Thomas is employed with a competitor and became so employed prior to the 90 day time limitation stated in the clause.

Although this Court finds Plaintiff may not have established a substantial likelihood of prevailing on the merits, they have established a reasonable likelihood of success. However, this Court finds the other elements required for issuance of a temporary restraining order under *Wichita Wire* have not been met.

First, Plaintiffs motion for temporary restraining order fails to establish irreparable harm. Plaintiff makes a "loss of customers" argument in stating that clients which have allegedly been solicited by Thomas cannot be "unsolicited." It must be noted that a temporary injunction is not a remedy for past injury. See *Wichita Wire* at Syl. 9. Plaintiff cites *Merrill Lynch, Pierce, Fenner & Smith v. Schwartz*, 991 F.Supp. 1480 (M.D. Ga. 1998), in which the court found irreparable injury where the Defendant Schwartz was subject to an employment contract with

8

Merrill Lynch which is very similar to the provisions of Thomas' agreement, including the provision not to solicit customers of Merrill Lynch or clients he had served at Merrill Lynch. The Defendant had worked for Merrill Lynch for 30 years building a client base of account assets worth approximately $120 million, then went to work for a competitor in which it was understood he would attempt to bring as many clients with him as he could. The court found that "in the rush to solicit clients, . . . even a few days can suffice to cause irreparable injury in the way of lost clients and reputation in the community. The court further found:

> . . . even though this court's decision will in all probability stand for only a very short while, perhaps two or three business days, this may make a considerable difference to plaintiff's ability to reap the benefit of its bargain through enforcement of the clear and undisputed non-solicitation agreement signed by defendant Schwartz. Therefore, in the court's opinion there is a substantial risk of injury to the plaintiff unless an injunction issues. Moreover, that injury would be in the nature of lost revenues resulting from any and all fees and commissions that might have been collected by Merrill Lynch during the period in question. As such, there is no way to calculate what business may have been lost to Merrill Lynch with any degree of accuracy, and so there is no adequate remedy at law.

*Schwartz* at 1482.

Here, it was evident to the Court in the hearing that all past damages could be monetarily quantified as Thomas has kept a list of the clients which have chosen to stay with her and Plaintiff has evidence of clients seeking a transfer to follow Thomas. In addition, there was testimony that Thomas' new employer will keep track of all commissions received from clients which have chosen to maintain the broker/client relationship established with Thomas. Thus, this Court finds any damages prior to arbitration could be calculated with a reasonable degree of accuracy.

9

Thus, Plaintiff's claimed damages, however stated, constitute loss of commissions and fees from clients which, however valid, would still only prove past damages, or damages capable of calculation and a monetary award should Plaintiff succeed. If by the actions of Thomas, Plaintiff has lost clients, this damage has been done and any continued loss of business can be quantified. Plaintiff has failed to show that a temporary injunction will *prevent* injury that could not be adequately remedied with monetary damages. Plaintiff also makes a "loss of momentum" argument in connection with the loss of clients choosing to remain with Thomas. Again, this is a type of monetary loss that could be quantified later. Thus, Plaintiff has failed to show any potential loss that could not later be remedied monetarily should Plaintiff prevail. As previously stated, this Court finds the reasoning in *de Liniere* convincing at this juncture:

> ". . . any loss of business to Merrill Lynch may be adequately redressed with money damages for breach of contract. The only possibly irreparable result would be some vaguely defined loss of business momentum, but the Court finds that to be unrealistic in the securities field. The real loss is in commission revenue generated by Mr. de Liniere from former Merrill Lynch customers, and that can be readily calculated from the commissions he and his new firm derive from the old Merrill Lynch customers. As a result, there will be no injury to the movant that cannot be remedied later."

*Wichita Wire* at 465 *quoting de Liniere* at 249.

Having found the Plaintiff has failed the show irreparable injury, the Court need not determine the remaining requirements of the test, however, it should be noted that even if Plaintiff could show irreparable injury, Plaintiff must still prove that the threatened injury to PJI would outweigh whatever damage the proposed injunction may cause Thomas; and also show that the injunction, if issued, would not be adverse to the public interest. While the Court, upon

10

reviewing the evidence and all arguments, finds that the threatened injury may outweigh the damage and hardship the injunction would cause Thomas, such has not been clearly proven as is required under the test. While Plaintiff has lost clients it may not otherwise have lost, that damage has been done. While it may be possible Plaintiff may retain some clients by issuance of an injunction who may otherwise yet choose to stay with Thomas, this is speculative. Meanwhile, if the injunction issues, Thomas will lose her earning capacity in her chosen profession in this community for ninety days which it has satisfactorily been shown would produce a great hardship on her.

Of greater concern, the Court finds the interests of the third-party customers, who will lose the relationship of trust they have built with Thomas if the injunction is granted, outweighs the damage that would be suffered by either party. Plaintiff has cited *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Napolitano*, 2000 WL 217481 (E.D. Pa.) in which the court found a temporary restraining order warranted where a broker who left the Plaintiff firm to join Morgan Stanley Dean Witter called the clients to inform them where he would be working so that they could choose where to take their accounts.

The court found he disengenuously argued he did not *solicit* clients but merely announced his move to Morgan Stanley Dean Witter, and held a substantial likelihood of success had been shown in the face of the express and unambiguous agreement not to solicit customers, directly or indirectly. However, all four prongs of the test must be met for a temporary restraining order to issue. The court in *Napolitano* found that the Merrill Lynch had persuasively argued that the injunction would serve the public interest in upholding the public policy of enforcing valid contractual provisions, and found that "Napolitano self-servingly argues that a denial of an

11

injunction would serve the public interest by preserving 'the unqualified right of the investing public to make decisions on their choice of investment advisors.'" *Napolitano* at 7. The court further noted that:

> . . . the impact of Napolitano's behavior on innocent clients poses the most difficult aspect of this case.
>> Two considerations are significant here. First, as noted, securities customers often develop a trusting relationship with their brokers and the clients consider this relationship irreplaceable. Second, the rules of the NYSE and NASD provide that a customer can direct a brokerage to transfer his or her account to another institution.
>
> *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Rodger*, 75 F.Supp. 2d 3375, 383 (M.D. Pa. 1999). These considerations notwithstanding, the Court concludes that the harm to the Merrill Lynch clients who were allegedly solicited by Napolitano does not outweigh the other relevant and more compelling considerations.

*Id.*

This Court disagrees with such conclusion reached by the court in *Napolitano* with regard to harm to the clients. We are currently seeing a period of extreme volatility in the market in which Thomas' clients have an over-riding interest in seeing their financial portfolios handled by the person they trust. As was well stated in *de Liniere*,

> The Court notes that Merrill Lynch itself has stressed the personal relationship between customer and broker. A stock broker stands in a different relationship to his customers from that of other kinds of salesmen, and fiduciary duties of a broker are recognized in law because of the important role of the broker in protecting the financial welfare of his clients. The "public's ability to choose the professional services it prefers," *Singer*, 250 Ga. at 377, 297 S.E.2d at 475, is central to the consideration of this criterion of injunctive relief. The public has a greater interest in being able to choose whether to follow its broker to a new firm or to remain at the old firm with a new broker. This is as important, if not more so, in this case with a stock broker than it was in *Singer* with an accountant.

12

The public has little interest in having its choice restricted to brokers other than the one who has served them. pending the resolution of this dispute.

*de Liniere* at 249.

Thus. this Court finds the fourth element has clearly not been met. The injunction. if issued, would most certainly be adverse to the public interest. The clients of Thomas. as well as those of any broker subject to similar non-compete clauses, would be vulnerable to losing the broker of their choice and whom they have established a trust with their investments in favor of the corporate interest of maintaining a client base. In times of such market volatility. such restriction of choice would indeed be detrimental to the investor's peace of mind, and more importantly, their financial security.

## CONCLUSION

The injunction requested is an extraordinary remedy for which Plaintiff carries a strong burden. Having found this burden is not met, the Court denies Plaintiff's Emergency Motion for Temporary Restraining Order.

The foregoing shall serve as the Court's entry of judgment in this matter. no further journal entry being required.

Dated this 22ⁿᵈ day of March, 2000.

Eric S. Rosen
District Judge

13



RECYCLED PAPER



1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


MERILLL LYNCH, PIERCE, FENNER )
& SMITH, INC.,                )
                             )
            Plaintiff,        )
                             )
    -vs-                      )   No. 97 C 7738
                             )
MARGARET TWOMBLY, and         )
CLAYTON BERRIGAN, JR.,        )   Chicago, Illinois
                             )   November 10, 1997
            Defendants.       )   9:30 o'clock a.m.


REPORT OF PROCEEDINGS
Motion for Temporary Restraining Order
BEFORE THE HONORABLE GEORGE M. MAROVICH


For the Plaintiff:          MR. PETER A. CANTWELL
                            (Cantwell & Cantwell)
                            30 North LaSalle Street
                            Chicago, Illinois  60602

                            MR. TERRENCE P. CANADE
                            (Lord, Bissell & Brook)
                            115 South LaSalle Street
                            Chicago, Illinois  60603


For the Defendants:         MR. JERRY M. SANTANGELO
                            (Neal, Gerber & Eisenberg)
                            Two North LaSalle Street
                            Chicago, Illinois  60602

                            MR. JOHN P.  MORRISON
                            (Bell, Boyd & Lloyd)
                            Three First National Plaza
                            Chicago, Illinois  60602-4207
Court Reporter:
                GERALDINE D. MONAHAN, CSR, RPR
                    Official Court Reporter
                  United States District Court
            219 South Dearborn Street, Room 1928
                    Chicago, Illinois 60604
                    Telephone (312) 435-6890


Geraldine D. Monahan, Official Court Reporter

2

1          THE CLERK:  97 C 7738, Merrill Lynch, Pierce, Fenner &

2    Smith v. Twombly, et al.

3          MR. CANADE:  Good morning, your Honor.  I'm Terrence

4    Canade, attorney for plaintiff, Merrill Lynch.  And I'm going to

5    yield to Peter Cantwell, who is filing an additional appearance.

6          THE COURT:  Good enough.

7          MR. MORRISON:  Good morning, your Honor.  John P.

8    Morrison for defendant, Clayton Berrigan, Jr.

9          MR. SANTANGELO:  And Jerry Santangelo of Neal, Gerber

10   & Eisenberg on behalf of Margaret Twombly.

11         THE COURT:  Just so that we don't have to reinvent the

12   wheel here, let me at least establish a starting point about

13   things that I think you could all agree that are accurate, based

14   upon the presentations that you have both given to me and that I

15   have read.

16         First of all, we start out with a general proposition

17   that temporary relief is something that is possible even though

18   this is a matter that is arbitrable by and between the parties.

19         It also is true that the arbitrator as well as the

20   Court has the authority to grant temporary injunctive relief,

21   and it is my understanding, that I think is correct, that

22   Merrill Lynch has the option under the rules of arbitration to

23   seek temporary relief here as opposed to in arbitration.

24         The Court has also read the case of Merrill Lynch v.

25   Salvano, which is at 993 F.2d, 211, in which the proposition

Geraldine D. Monahan, Official Court Reporter

3

1   that I just stated, namely, that the Federal District Court may

2   issue preliminary injunctive relief in disputes that are

3   ultimately to be resolved by arbitration is stated.  But that

4   Court goes on to say that the extension of the TRO, once the

5   arbitration panel was in place, was not appropriate.

6          With those -- also, the termination of Miss Twombly

7   and Mr. Berrigan from Merrill Lynch, for whatever reasons and by

8   virtue of whoever's fault, occurred at least ten days ago.  And

9   I say this as a way of observation.  If there was a need or a

10  desire for expedited hearings on this matter before the

11  arbitration panel, in all probability that could have been set

12  and probably heard by now.

13         With that by way of background, I will allow you to --

14  and one final statement, and that is, while the Court in Salvano

15  upheld the authority to issue the temporary restraining order,

16  they did so while saying that whether it should issue or not in

17  the first place would be reviewed on an abuse-of-discretion

18  standard.

19         MR. CANTWELL:  I agree with everything you've said

20  your Honor.

21         THE COURT:  Good.

22         MR. CANTWELL:  Let me respond, if I may.

23         First of all, Miss Twombly was terminated on October

24  31st.  That was a week ago Friday.  Mr. Berrigan and their sales

25  assistant came in at five o'clock in the morning on that Monday,

Geraldine D. Monahan, Official Court Reporter

4

1  copied whatever records we believe could have been copied, and

2  Mr. Berrigan tendered a resignation by slipping it underneath

3  his manager's door that morning.

4        No one at Merrill Lynch expected Mr. Berrigan to do

5  anything but continue on with these accounts.  No one at Merrill

6  Lynch expected anything else would happen with respect to the

7  entire situation.

8        On Tuesday, when we became aware of the fact that

9  there were telephone solicitations being made, we immediately

10  filed this lawsuit, and a stand-still agreement was reached

11  between Merrill Lynch's counsel and counsel for Miss Twombly and

12  Mr. Berrigan.  In the course of that afternoon, a settlement was

13  reached.  That settlement was documented, and copies of the

14  document of settlement were transmitted the very next morning,

15  on Wednesday.

16        It wasn't until late Wednesday or possibly Thursday

17  that we learned that in fact they were not going to honor the

18  settlement, but there was an issue that came up with respect to

19  Miss Twombly.  I'm not sure exactly how that relates to the

20  understandings with Mr. Berrigan, but in either event, on

21  Thursday, we again found out that there was active telephone

22  solicitation.

23        What we found out on Friday and what caused us to come

24  to this Court, or to attempt to come to this Court on Friday

25  morning this past week, was the fact that we discovered that an

5

1    actual mailing had been made.  And I'd like the Court to see,

2    and we have tendered the affidavit.  It was delivered to your

3    chambers this morning.

4            Just to get an idea of what this mailing consists of,

5    it is pretyped, preprinted forms.  It's a box, two and a half

6    inches thick.  It was Airborne expressed out and was Airborne

7    expressed out on Wednesday, at the very same time that we

8    understood that we had a settlement that was going to be

9    documented, at the very same time that we thought that there was

10   a stand-still agreement in place.

11           Now, these forms are completed.  I have the originals

12   here as well as redacted copies with customers' names, their

13   account numbers, their Social Security numbers, the addresses of

14   the offices to be transferred to and so on and so forth.  There

15   are literally -- in this particular box alone, there are three

16   different sets of papers to be filed and completed.

17           Now, when we filed the lawsuit on Tuesday, Merrill

18   Lynch, exercising its option of either petitioning an NASD panel

19   for appointment of a single arbitrator to hear this on an

20   interim basis or come into this Court, we opted to come to the

21   Court, because we know that if we come to Court, we are going to

22   get a more efficient, more responsive hearing.  Yet we did file

23   a statement of claim in arbitration at the same time on Tuesday

24   that we filed this.

25           I will represent to the Court that no one from the

Geraldine D. Monahan, Official Court Reporter

6

1   NASD contacted us until I contacted the NASD on Friday, again

2   finding out about what had been happening, to make inquiry as to

3   what their status was.

4           The claimants, by the way, in that case of course are

5   Merrill Lynch.  The defendants are Margaret Twombly and

6   Mr. Berrigan, as well as Bransell (phonetic) securities.

7           That action is something we have an absolute right to

8   bring.  And if this Court grants the temporary relief that we're

9   asking for, then under Section G of 103335, an expedited

10  arbitration process is going to immediately commence.  We have

11  no problem with that.

12          But what our experience has taught us is, not only

13  will we get a better hearing from a qualified jurist that is

14  familiar with these kinds of issues by coming to Federal Court,

15  as your Honor has entered similar relief in the past, as every

16  -- virtually every judge in this building has entered the same

17  relief in the past, we know that we'll get that immediately, and

18  we know that the force of a federal injunction has the effect on

19  everybody involved to protect the status quo and maintain

20  everyone's interest.

21          In this situation, the respondents also filed a

22  statement of claim in arbitration.  They didn't bother to serve

23  it on us until apparently it was dropped off someplace at

24  Merrill Lynch either late Wednesday evening or Thursday

25  morning.  I didn't find out about it until Friday around noon,

7

1  or whenever it was I called the NASD.  We heard that something

2  had been filed, but no one provided a copy to us.

3        Their prayer for relief is comparable in many ways to

4  that which Merrill Lynch is asking for except they opted to ask

5  for the relief from an arbitration panel.  That panel has not

6  been appointed.  That -- and the parties' arbitration agreement

7  under the Federal Arbitration Act absolutely requires that

8  everybody's rights be protected, their rights to go to

9  arbitration as well as the rights contractually that each has.

10        We have a contractual right to petition this Court and

11  your Honor for the relief that we've asked for.

12        THE COURT:  Could I just ask you, sir, how soon can

13  that panel in arbitration be constituted and who is it that is

14  the driving force in getting that matter set?

15        MR. CANTWELL:  We've made inquiry of that ourselves,

16  because we're anxious to move forward with this thing, as I

17  think the Court can understand how and why.  We want to know

18  what exactly is going on.  And we will ask for that arbitration

19  hearing as quickly as possible, and I can tell you that it's up

20  to the NASD to appoint someone.  They have not yet appointed

21  someone.  And all we're asking for, your Honor, is that you

22  enter the temporary restraining order that we talked about, that

23  we petitioned for, until such time as an arbitration panel of

24  the NASD can take charge of this proceeding.  And that's going

25  to be maybe two or three days, and our experience has been --

8

1          MR. STEED:  Two or three weeks.

2          MR. CANTWELL:  To get the to merits, it may be two or

3   three weeks, but once an arbitration panel is appointed pursuant

4   to our request, which is what we made, then the NASD is going to

5   take charge of things.

6          What they're asking in their relief, incidentally,

7   your Honor, you may be interested to know, is they're asking

8   that arbitration panel to disregard -- in their prayer, in their

9   petition that they filed with the NASD to disregard this Court's

10   order, and that would be wrong.  This Court has the power to

11   enjoin these proceedings and to leave the status quo where it is

12   pending a ruling from an arbitrator.  That's all we're asking

13   this Court to do.

14          I don't expect that that arbitration panel will be

15   appointed until sometime late this week, at the earliest.  And

16   in the process of doing that, some very important rights I think

17   this Court needs to know about, there are -- the ability and we

18   have the ability under the process that we've opted for, to --

19   each side has a right to make one preemptory challenge and each

20   side has a right to challenge for cause.

21          The single arbitrator process that I think the Court

22   asked about before, which was our other alternative when we

23   commenced the action on Tuesday, doesn't give you anything in

24   the way of preemptory right.  You're basically stuck and saddled

25   with one arbitrator who then becomes your arbitrator for -- one

9

1  the three arbitrators for the entire process.  We think that

2  deprives of us of our rights.  And it deprives everybody,

3  perhaps, of the right to make that challenge for -- on a

4  preemptory basis.

5          THE COURT:  Well, when you get to this arbitration,

6  whenever it is that you do, what do you see as the issues

7  there?  Because there's a couple of them that come to my mind.

8  And I suppose I want to know, because one of the prongs in

9  issuing a temporary restraining order is likelihood of success.

10         It seems to me that there would be some considerable

11 dispute as to whose customers these are and what lists that we

12 are talking about.  And I ask the question in this context.

13 Counsel as learned as you understand that customers don't belong

14 to anybody.  They are not a fungible property that Merrill Lynch

15 and Miss Twombly and Mr. Berrigan have some proprietary right

16 in, but customer lists are.  And there seems to be some

17 legitimate questions that would be asked as to if he took some

18 lists or they took some lists, whose lists were they in the

19 beginning.  Were they lists that they had developed through

20 their contacts over 20-some years and happened to have it in the

21 machine that was located in Merrill Lynch's office, or did they

22 take a list that Merrill Lynch had generated and using that for

23 their own benefit, since that seems to be what would be

24 precluded under unfair competition of taking trade secrets or

25 things of that nature.

10

```
 1            So is that not an issue that would be in arbitration?

 2            MR. CANTWELL:  I think the answer is, you look to the

 3    parties' contract.  And these people have agreed amongst

 4    themselves exactly as to who those customers belong to by

 5    written agreement.  Both of them did.

 6            But the guy that can really help I think the Court

 7    understand this in a very graphic way who's standing on my right

 8    and your left is Christopher Steed, who is in from

 9    Philadelphia.  He's a member of the Bar.  I've known his office

10    and Mr. Steed for a long period of time now, and I move his

11    admission pro hac vicae, because he does a great deal of this

12    work, and he can give the Court, I think, some special insight

13    into exactly what happens at those arbitration hearings and why.

14            THE COURT:  Well, I'm just trying to get down to what

15    it is that is at issue here, and I see it as whose customers

16    these are is a legitimate issue, unless I'm missing the boot on

17    something.  And, also, when you're talking about these

18    agreements that have to do with whose customers they are, the

19    validity of those contracts and whether they are supported by

20    consideration and other things are an issue as well.  And one of

21    the things that has a bearing on that is when it was that they

22    were entered into, before or after employment, and is that

23    something that in your judgment is going to be disputed at an

24    arbitration hearing.

25            MR. SANTANGELO:  Your Honor, very much so.  My client,
```

11

1   Miss Twombly, was hired in 1983.  She left Merrill Lynch in

2   1987.  At that time, Merrill Lynch never sought any restraining

3   order from her moving with her clients to Bear Stearns.

4            THE COURT:  Maybe because at that time they didn't

5   have a hundred million dollar block of business.

6            MR. SANTANGELO:  Possibly, your Honor.  But in 1988

7   when she came back, they had her sign this training agreement.

8   She never received any training from Merrill Lynch at that

9   time.  She never went to the Merrill Lynch training school at

10  that time, your Honor.  The promises here are illusory.

11           And the agreement itself says:  For any violation, I

12  understand I will be liable to Merrill Lynch for any damages

13  caused thereby.

14           They're coming to this Court, your Honor, saying its

15  fairly innocuous relief.  We just need this order for a day or

16  two or three or whatever.

17           But what Merrill Lynch will do, your Honor, is if this

18  Court enters a restraining order, they will freeze the

19  customers' assets.  Customers who have requested possibly these

20  assets be transferred in these extremely volatile times, those

21  customers will literally be in limbo.

22           Merrill Lynch has been out soliciting, contacting

23  these individuals all the time, your Honor.  There's a

24  competitive process going on for these customers.  That's the

25  way it should be.

Geraldine D. Monahan, Official Court Reporter

12

1          The NASD can secure an arbitrator, Mr. Morrison

2   advised me, and he has an affidavit to that effect.   An

3   arbitrator is being appointed today to hear this controversy.

4   And the issues that your Honor asked about, whose customers are

5   these, the validity and enforcement of these kinds of agreements

6   are clearly industry issues that should be resolved by an

7   industry arbitrator.

8          You know, your Honor, I apologize for getting my brief

9   to you so late this morning.  As I indicated, I was just

10  retained late Friday.  But there is a very fundamental issue, as

11  well, before we get to the agreement:  Can they enforce it

12  because of their bad-faith termination of Miss Twombly.

13         And I cited to the Court the Seventh Circuit's

14  decision in Rea v. Rea (phonetic), which clearly says if you

15  have a termination that's without cause and in bad faith, you

16  cannot enforce any restrictive covenant.

17         I cited an Illinois case, an Appellate Court case in

18  Bishop that follows that principle, as well as a New York

19  decision that follows that principle.

20         And, your Honor, just briefly if I may talk about the

21  fact of what happened to Miss Twombly.  Miss Twombly has an

22  impeccable record, your Honor.  For 14 years she has never had a

23  customer complaint.  She has never had a compliance problem with

24  Merrill Lynch at all.

25         In March of 1987, Merrill Lynch tried to break up her

13

1  partnership.  And Miss Twombly is here and you can feel free to

2  ask her any questions you may like.  She forms a partnership

3  with Mr. Berrigan.

4          MR. MORRISON:  '97

5          MR. SANTANGELO:  I'm sorry.  In '97 they tried to

6  break this partnership up because the branch manager at that

7  time wanted to have the right to divvy up Mr. Berrigan's

8  clients.

9          Mr. Berrigan is 69 years old, but he has no desire of

10  retiring.  He has never indicated to anybody that he wanted to

11  retire.

12          The branch manager unilaterally reassigns those

13  accounts away from the joint production number.  The branch

14  manager gets reversed by the district manager from Merrill

15  Lynch.  Now this manager is very embarrassed.  He fires the

16  office manager who he directed to do this at the Sears Tower

17  branch and installs a new office manager.  And what happens

18  then, your Honor?

19          On the busiest trading day in the history of the New

20  York Stock Exchange, 1.2 billion shares traded, my client,

21  Mr. Berrigan's volume is three and a half times their normal

22  day.  That was the day after, your Honor, the market crashed 554

23  points.

24          They have a client for the last 15 years who is a

25  U. S. citizen who has been residing in England for the last five

14

1   years, works for Citicorp.  This client is a very sophisticated

2   investor.  He calls up, realizing like a lot of Americans

3   realize, that there might be a buying opportunity because of the

4   substantial market drop on that Monday.

5           He calls up and asks about information about specific

6   companies.  She gives him the information as he requests, he

7   pulls it up on his computer screen, and then he puts in five

8   orders, three limit orders, which means at a certain price, and

9   two market orders, like he had done for ten years.  Never once

10  was any transaction questioned.  And these transactions are

11  marked, whether they're marked solicited or unsolicited.  She

12  had marked those unsolicited.

13          The next day she sends a facsimile to the client on

14  some additional information he requested.  Mr. Reynolds, the

15  operations manager, approves the sending of that document.  We

16  don't hear anything.  We don't know anything is going on until

17  Friday afternoon, Halloween afternoon they call her into the

18  office and say:  You're fired because you marked those tickets

19  unsolicited and they should have been marked solicited.  The

20  first time she ever heard that that was even an issue.  A woman

21  with 14 years of an impeccable record, and they don't even ask

22  her for her explanation?

23          We're going to demonstrate, your Honor, to an

24  arbitration panel, a securities industry panel, that that was a

25  totally improper firing.  It's a pretext, your Honor, and they

Geraldine D. Monahan, Official Court Reporter

15

1   fire her.  And you know what the bad faith -- not only the fact

2   that they don't talk to her, the fact that he had been doing

3   trades for ten years and never once was one questioned.

4           But Mr. Berrigan, who had been with Merrill Lynch for

5   20 years, was appalled at what they did, and, come Monday

6   morning, he resigned.  And, your Honor, that's prima facie

7   evidence, as well, of Merrill Lynch's bad faith.

8           And now they want to come in here and say:  We want to

9   enforce a restrictive covenant contained in a training agreement

10  that's illusory, because there was no training provided to her

11  when she signed this in 1988.  And more importantly, the law is

12  very clear that they can't do that where, as here, their

13  termination is in bad faith.  And we're prepared to put on

14  evidence, your Honor, of that fact.  My papers, Miss Twombly

15  verified.  Given the time frame, we weren't able to, but we can

16  go before an arbitrator today or tomorrow and explain this to

17  them.

18          But this inoccuous restraining order they want to do

19  is, they want to use this to literally put our customers in

20  limbo, and that is not appropriate, particularly in these highly

21  volatile times.

22          MR. CANTWELL:  Your Honor, no customer is going to be

23  in limbo under any circumstances.  That's one thing I think that

24  everybody is prepared to guarantee to those customers.

25          Secondly, with respect to Margaret Twombly, I think

16

1  it's particularly telling that not only she sign the contract

2  once when she was first hired, but then she came back and signed

3  it again.

4        THE COURT:  Tell me what is going to happen if you say

5  nothing is going to happen to these customers.  What is going to

6  be the situation if they want to make a trade on this particular

7  day, and if they call Mr. Berrigan directly as opposed to

8  calling Merrill Lynch?  And what is Merrill Lynch going to be

9  doing in the meantime if it turns out these customers are

10  Mr. Berrigan's and Miss Twombly's?  Are they maybe going to be

11  would wooing away from Mr. Berrigan that which you don't want to

12  be wooed away from you?  Is that not an issue or a possibility?

13        MR. MORRISON:  Your Honor, that's fair competition and

14  we don't have a problem with that.  If they want to make those

15  woos, we will make the woos, too, and let the customer decide.

16        I do want, before we get too far into this, to present

17  an affidavit from Jordan Becker, an attorney in New York that

18  has attested here that on Friday afternoon he spoke with

19  Elizabeth Walsh of the NASD Chicago regional office who informed

20  him that a single arbitrator would be appointed on Monday,

21  November 10, that's today, to hear the request for immediate

22  injunctive relief set forth in this statement of claim filed by

23  my client.

24        THE COURT:  I want to familiarize myself with the

25  proceedings, because I was taken by your statement of strikes on

Geraldine D. Monahan, Official Court Reporter

17

1   single arbitrators as opposed to a panel.

2           Am I correct in my assumption that if you had a single

3   arbitrator who decided on the matter of temporary injunctive

4   relief that you would still have this matter resolved by a full

5   panel and not by a single arbitrator?

6           MR. STEED:  Your Honor, I think you've hit on a

7   critical issue, and it's the critical reason why Merrill Lynch

8   elects to come to Court as opposed to arbitration for a

9   temporary restraining order-like relief.

10          Although you can get it in arbitration, if you go in

11  front of a single arbitrator, the rules provide that you have no

12  preemptory strike against that single arbitrator.

13          THE COURT:  Or against me, either.

14          MR. STEED:  Nor against you.  But he has not gone

15  through an Article III confirmation process.

16          THE COURT:  And I haven't gone through a broker

17  training period, either, so it seems like a fair trade-off.

18          MR. SANTANGELO:  These are the rules, your Honor, of

19  the SEC.

20          THE COURT:  I am so secure in my position that I am

21  more than willing to admit my ignorance in certain matters.  Not

22  stupidity, ignorance, and one of them is in the security

23  industry.  And I don't have any doubt about the fact that

24  whether it is a single or multiple arbitrator, the chances are

25  that though they have not gone through this marvelous

Geraldine D. Monahan, Official Court Reporter

18

1   confirmation hearing that some people now have some question

2   about, that they bring with them more expertise to this

3   particular problem than I even claim to have as we sit here on

4   this day, as humbling for me to admit as that is.

5           MR. STEED:  Your Honor, the fact is that they don't.

6   They don't have more expertise on this issue, because this

7   issue, what this issue comes down to is really two things:

8   Illinois contract law and Illinois trade secret law.  It's not a

9   securities case, it's ultimately an employment law case where

10  this Court's experience with Illinois law is the best guidance

11  on what should be done.

12          It's clearly an enforceable contract under Illinois

13  law, and the materials that were appropriated are clearly trade

14  secrets under Illinois law, or Act.

15          THE COURT:  I'm not always as sure as lawyers are when

16  they tell me how clears things are.  Maybe they are clear to

17  you, counsel, but I say to you that it is not clear to me.

18          I have two major problems that I see here.  Number

19  one, I am not so sure about the enforceability of the contract,

20  per se, since I am not sure about the consideration for it.  And

21  I am not sure about whether or not the unclean hands doctrine

22  would come into play.  And I am not speaking to the merits of

23  the thing.  And I don't know whose customers these are.

24          MR. CANTWELL:  We cited Merrill Lynch v. Roman.  We

25  cited half a dozen other cases, your Honor, where there was no

19

1   contract at all, and the same relief was granted.

2          THE COURT:  Well, counsels, I really think that you

3   have given me as much enlighten me I need, since I have your

4   arguments plus about 20 pounds of paper.

5          MR. MORRISON:  Could I give you about a minute, your

6   Honor?

7          THE COURT:  There's no lawyer in the world who's ever

8   given me one minute.

9          MR. MORRISON:  I find it ironic that they said

10  Illinois law applies, because the contracts specifically say

11  that New York law applies.  And New York law only enforces these

12  to the extent necessary to protect confidential information.

13         The contracts themselves don't give them the relief

14  that they seek.  It just says that you can't solicit.

15         Now, here, as Mr. Berrigan would attest, he was the

16  director of development for the Loyola University Medical Center

17  before he started with Merrill Lynch.  The reason he was hired

18  at age 50 at Merrill Lynch was because he had all sorts of

19  contacts that had -- doctors, dentists that made lots of money

20  or that donated lots of money to Loyola that he could in turn

21  bring to Merrill Lynch.  The reason he was successful at Merrill

22  Lynch was because of his contacts.  He estimates that, at most,

23  5 to 7 percent of his business were hand-me-down house

24  accounts.  The rest were developed from relationships he knew,

25  friends that he knew.

Geraldine D. Monahan, Official Court Reporter

20

1         But most importantly, this can and should be

2    arbitrated.  The arbitration is scheduled -- or the arbitrator

3    can be appointed today.  Merrill Lynch chooses not to go before

4    the expedited arbitration panel because they want to drag this

5    out.

6         Salvano makes it clear that if the parties have agreed

7    to arbitrate, and by virtue of having signed the contract and

8    being a member of the NASD, Merrill Lynch has to abide by those

9    rules, our arbitration claim permits an expedited arbitration

10   hearing.  An arbitrator can be appointed today.  Salvano

11   dictates that there really would be no need for you to get

12   involved.

13        And then, finally, as far as consideration goes, the

14   contract for Mr. Berrigan provides that he is to be paid a

15   salary with Merrill Lynch.  He wasn't and has been paid a salary

16   for decades.  He was paid solely on commission.  If there was

17   consideration, there has been a complete failure of

18   consideration.  There is no consideration at all given, that

19   Merrill Lynch has not paid him a salary.

20        MR. STEED:  Your Honor, two sentences.  One, yes, he

21   was paid.  Two, under New York law, 623 N.Y. Sup. 2d 220, in

22   Leak v. Merrill Lynch, the New York Appellate Division holds it

23   was an abuse of discretion for the lower court to fail to grant

24   a preliminary injunction pending arbitration on Merrill Lynch's

25   contract.

21

1          THE COURT:   Thank you.

2          MR. STEED:   Thank you.

3          THE COURT:   I am going to deny the TRO this morning

4  for a number of reasons.

5          While I understand the right of Merrill Lynch to seek

6  the relief here as well as in arbitration, the immediate

7  availability of arbitration is a factor that I take into account

8  in exercising my discretion in this matter.

9          We all know the different prongs that are to be

10 considered in the issuance of this extraordinary relief called a

11 temporary restraining order.  And while one of them is the

12 likelihood of success on the merits, it is not a very high

13 threshold to meet.  And without any attempt to prejudice either

14 of the parties on the merits of their claims or defenses before

15 an arbitration panel, I do believe that Merrill Lynch has met

16 that rather low standard, although I have some doubts as to the

17 outcome of this case when you consider the consideration that

18 supports the employment contracts or these contracts that we are

19 talking about and whose customers they are.  I will leave that

20 somebody for a later date.

21         I come down on the side of Miss Twombly and

22 Mr. Berrigan here when I go about the business of weighing the

23 harm to the parties.  And, very frankly, I do not see very much

24 harm that would be visited upon Merrill Lynch by a temporary

25 restraining order that would be of very short duration, indeed.

Geraldine D. Monahan, Official Court Reporter

22

1   I see some harm to Miss Twombly and Mr. Berrigan should I issue

2   the injunction.  But, more important, I see the possibility of

3   harm to parties people who are not party to these proceedings,

4   and that is these customers who you seem to be fighting about.

5   And in these volatile times, I don't want to put them in more

6   harm than they already are.

7           And for those reasons and as a matter of discretion in

8   this matter, I most respectfully deny the request for injunctive

9   relief, but I will stay any further proceedings here pending the

10  outcome of the arbitration.

11          MR. SANTANGELO:  Thank you, your Honor.  We appreciate

12  your time.

13          MR. CANTWELL:  Your Honor, would you reconsider the

14  ruling if we don't have an arbitrator today?

15          THE COURT:  Counsel, I doubt it, because I think that

16  that is more in your hands than in mine.  And I really don't

17  want to have the opportunity to delay that proceeding to have an

18  impact on the result here.  There is no reason that I can see

19  why you shouldn't go forth, and you have the ability to do that

20  if that is your desire.  And if it doesn't happen, I have the

21  cynical question in my mind as to why.  And I don't know that

22  anybody is going to answer since it is so readily available to

23  you.

24          So hie thee forth and go into arbitration and get a

25  result there that one of you is probably going to like better

Geraldine D. Monahan, Official Court Reporter

23

1   than the other, unless you do what you were contemplating in the

2   first place, namely, resolve it by and between yourselves, which

3   I think is always the best solution but not one that I can

4   mandate upon you.  But I submit it to your consideration.  Try

5   it.  You might like it.

6           MR. SANTANGELO:  Thank you, your Honor.

7           MR. CANTWELL:  Thank you, your Honor.

8              C E R T I F I C A T E

9   I certify that the foregoing is a correct transcript from the

10   record of proceedings in the above-entitled case on November 10,

11   1997 at 9:30 a.m.

12

13

14   _____    _____

    Official Court Reporter              Date

15   United States District Court

    Northern District of Illinois

16   Eastern Division

17

18

19

20

21

22

23

24

25

Geraldine D. Monahan, Official Court Reporter



RECYCLED PAPER



NASD REGULATION INC. : OFFICE OF DISPUTE RESOLUTION

MICHAEL NIGRIS and THOMAS LUCARDI,

                                  Claimants,

        -against-

                                       NASD Case No.
                                       00-00162

PRUDENTIAL SECURITIES, INC.,

                                Respondent.

## ORDER

Appearances:  Jackson, Lewis, Schnitzler & Krupman for Claimants
              Of Counsel.  Marc S. Wenger, Esq.

              Kenna, Powers & Andrews, P.C., for Respondent
              Of Counsel:  Ralph DeSimone, Esq.

Having read the submission of Claimants Michael Nigris and Thomas Lucardi ("Claimants")  Statement of Claim and Application for Immediate Injunctive Order and Statement of Facts in Support dated January 14, 2000 with exhibits attached,  and the submission of Respondent Prudential Securities, Inc. ("Respondent"):  Answer and Counterclaim and request for Injunctive Relief dated January 19, 2000 with exhibits attached,  Supplemental Letter Brief dated January 19, 2000,  Letter Brief dated January 25, 2000 with exhibits attached;  Financial Advisor in Training Agreements with Claimants dated as of January 8, 1993 ("Training Agreements");  Order filed January 20, 2000 in Prudential Securities Incorporated v. Michael Nigris, Civ. No. 00-290, U. S. District Court - District New Jersey,  Order to Show Cause dated January 24, 2000  in Prudential Securities Incorporated v. Thomas Lucardi, New York Supreme Court,

Rockland County;  and having heard oral argument from counsel for the parties by telephone on January 25, 2000;

IT IS:

ORDERED,  a single arbitrator has the authority under section 10335 of the Code of Arbitration Procedure to hear and determine this application for interim injunctive relief  although the above courts have previously issued temporary restraining orders in favor of the Respondent against  the Claimants;  and it is further

ORDERED, Claimants' application for an immediate injunctive order is granted to the extent that  Respondent is hereby enjoined from prosecuting or commencing any suit, action or proceeding in court or in arbitration against the Claimants concerning any dispute arising out of Claimants' employment with Respondent;  and it is further

ORDERED, the parties shall forthwith submit joint applications to the above courts for orders  submitting all claims in those actions to arbitration, which claims shall be consolidated for hearing and award purposes with this case;   and it is further

ORDERED,  Respondent's application for equitable relief  restraining Claimants and their new employer from servicing any and all Respondent's customers covered by the Training Agreements is denied on the grounds that  Respondent's claim for loss of business can be satisfied by an award of money damages, and injunctive relief is not in the best interest of  the customers;  and it is further

ORDERED, except as provided herein, the parties' applications are denied;  and it further

ORDERED,  delivery of a copy of this order by facsimile transmission or by overnight delivery to counsel for the parties shall be good and sufficient service.

2

**SIGNATURE**

I, the undersigned arbitrator, do hereby affirm, pursuant to Article 75 of the Civil

Practice Law and Rules, that I am the individual described herein and who executed this

instrument which is my order.

_____           _____
JAMES DOLAN                          Signature/Date
Public Arbitrator

3





RECYCLED PAPER



# Code of Arbitration Procedure

**M A Y  1 9 9 9**



# 10000. CODE OF ARBITRATION PROCEDURE

## 10100. ADMINISTRATIVE PROVISIONS

### IM-10100. Failure to Act Under Provisions of Code of Arbitration Procedure

It may be deemed conduct inconsistent with just and equitable principles of trade and a violation of Rule 2110 for a member or a person associated with a member to:

(a) fail to submit a dispute for arbitration under the NASD Code of Arbitration Procedure as required by that Code;

(b) fail to comply with any injunctive order issued pursuant to Rule 10335;

(c) fail to appear or to produce any document in his possession or control as directed pursuant to provisions of the NASD Code of Arbitration Procedure;

(d) fail to honor an award, or comply with a written and executed settlement agreement, obtained in connection with an arbitration submitted for disposition pursuant to the procedures specified by the National Association of Securities Dealers, Inc., the New York, American, Boston, Cincinnati, Chicago, or Philadelphia Stock Exchanges, the Pacific Exchange, Inc., the Chicago Board Options Exchange, the Municipal Securities Rulemaking Board, or pursuant to the rules applicable to the arbitration of securities disputes before the American Arbitration Association where timely motion has not been made to vacate or modify such award pursuant to applicable law; or

(e) fail to comply with a written and executed settlement agreement, obtained in connection with a mediation submitted for disposition pursuant to the procedures specified by the National Association of Securities Dealers, Inc.

All awards shall be honored by a cash payment to the prevailing party of the exact dollar amount stated in the award. Awards may not be honored by crediting the prevailing party's account with the dollar amount of the award, unless authorized by the express terms of the award or consented to in writing by the parties. Awards shall be honored upon receipt thereof, or within such other time period as may be prescribed by the award.

Action by members requiring associated persons to waive the arbitration of disputes contrary to the provisions of the Code of Arbitration Procedure shall constitute conduct that is inconsistent with just and equitable principles of trade and a violation of Rule 2110.

*[Adopted eff. May 1, 1973; amended July 1, 1987; amended by SR-NASD-90-03 eff. June 18, 1990; amended by SR-NASD-90-62 eff. May 7, 1991; amended by SR-NASD-95-20 eff. Oct. 2, 1995; amended by SR-NASD-93-38 eff. Jan. 3, 1996; amended by SR-NASD-99-19 eff. May 17, 1999.]*

## 10101. Matters Eligible for Submission

This Code of Arbitration Procedure is prescribed and adopted pursuant to Article VII, Section 1(a)(iv) of the By-Laws of the Association for the arbitration of any dispute, claim, or controversy arising out of or in connection with the business of any member of the Association, or arising out of the employment or termination of employment of associated person(s) with any member, with the exception of disputes involving the insurance business of any member which is also an insurance company:

(a) between or among members;

(b) between or among members and associated persons;

(c) between or among members or associated persons and public customers, or others; and

(d) between or among members, registered clearing agencies with which the Association has entered into an agreement to utilize the Association's arbitration facilities and procedures, and participants, pledgees, or other persons using the facilities of a registered clearing agency, as these terms are defined under the rules of such a registered clearing agency.

*[Amended eff. May 7, 1991; Oct. 1, 1993; amended by SR-NASD-98-86 eff. Nov.19,1998.]*

## 10102. National Arbitration and Mediation Committee

(a) The Board of Governors of the Association, following the annual election of members to the Board, shall appoint a National Arbitration and Mediation Committee of such size and composition, including representation from the public at large, as it shall deem appropriate and in the public interest. The Chairman of the Committee shall be named by the Chairman of the Board. The said Committee shall establish and maintain a pool of arbitrators composed of persons from within and without the securities industry.

(b) The Committee shall have the authority to establish appropriate Rules, regulations, and procedures to govern the conduct of all arbitration matters before the Association. All Rules, regulations, and procedures and amendments thereto promulgated by the Committee must be by a majority vote of all the members of the said Committee. It also shall have such other power and authority as is necessary to effectuate the purposes of this Code.

(c) The Committee shall meet at least once each year and at such other times as are deemed necessary by the Committee.

*[Amended by SR-NASD-94-77 eff. Feb. 8, 1995; amended by SR-NASD-98-48 eff. Nov. 17, 1998.]*

## 10103. Director of Arbitration

The Board of Governors of the Association shall appoint a Director of Arbitration (Director) who shall be charged with the performance of all administrative duties and functions in connection with matters submitted for arbitration pursuant to this Code. The Director shall be directly responsible to the National Arbitration and Mediation Committee and shall report to it at periodic intervals established by the Committee and at such other times as called upon by the Committee to do so. The duties and functions of

the Director may be delegated by the Director, as appropriate. In the event of the incapacitation, resignation, removal, or other permanent or indefinite inability of the Director to perform the duties and responsibilities of the Director, the President or an Executive Vice President of the Association may appoint an interim Director.

*[Amended by SR-NASD-98-48 eff. Nov. 17, 1998.]*

## 10104. Composition and Appointment of Panels

Except as otherwise specifically provided in Rule 10308, the Director shall compose and appoint panels of arbitrators from the existing pool of arbitrators of the Association to conduct the arbitration of any matter which shall be eligible for submission under this Code.

*[Amended by SR-NASD-98-48 eff. Nov. 17, 1998.]*

### IM-10104. Arbitrators' Honorarium

All persons selected to serve as arbitrators pursuant to the Association's Code of Arbitration Procedure shall be paid an honorarium for each hearing session (including a prehearing conference) in which they participate.

The honorarium shall be $200 for each hearing session, $50 for travel to a canceled hearing, and $75 per day additional honorarium to the chairperson of the panel. The honorarium for a case not requiring a hearing shall be $125.

*[Adopted eff. June 14, 1977; amended eff. May 30, 1980; Feb. 8, 1982; Jan. 14, 1987; amended by SR-NASD-97-79 eff. March 18, 1999.]*

## 10105. Non-Waiver of Association Objects and Purposes

The submission of any matter to arbitration under this Code shall in no way limit or preclude any right, action or determination by the Association which it would otherwise be authorized to adopt, administer or enforce. If any matter comes to the attention of an arbitrator during and in connection with the arbitrator's participation in a proceeding, either from the record of the proceeding or from material or communications related to the proceeding, that the arbitrator has reason to believe may constitute a violation of the Association's Rules or the federal securities laws, the arbitrator may initiate a referral of the matter to the Association for disciplinary investigation; provided, however, that any such referral should only be initiated by an arbitrator after the matter before him has been settled or otherwise disposed of, or after an award finally disposing of the matter has been rendered pursuant to Rule 10330 of the Code.

*[Amended by SR-NASD-93-75 eff. Aug. 15, 1994.]*

## 10106. Legal Proceedings

No party shall, during the arbitration of any matter, prosecute or commence any suit, action, or proceeding against any other party touching upon any of the matters referred to arbitration pursuant to this Code.



RECYCLED PAPER

# Code of Arbitration Procedure

MAY 1999



REGULATION
An NASD Company

parties may specifically agree that the award shall be accompanied by a statement of reasons or basis of the award.

**(h) Temporary Effectiveness**

This Rule shall remain in effect until August 1, 2002 unless modified or extended prior thereto by the Board of Governors.

*[Added by SR-NASD-94-10 eff. May 2, 1995; amended by SR-NASD-96-18 eff. Apr. 30, 1996; amended by SR-NASD-96-24 eff. Aug. 1, 1996; amended by SR-NASD-97-52 eff. Sept. 5, 1997.]*

## 10335. Injunctions

In industry or clearing disputes required to be submitted to arbitration pursuant to Rule 10201, parties to the arbitration may seek injunctive relief either within the arbitration process or from a court of competent jurisdiction. Within the arbitration process, parties may seek either an "interim injunction" from a single arbitrator or a permanent injunction from a full arbitration panel. From a court of competent jurisdiction, parties may seek a temporary injunction. A party seeking temporary injunctive relief from a court with respect to an industry or clearing dispute required to be submitted to arbitration pursuant to Rule 10201 shall simultaneously file a claim for permanent relief with respect to the same dispute with the Director in the manner specified under this Code. This Rule contains procedures for obtaining an interim injunction. Paragraph (g) of this Rule relates to the effect of court-imposed injunctions on arbitration proceedings. If any injunction is sought as part of the final award, such request should be made in the remedies portion of the Statement of Claim, pursuant to Rule 10314(a).

**(a) Single Arbitrator**

Applications for interim injunctive relief shall be heard by a single arbitrator.

**(b) Showing Required**

In order to obtain an interim injunction, the party seeking the injunction must make a clear showing that it is likely to succeed on the merits, that it will suffer irreparable injury unless the relief is granted, and that the balancing of the equities lies in its favor.

**(c) Application for Relief**

Interim injunctions include both Immediate Injunctive Orders and Regular Injunctive Orders, as described in paragraph (d) below. In either case, the applicant shall make application for relief by serving a Statement of Claim, a statement of facts demonstrating the necessity for injunctive relief, and a properly-executed Submission Agreement on the party or parties against whom injunctive relief is sought. The above documents shall simultaneously and in the same manner be filed with the Director of Arbitration, together with an extra copy of each document for the arbitrator, proof of service on all parties, and all fees required under Rule 10205. Filings and service required under this Rule may be made by United States mail, overnight delivery service or messenger.

**(d) The procedures and timetable for handling applications for interim injunctive relief are as follows:**

**(1) Immediate Injunctive Orders**

**(A)** Upon receipt of an application for an Immediate Injunctive Order, the Director shall endeavor to schedule a hearing no sooner than one and no later than three business days after receipt of the application by the respondent and the Director.

**(B)** The filing of a response to an application for an Immediate Injunctive Order is optional to the party against whom the immediate order is sought. Any response shall be served on the applicant. If a response is submitted, the responding party shall, prior to the hearing or at the hearing, file with the Director two copies of the response and proof of service on all parties.

**(C)** Notice of the date, time and place of the hearing; the name and employment history of the single arbitrator required by Rule 10310; and any information required to be disclosed by the arbitrator pursuant to Rule 10312 shall be provided to all parties via telephone, facsimile transmission or messenger delivery prior to the hearing.

**(D)** The hearing on the application for an Immediate Injunctive Order may be held, at the discretion of the arbitrator or the Director, by telephone or in person in a city designated by the Director of Arbitration.

(E) The arbitrator shall endeavor to grant or deny the application within one business day after the hearing and record are closed.

(F) If the application is granted, the arbitrator shall determine the duration of the Immediate Injunctive Order. Unless the parties agree otherwise, however, the order will expire no later than the earlier of the issuance or denial of a Regular Injunctive Order under subparagraph (2) or a decision on the merits of the entire controversy by an arbitration panel appointed under this Code.

**(2) Regular Injunctive Orders**

(A) Upon receipt of an application for a Regular Injunctive Order, the Director shall endeavor to schedule a hearing no sooner than three and no later than five business days after the response is filed or due to be filed, whichever comes first.

(B) The party against which a Regular Injunctive Order is sought shall serve a response on the applicant within three business days of receipt of the application. The responding party shall simultaneously and in the same manner file with the Director two copies of the response and proof of service on all parties. Failure to file a response within the specified time period shall not be grounds for delaying the hearing, nor shall it bar the respondent from presenting evidence at the hearing.

(C) Notice of the date, time and place of the hearing; the name and employment history of the single arbitrator required by Rule 10310; and any information required to be disclosed by the arbitrator pursuant to Rule 10312 shall be provided to all parties via telephone, facsimile transmission or messenger delivery prior to the hearing.

(D) The hearing on the application for a Regular Injunctive Order may be held, at the discretion of the arbitrator or the Director, by telephone or in person in a city designated by the Director of Arbitration.

(E) The arbitrator shall endeavor to grant or deny the application within one business day after the hearing and record are closed.

(F) If the application is granted, the arbitrator shall determine the duration of the Regular Injunctive Order. Unless the parties agree otherwise, however, a Regular Injunctive Order shall expire no later than a decision on the merits of the entire controversy by an arbitration panel appointed under this Code.

**(e) Challenges to Arbitrators**

There shall be unlimited challenges for cause to the single arbitrator appointed to hear the application for injunctive relief, but there shall be no peremptory challenges. Parties wishing to object to the arbitrator shall do so by telephone to the Director, and shall confirm such objection immediately in writing or by facsimile transmission, with a copy to all parties. A peremptory challenge may not be made to an arbitrator who heard an application for an injunctive order and who subsequently participates or is to participate on the arbitration panel hearing the same arbitration case on the merits.

**(f) Hearing on the Merits**

Immediately following the issuance of an Immediate or Regular Injunctive Order, the Director shall appoint arbitrators according to the procedures specified in the Code to hear the matter on the merits. The arbitration shall proceed in an expedited manner pursuant to a schedule and procedures specified by the arbitrators. The arbitrators may specify procedures and time limitations for actions by the parties different from those specified in the Code.

**(g) Effect of Court Injunction**

If a court has issued an injunction against one of the parties to an arbitration agreement, unless otherwise specified by the court, any requested arbitration concerning the matter of the injunction shall proceed in an expedited manner according to a time schedule and procedures specified by the arbitration panel appointed under this Code.

**(h) Security**

The arbitrator issuing the Immediate or Regular Injunctive Order may require the applicant, as a condition to effectiveness of the order, to deposit security in an amount that the arbitrator deems proper, in a separate bank trust or escrow account for the benefit of the party against whom

injunctive relief is sought, for the payment of any costs and damages that may be incurred or suffered by the party against whom injunctive relief is sought if it is found to have been wrongfully enjoined.

**(l) Effective Date**

This Rule shall apply to arbitration claims filed on or after January 3, 1996. Except as otherwise provided in this Rule, the remaining provisions of the Code shall apply to proceedings instituted under this Rule. This Rule shall expire on July 3, 1999, unless extended by the Association's Board of Governors.

*[Adopted by SR-NASD-93-38 eff. Jan. 3, 1996; amended by SR-NASD-96-44 eff. Dec. 20, 1996; amended by SR-NASD-97-87 eff. Jan. 3, 1998; amended by SR-NASD-98-42 eff. June 24, 1998; amended by SR-NASD-98-97 eff. Dec. 28, 1998.]*





RECYCLED PAPER

1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
2                            EASTERN DIVISION

3
   MERRILL LYNCH, PIERCE, FENNER        )     No. 00 C 7774
4  & SMITH, INC.,                       )
                                        )
5                    Plaintiff,         )
                                        )
6            vs.                        )     Chicago, Illinois
                                        )     December 14, 2000
7  JAMES A. BAXTER,                     )     10:00 o'clock a.m.
                                        )
8                    Defendant.         )

9
         TRANSCRIPT OF PROCEEDINGS - TEMPORARY RESTRAINING ORDER
10                   BEFORE THE HON. MARVIN E. ASPEN

11
   APPEARANCES:
12
   For the Plaintiff:            SEIDLER & MC ERLEAN
13                               BY:  MR. PETER G. HALLAM
                                 161 North Clark Street
14                               Suite 2650
                                 Chicago, Illinois 60601
15

16  For the Defendant:           NEAL GERBER & EISENBERG
                                 BY:  MR. JERRY SANTANGELO
17                               Two North LaSalle Street
                                 23rd Floor
18                               Chicago, Illinois 60602

19

20

21

22                       MARY M. HACKER
                      Official Court Reporter
23            219 South Dearborn Street Room No. 2528A
                     Chicago, Illinois 60604
24                       (312) 663-0049

25

1           THE CLERK:  OO C 7774, Merrill Lynch Pierce versus

2     James Baxter.

3           THE COURT:  Good morning.

4           MR. HALLAM:  Good morning, your Honor.  Peter Hallam,

5     H-a-l-l-a-m, for the plaintiff.

6           MR. SANTANGELO:  Good morning, your Honor.  Jerry

7     Santangelo of Neal, Gerber & Eisenberg on behalf of Mr. Baxter.

8           MR. HALLAM:  Thank you, your Honor, for giving us this

9     time this morning.  We appreciate it on short notice.

10          THE COURT:  Sure.

11          MR. HALLAM:  And especially given the weather.

12          We are here seeking to enforce the post termination

13    restrictive covenant contained in a series of employment

14    agreements that the defendant freely entered into with Merrill

15    Lynch as a condition of his employment there.

16          We are seeking to have the TRO in place until the

17    parties can proceed with an NASD arbitration and --

18          THE COURT:  Have you started that proceeding?

19          MR. HALLAM:  We have filed the initial paper that you

20    do to start the process.  We are required under those rules to

21    do it simultaneously.

22          THE COURT:  Have you attempted to expedite it?

23          MR. HALLAM:  We have filed it as a 10335 -- I'm going

24    to say a G -- whichever the one for expedited is, yes, we have

25    done that.  And we are seeking then this interim relief until

3

1    that panel can be impaneled and the decision rendered, which

2    will certainly --

3            THE COURT:  What has Mr. Baxter done other than

4    sending out an announcement of his new affiliation?

5            MR. HALLAM:  Well, we believe that, A, an announcement

6    is a solicitation; and in terms of sending out an announcement,

7    we do not know specifically what he has done in his

8    conversations with anyone who has followed up with that.

9            We do know that he has sent out some account transfer

10   forms, according to the affidavit that we have submitted.

11           And indeed, Judge, sending out an announcement is not

12   like sending out a general announcement to the general public;

13   it's sort of -- I like to think of it in terms of like a

14   haystack, and the whole haystack is the entire public.  But of

15   that haystack, only a certain amount uses a full-service

16   brokerage firm; and of that, only so much have the capability

17   of using one like a Merrill Lynch or a Smith-Barney.  So he's

18   not --

19           THE COURT:  Should there be any differentiation in

20   treating him in regard to the clients that he brought into

21   Merrill Lynch as opposed to these that he developed after he

22   joined Merrill Lynch?

23           MR. HALLAM:  Well, I -- certainly we agree that family

24   relationships and those relationships -- we have not asked for

25   that.

4

1          But as to the other relationships --

2          THE COURT:  That's not my question.

3          MR. HALLAM:  I understand what you're asking.

4          Whatever relationships he had with those people, he

5     had when he was working as some sort of insurance broker.

6          We then set him up and gave him the training and gave

7     him the name, the staff, the money, the everything.  So, yes,

8     we do believe because -- while he may have known those people,

9     he did not know them as a securities broker.  And from our

10    perspective in that, he was trading on our good will, our name,

11    our money, our staff, in terms of developing those

12    relationships.

13         And as the Court in the Cuna Mutual Life case and in

14    the Lawrence and Allen case, both of those said what the

15    employee fails to recognize is that while he was developing

16    those relationships, he was an agent of the employer and owed

17    the highest fiduciary duty to the employer on that basis.

18         THE COURT:  Okay.

19         MR. HALLAM:  We also believe that, therefore, we have

20    shown a near permanent relationship here with our customers;

21    that is supported by the Salvano case in the Seventh Circuit as

22    well as, again, the Lawrence and Alan case and the Cuna Mutual

23    Life case.  And we simply want to prevent him from soliciting

24    our customers.

25         We believe the solicitation includes sending out

```
 1    announcement forms, because it's a fine line between sending
 2    out the announcement forms and then slipping in the account
 3    transfer forms.  And it's only for the period of time until the
 4    arbitration can proceed and the panel of arbitrators concludes.
 5              Moreover --
 6              THE COURT:  Tell me about the irreparable harm.
 7              MR. HALLAM:  I'm sorry?
 8              THE COURT:  Tell me about the irreparable harm.
 9              MR. HALLAM:  Well, the irreparable harm is in two
10    different ways.  One, from the perspective of office stability,
11    from the relationship that Merrill Lynch has with its brokers
12    and with the public, so that they understand that this isn't
13    some revolving door.
14              And, moreover, we don't know -- it's unlike what the
15    defendant says, that you can track this with some sort of
16    precision.  You can only track what sort of precision actually
17    goes over.  You don't know necessarily what additional amounts
18    these people do, what other relationships they may have with
19    other people or with the public, whether they invest more or
20    less, whether they have uncles, grand inheritances, and it's
21    much more difficult.
22              It does not -- simple money damages does not
23    necessarily -- is not necessarily the test.  The test is
24    whether the injunctive relief, whether the -- or, I'm sorry,
25    whether the remedy at law is as clear, complete and practical
```

1    in the circumstances as the equitable relief would be.

2            THE COURT:  And you want your TRO until the

3    arbitration proceeding begins, is that it?

4            MR. HALLAM:  Until the arbitration panel rules.

5            THE COURT:  When would that be?

6            MR. HALLAM:  Well, in general, that process takes in

7    the range of four to six weeks to go through, once you impanel

8    the arbitrators.

9            The most recent one we had, we had a little difficulty

10   with -- because of the holidays, in terms of the getting the

11   panel impaneled.  And so that's the only -- I will throw that

12   out as a caveat for this.

13           In terms of the timing -- but it's beyond our control.

14   It's a question of everybody's times, and including counsel on

15   our side, their side and for the NASD.  But we certainly will

16   proceed as expeditiously as we can, and it will not be because

17   of any delay on our part.

18           If there is some delay that incurs, it's just the --

19           THE COURT:  Have you ever had this experience before,

20   where somebody left your agency, joined another agency and sent

21   out announcements?

22           MR. HALLAM:  Oh, yes.

23           THE COURT:  And do you seek this type of action every

24   time that's done?

25           MR. HALLAM:  Every time, Judge?  I couldn't say every

```
 1    time.
 2              In my experiences here in the Chicago area ----
 3              THE COURT:  In the Chicago area.
 4              MR. HALLAM:  In the Chicago area we generally seek
 5    this kind of relief.
 6              THE COURT:  You go into federal court every time one
 7    of your agents switches to a different brokerage firm?
 8              MR. HALLAM:  I can speak only since April.  And since
 9    April, each time someone's has left -- we don't necessarily go
10    into federal court.  One time we actually went into state court
11    in DuPage County, and that was a question of diversity.  But,
12    yes, we go in to seek injunctive relief to prevent them from
13    soliciting our customers.
14              Now, if they are not going out and soliciting, then
15    there is no harm to -- you know, we're not going to run in
16    every time somebody leaves.  It's if they leave and go to
17    another house and start soliciting our customers, then, yes, we
18    do, Judge.
19              THE COURT:  And you say that sending out announcements
20    is tantamount to solicitation of --
21              MR. HALLAM:  We believe that -- you know, it's a
22    slippery slope, that you can't stop it just at the
23    announcements.  And --
24              THE COURT:  Does the law support that?
25              MR. HALLAM:  I believe it does.  Again, I can site to
```

8

1    you --

2              THE COURT:  No.  We'll take a look at it.  Obviously I

3    didn't receive the defendant's pleadings until just a few

4    minutes ago and I haven't read them.

5              MR. HALLAM:  Right.

6              MR. SANTANGELO:  Thank you, your Honor.

7              First, on the arbitration issue, Merrill Lynch hasn't

8    sought the most expeditious arbitration relief.  They could

9    have had a single arbitrator hear this thing within one to

10   three business days, as mandated by the code.

11             They opted, as you indicated, to come in to federal

12   court, use their litigation machine against these individuals

13   that leave, and they do this routinely.  And the federal courts

14   here in the Northern District have gotten -- I believe have

15   been uniform in saying, Merrill Lynch, you can't do this.

16   Merrill Lynch, sending out an announcement is not a

17   solicitation as you define it in your contract, because that's

18   the only basis they can come in here and say you can't solicit.

19   And you look at their contract, and their contract is very

20   clear.  It does not prohibit these kind of announcements.

21             THE COURT:  That's the only thing your client has

22   done?

23             MR. SANTANGELO:  That's the only thing.  He has been

24   very circumspect, your Honor.  He has been guided by the

25   decisions of Judge Holderman, Judge Gettleman, Judge Bucklo,

1   who recently sanctioned -- approved a sanction against Merrill

2   Lynch for the same kind of harrassing litigation tactics.

3          And in that case -- it's the O'Conner case that we

4   site to the Court and it's in the appendix.  In that case, your

5   Honor, it was very similar in the sense that he had a

6   pre-existing business relationship with people that he brought

7   to Merrill Lynch.

8          So in that case -- they don't even have a protectable

9   interest in enforsing a non-solicitation agreement, to begin

10  with, because they have to have a legitimate business interest.

11  They don't have that legitimate business interest when it's the

12  broker himself or herself who brings pre-existing clients, like

13  Mr. Baxter did, to the firm.

14         Mr. Baxter has sent about 60 announcements.  They say

15  he has hundreds of accounts.  He sent about 60 of these

16  announcements, and I have a copy of it.  I apologise.  I

17  noticed that it wasn't attached.  If I may, I would like to

18  tender it to the Court now.

19         THE COURT:  Okay.

20     (Document tendered.)

21         MR. SANTANGELO:  It is the same type of announcement

22  that was approved by all of the other federal district courts

23  in this district; and that Judge Holderman even went so far,

24  your Honor, to say that this is the most ethical, legal way he

25  has ever seen a departure in a financial services business.

1           Because what is the alternative?  What is a broker

2    supposed to do?  They are professionals, like lawyers and

3    doctors; they have personal responsibility under the securities

4    laws, under state laws.  They are regulated -- it's a highly

5    regulated industry and they have these relationships with

6    customers.  Are they supposed to simply just disappear, walk

7    away?

8           Now, Merrill will say, on the other hand, no, we will

9    advise the client.  They will come back and say that.  If they

10   are going to advise the client, then what is the problem?  They

11   are saying that this information is warranted and should be

12   given to clients.

13          So again, your Honor, he had sound reasons for

14   leaving, as we indicated in his affidavit, and the Court, I

15   gather, has read that.

16          We are not playing for the sympathy, but this is --

17   you know, what they say now is -- I heard their response on

18   irreparable harm, your Honor, office stability.  What they want

19   to do is, they want to be vindictive.  They want -- and here's

20   a man who has a legitimate reason, has told them

21   they can't accommodate his unique family situation.  He now

22   exercises his right as an at-will employee.  He does the right

23   thing, guided by the precedents of this district, and they come

24   in here and seek this thing.

25          THE COURT:  Okay.

1          Mr. Hallam, I am going to ask you another question, if
2     I may.

3          MR. HALLAM:  Yes.

4          THE COURT:  If you left your law firm and you joined
5     another firm, do you think you would be precluded from sending
6     a plain announcement out to the --

7          MR. HALLAM:  Excuse me, your Honor.  I think there are
8     two fundamental differences between that.  One is, that I don't
9     have an employment agreement with my current employer that
10    prevents me from doing that.  Secondly, I have a different
11    fiduciary relationship with my customers than he has with his
12    clients.  They are hired, he agrees.  Everyone knows when they
13    go in.  He is becoming -- those customers are becoming clients
14    not of James Baxter, --

15         THE COURT:  No, I agree with you.

16         MR. SHEPARD:  -- of Merrill Lynch.

17         When I bring in a client, they are becoming a client
18    of Peter Hallam, who just so happens to be associated with the
19    firm of Seidler & McErlean.  So I think there is a fundamental
20    difference.

21         THE COURT:  Let's talk about -- you joined Seidler --

22         MR. HALLAM:  -- & McErlean.

23         THE COURT:  -- & McErlean.

24         MR. HALLAM:  Yes.

25         THE COURT:  And they have an institutional client,

12

1  Merrill Lynch, and you do Merrill Lynch's work and you do a
2  real bang-up job, and then you decide to join Jenner & Block
3  and you send out announcements to everybody that you're now at
4  Jenner & Block.  Would that be okay, do you think?
5          MR. HALLAM:  I believe that after -- well, again, I
6  don't have -- was the presumption that I had an employment
7  agreement?
8          THE COURT:  I know it's not your situation.
9          MR. HALLAM:  Right.
10         THE COURT:  Take my hypothetical.
11         MR. HALLAM:  I'm sorry.  In the first step in the
12 hypothetical, did I have an employment agreement with my
13 current employer that required me not to solicit?
14         THE COURT:  No.  You're just a partner --
15         MR. HALLAM:  If I do not have that kind of employment
16 relationship, employment agreement that has -- that I freely
17 entered into, then, yes, I can.
18         THE COURT:  You can do that?
19         MR. HALLAM:  I could contact them, I could announce to
20 them I have gone from here to here.  But I don't have that kind
21 of relationship; I don't have that kind of restriction on me.
22         And that's -- and, you know, if I were going to
23 Seidler & McErlean and they asked me to sign that kind of
24 agreement, I would have to weigh that against the amount of
25 money that I'm getting, the opportunities I'm getting, what

13

1    they are going to provide to me to help me in my professional

2    life.

3            And it's not as if the announcement that Mr. Baxter is

4    sending is some sort of a general announcement that goes out to

5    anybody and everybody in the world.  It is a very specific

6    announcement that's targeted, just like in the Tomei case,

7    where, you know, an Illinois Appellate Court said that is the

8    kind of situation where they are targeting it.

9            THE COURT:  Okay.  Let me --

10           MR. HALLAM:  And -- I'm sorry.

11           THE COURT:  Let me look at those cases.  I haven't,

12   okay?

13           MR. HALLAM:  Okay.

14           THE COURT:  And you will hear from me sometime today.

15           MR. HALLAM:  Okay, Judge.  Thank you.

16           MR. SANTANGELO:  Thank you, your Honor.

17       (Which were all the proceedings had at the hearing of

18       the within cause on the day and date hereof.)

19

20

21

22

23

24

25

14

1                              CERTIFICATE

2                I HEREBY CERTIFY that the foregoing is a true,

3    correct and complete transcript of the proceedings had at the

4    hearing of the aforementioned cause on the day and date hereof.

5

6

7    _____          12-15-00
     Official Court Reporter                    Date
8    U.S. District Court
     Northern District of Illinois
9    Eastern Division

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



RECYCLED PAPER



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| MERRILL LYNCH PIERCE FENNER & SMITH, INC., | : | Case No. 1:01cv0092 |
| | : | |
| Plaintiff, | : | **JUDGE MATIA** |
| | : | **(JUDGE O'MALLEY)** |
| v. | : | |
| | : | <u>**MEMORANDUM & ORDER**</u> |
| KENT D. HAGEMAN, | : | |
| | : | |
| Defendant. | : | |

Plaintiff, Merrill Lynch Pierce Fenner & Smith, Inc. ["Merrill Lynch"], brings this action against its former employee, Kent D. Hageman for (1) breach of contract, (2) conversion of Merrill Lynch's proprietary information and trade secrets, (3) breach of fiduciary duty, and (4) unfair competition. Merrill Lynch also seeks a temporary restraining order against Hageman. Hageman left his employment as a broker at Merrill Lynch on Friday, January 5, 2001, and allegedly began working at Morgan Stanley Dean Witter ["Dean Witter"] the very same day. Merrill Lynch asserts that Hageman has been soliciting his former clients at Merrill Lynch through the mail and in person to transfer their accounts to Dean Witter, in direct violation of an employment contract Hageman signed when he began working for Merrill Lynch as a broker, and also in violation of Ohio Trade Secret law.

The Court, per Judge Kathleen M. O'Malley for Judge Paul R. Matia, held a hearing on Merrill Lynch's motion for a temporary restraining order on January 10, 2001. During that

hearing, the Court explained on the record that (1) a substantial likelihood exists that Merrill Lynch will prevail on the merits of this case, (2) Merrill Lynch has no adequate remedy at law, and will suffer irreparable harm if Hageman is permitted to continue to solicit customers, and accept account transfers from customers he has previously solicited, (3) greater injury will be inflicted upon Merrill Lynch by the denial of temporary injunctive relief then would be inflicted upon Hageman or third parties by the granting of such relief, and (4) the public interest will be served by such relief.  The Court, thus, granted Merrill Lynch's Motion for a Temporary Restraining Order, but provided that it would issue an Order detailing the terms of the restraining order the following day.

The Court, therefore, issues a Temporary Restraining Order as follows.

(1)   Defendants shall post security in the amount of $100,000 no later than 5:00 p.m. on Friday, January 12, 2001.

(2)   Defendant, Kent D. Hageman, is enjoined and restrained, directly or indirectly, and whether alone or in concert with others, including any officer, agent, representative, or employee of defendant's current employer, Dean Witter Reynolds, Inc., from:

2

(A) soliciting[1] any business from any client of Merrill Lynch whom Hageman served or whose name became known to Hageman while in the employ of Merrill Lynch;

(B) accepting business or account transfers from any of said customers whom Hageman has solicited in the past for the purpose of doing business with Hageman's present employer Dean Witter (excluding members of Hageman's immediate family and those customers that reside more than one hundred (100) miles from Merrill Lynch's North Olmsted office); and

(C) using, disclosing or transmitting for any purpose, including solicitation of said clients, the information contained in the records of Merrill Lynch, including, without limitation, the names, addresses, and confidential financial information of those clients.

(3)   Kent D. Hageman, and anyone acting in concert or participation with Hageman, including any agent, employee, officer, or representative of Hageman's current employer, Dean Witter, shall return all information pertaining to Merrill Lynch

---

[1] The Court finds that a mere "information contact" between Hageman and any former client will not constitute a "solicitation." See Wells v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 919 F.Supp. 1047, 1053 (E.D. Ky 1994). An "information contact" consists only of "any written or oral contact that provides information about the Plaintiff's whereabouts and how they may be contacted." Id. To the extent that any contact includes information such as: stating Dean Witter will provide Hageman or his former clients better service, explaining Hageman's reasons for leaving Merrill Lynch, instructing clients how to transfer their accounts, enclosing account transfer forms, or providing anything beyond an "information contact" as defined here designed to persuade a client to follow Hageman to Dean Witter or to ease a transfer, the Court will construe such contact as a solicitation in violation of this Court's Order.

3

customers, clients, or accounts, whether in original, copied, computerized, handwritten, or any other form, to plaintiff immediately.

(4)     Nothing in this Order prevents Hageman or Dean Witter from servicing clients whose accounts were fully transferred from Merrill Lynch to Dean Witter prior to 5:00 p.m. on January 10, 2001, though such service may, if appropriate, give rise to a claim for damages before the NASD.

(5)     Pursuant to Fed. R. Civ. P. 65(b), this Order shall remain in full force and effect for ten non-holiday business days, or through January 25, 2001, unless replaced by an order of an appropriate panel of the NASD arbitrators or extended by Order of this Court. The parties shall return for a hearing before Chief Judge Paul R. Matia on Wednesday, January 24, 2001 at 2:00 p.m.

(6)     Merrill Lynch shall commence discovery immediately to the extent that such discovery is consistent with the NASD code, or as directed by the NASD arbitrator(s).

(7)     The parties are directed to commence and proceed with arbitration pursuant to the NASD code as expeditiously as possible, and the Court further requests that the NASD make every effort to conclude its arbitration on or before January 25, 2001, or as soon thereafter as is reasonably possible.

(8)     The parties shall file with the Court weekly reports beginning Wednesday, January 17, 2001, updating the Court on the status of any NASD arbitration proceedings.

IT IS SO ORDERED.

_Kathleen M. O'Malley_

**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**



RECYCLED PAPER

### BEFORE NASD DISPUTE RESOLUTION, INC.

| | |
|---|---|
| H & R BLOCK FINANCIAL ADVISORS, INCORPORATED, | ) NASD-DR<br>) Case No. 01-01893<br>) |
| Claimant, | )<br>)<br>) |
| vs. | )<br>) **ORDER** |
| ANDREW SCOTT MOORE, | )<br>) |
| and | )<br>) |
| SALOMON SMITH BARNEY, INC., | )<br>) |
| Respondents. | ) |

On April 20, 2001, pursuant to Rule 10335(d)(2) of the NASD Code of Arbitration Procedure, a telephonic hearing was held for the purpose of ruling upon the application of H & R Block Financial Advisors, Inc. (hereinafter "HRBFA") for an immediate injunctive order. The hearing was conducted by James P. Kneller, and was attended by attorney Kevin Shea on behalf of the Claimant, and attorney Jerry Santangelo on behalf of Respondent Moore. After considering the pleadings and exhibits submitted by the parties, as well as the arguments of counsel for Claimant and Respondents, the parties having been given full opportunity to brief and argue their positions, as Arbitrator for this case, I find as follows:

I.   **Findings of Fact**

1.   On or about August 31, 1994 Respondent Moore became employed by Olde Discount Corporation (hereinafter "Olde Discount"), at which time he signed a "Stock Broker Employment Agreement". That Employment Agreement contained a number of restrictive provisions including confidentiality provisions and a covenant not to serve the company's customers after termination.

- 1

2.      Subsequent to the execution of the above-referenced Employment Agreement, Olde Discount was purchased by HRBFA which in turn became the successor party in interest with respect to the Employment Agreement.

3.      On or about March 23, 2001, Moore resigned from HRBFA and immediately began working for Respondent Salomon Smith Barney, a direct competitor of HRBFA. Following Respondent Moore's departure from HRBFA, he delivered to various customers whose accounts had been serviced by him during his employment with Claimant, an announcement confirming that he was no longer affiliated with HRBFA, and that he joined Salomon Smith Barney.  No compelling evidence was offered, however, establishing any solicitation by either of the Respondents to induce the customers of HRBFA to transfer their accounts to Respondent Salomon Smith Barney. There was evidence presented suggesting that in at least once instance, transfer documents were sent to a customer of HRBFA which were not requested by that customer; however, other evidence was presented which, if true, would explain the instance.

4.      Of the over 900 customers Respondent Moore serviced on behalf of Claimant, approximately 36 of them have transferred their accounts to Salomon Smith Barney since March 21, 2001.

5.      Claimant submitted evidence, not disputed by the Respondents, that Respondent Moore currently has in his possession a Practice Management Report that is clearly property of HRBFA.  Furthermore, it is undisputed that Respondent Moore has in his possession, stored in his personal computer, various notes he kept while employed by HRBFA relating to HRBFA's customers.

II.    **CONCLUSIONS OF LAW**

6.      When requesting an injunction, it is the burden upon Claimant to show that it would likely succeed on the merits of its claims at an evidentiary hearing, that it would suffer

- 2 -

irreparable injury if the injunction is not granted, and that the balance of the equities are in its favor. Claimant has not met this burden.

7.     Mere notification by way of an announcement sent to past customers advising them of an employee's change of employment and providing those customers with the employee's new address does not violate any contractual restrictive employment agreement, nor does such action breach any fiduciary duty. This conclusion is based upon the law of the State of Arizona and upon the finding that there was no evidence of solicitation by Respondents.

8.     It is the Claimant's burden when requesting an injunctive order to establish that an award of monetary damages is insufficient to remedy the alleged wrong. In the present case, any such wrongdoing alleged to have been perpetrated by Respondents can be remedied by a monetary award, if, after a full hearing, the evidence warrants the same. Consequently, in the present case, the injunctive relief requested is unwarranted.

9.     Any and all documentation, including notes and other information, however stored, created or otherwise assembled by Respondent Moore while in the employment of Claimant, if done in furtherance of his duties of Claimant's employee, remains the property of Claimant after the termination of the employer/employee relationship.

**IT IS ORDERED,** based upon the foregoing, that Claimant's Application for Immediate Injunctive Order be, and hereby is, denied.

**IT IS FURTHER ORDERED,** that Respondent Moore shall immediately return to Claimant all information concerning Claimant's customers, including the Practice Management Report and any information stored in Respondent Moore's personal computer(s), and shall thereafter, if requested by Claimant, deliver to Claimant an Affidavit that all such information, including all copies of the same, has been returned.

1    **IT IS FURTHER ORDERED** that this matter shall proceed to an evidentiary hearing

2    before a full Arbitration panel at a date and time to be scheduled by the Office of the NASD

3    Dispute Resolution.

4    DATED this 20th day of April, 2001.

5

6

7

8    _____Original signed and mailed__
     James P. Kneller, Arbitrator

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



RECYCLED PAPER

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TEXAS
TYLER DIVISION



MERRILL LYNCH, PIERCE,      §
FENNER, SMITH, INC.,         §
                             §
        Plaintiff,           §
                             §
V.                           §      No. 6:01-cv-75
                             §
CRAIG DICKERSON,             §
                             §
        Defendant,           §

## ORDER DENYING DEFENDANT'S MOTION FOR A TEMPORARY RESTRAINING ORDER

Now before the Court is Plaintiff's Emergency Motion for a Temporary Restraining Order and Preliminary Injunction pursuant to Federal Rule of Civil Procedure 65. Based upon the parties' filings, the arguments made at the February 21, 2001 hearing, and the applicable law, the Court rules as follows.

**I.    BACKGROUND**

In 1989, Craig Dickerson began working for Merrill Lynch as a stockbroker. At that time, he signed an employment agreement with Merrill Lynch which stated that he would 1) not remove customer records from Merrill Lynch after termination of his employment; and 2) would not solicit any of the clients of Merrill Lynch for a period of one year after his date of termination or decision to leave the company.

On February 16, 2001, Mr. Dickerson quit his job at Merrill Lynch and moved to Paine Webber. Immediately thereafter, Mr. Dickerson began to contact the clients he serviced at Merrill Lynch. Mr. Dickerson informed his clients that he had changed brokerage firms and would like for them to transfer their investment business to Paine Webber if they so desired.

On February 20, 2001, Merrill Lynch filed this case asserting that Mr. Dickerson's use of the customer lists and solicitation of Merrill Lynch customers violated his employment agreement. Merrill Lynch brought causes of action for breach of contract, conversion and misappropriation of trade secrets, breach of duty of loyalty and fiduciary duty, and unfair competition. Merrill Lynch also sought injunctive relief by filing an Emergency Motion for a Temporary Restraining Order. The motion is now properly before the Court.

## II.   TEMPORARY RESTRAINING ORDER STANDARD

In order for the Court to grant this Temporary Restraining Order ("TRO"), the Plaintiff must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of immediate and irreparable harm, for which it has no adequate remedy at law; (3) greater injury will result from denial of the temporary restraining order than from its being granted; and (iv) that the temporary restraining order will not disserve the public interest. *See Mississippi Power & Light Co. v. United States*

2

*Gas Pipeline*, 760 F.2d 618, 621 (5th Cir. 1985).

## III.   ANALYSIS

In 1999, in a case styled *Merrill Lynch v. Hanson and Strnadel*, No. 6:99-cv-157, this Court faced the same type of issue that is currently in dispute. In that case, the Court issued a temporary restraining order. However, the Court's 1999 Order specifically recognized that the NASD arbitration procedure provides Plaintiffs such as Merrill Lynch with a speedy mechanism for pursuing injunctive relief. Building upon this observation and the arguments of both parties, the Court finds that the Plaintiff has failed to demonstrate irreparable harm, or, that greater injury will result from the denial of the TRO in this particular case. In addition, the Court finds that the public interest is best served by denying the TRO.

## A.   Irreparable Harm

The NASD Code of Arbitration Procedure specifically allows parties to obtain immediate injunctive relief in arbitration. Under Section 10335, any party to an arbitrable dispute has the right to obtain a hearing before an NASD arbitrator within 1-3 days of filing with the NASD. The Defendant has already initiated an arbitration proceeding at the NASD and sought injunctive relief.

The critical issue in this motion is whether the Plaintiff will suffer irreparable

3

harm[1] by having to seek injunctive relief before an NASD arbitrator rather than before this court? The answer to that question is no for two reasons. First, NASD arbitrators have a greater understanding of the merits of these types of disputes than most federal judges, and are thus better equipped to determine whether injunctive relief is appropriate. *See Merrill Lynch v. Maniscalco*, No. 98 C 8185 (N.D. Ill. Dec. 22, 1998) (J. Manning) (noting that it is appropriate to defer to the NASD arbitrator, the one who has special expertise in the industry). Second, the NASD mechanism allows for an expedited hearing on the issue of injunctive relief. It is presumed that if the Court denies this motion, a NASD arbitrator will rule on the injunctive relief issue within a very short period of time. In sum, Merrill Lynch will not be harmed by having to wait a few more days to determine whether it is entitled to some sort of injunctive relief. *See Merrill Lynch v. Bush*, No. 99-1010 (C.D. Ill. Jan. 13, 1999) (J. Mihm) (holding that the fact that Plaintiff can seek injunctive relief from the NASD indicates that Plaintiff will not be irreparably harmed if the injunction is not issued).

---

[1] The Court recognizes that the "irreparable harm" prong is distinct from the "greater injury" prong. However, the Court will not independently address the "greater injury" prong because the reasons which support the Court's decision with respect to the "irreparable harm" prong apply with equal weight to the "greater injury" prong.

4

**B.     Balancing of the Equities/Public Interest**

Federal courts have traditionally weighed the equities in determining whether injunctive relief is appropriate. For a variety of reasons, the Court finds that the equities and the public interest favor a denial of the Motion for a Temporary Restraining Order. First, the Court takes judicial notice of the fact that it is standard practice in this industry for companies such as Paine Webber and Merrill Lynch to lure brokers from competing firms in order to "steal" away the competitor's clients. In fact, Plaintiff's counsel admitted that Merrill Lynch is involved in a "significant minority of cases" where it has hired rival brokers to attract the rival brokerage firm's clients. In those situations, Merrill Lynch argues with a straight face that these non-solicitation/covenant not to compete clauses are unenforceable, and that courts should not grant injunctive relief. Whether Merrill Lynch's behavior is viewed from the standpoint of the unclean hands doctrine or judicial estoppel, it is apparent that this conduct, while understandable, is difficult to reconcile with the request for extraordinary relief that is the hallmark of a TRO. In sum, the Court will not allow Merrill Lynch to have its cake and eat it, too.

Second, the public is best served by the efficient administration of justice. I this case, the procedure set forth by the NASD contemplates that appropriately trained NASD arbitrators will be making fact-specific decisions concerning the

5

propriety of granting injunctions as well as the ultimate ruling on the merits of the case. Since this procedure has been carefully constructed, it makes more sense for the parties to utilize the NASD resources, rather than the resources of the federal courts.

Finally, based upon the arguments of both parties during oral argument, the Court finds that the decision to file for injunctive relief in federal court instead of with the NASD has nothing to do with the ability of the NASD arbitrators to make fair and just decisions. It is the Court's belief that the use of the federal courts in these types of cases is merely a procedural maneuver to increase a plaintiff's settlement leverage. The Court finds that the public interest is best served by encouraging parties to seek immediate injunctive relief through the NASD arbitration process rather than through the federal. The Court's order attempts to aid in this goal.

## IV.   CONCLUSION

The Court, having considered Plaintiff's request for a temporary restraining order and other injunctive relief, finds that Plaintiff's request for a temporary restraining order should be DENIED. It is therefore ORDERED that Plaintiff's request for a temporary restraining order is in all things DENIED.

It is further ORDERED that Plaintiff's request for a temporary injunction shall

6

not be heard by this Court, but instead, this Court defers any and all future rulings in this matter to the arbitrator(s) pursuant to § 10335 of the NASD Code of Arbitration Procedure given the pending arbitration(s) that cover the disputes before this Court.

SIGNED this 22ⁿᵈ Day of February , 2001.

John Hannah, Jr.
United States District Judge

7